RECEIVED
2022 JAN -4 PM 2:20
US COURT OF APPEALS
FEDERAL CIRCUIT

FORM 12. Informal Opening Brief (District Court, Court of International Trade, and Court of Federal Claims)

Form 12 (p. 1)
July 2020

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## INFORMAL BRIEF OF APPELLANT

**Case Number:** 2022-1229

**Short Case Caption:** Golden v. Apple, Inc.

**Name of Appellant:** Larry Golden

**Instructions:** Read the Guide for Unrepresented Parties before completing this form. Answer the questions as best as you can. Attach additional pages as needed to answer the questions. This form and continuation pages may not exceed 30 pages.

Attach a copy of the trial court's opinion, order, and/or judgment. You may also attach other record material as an appendix. Any attached material should be referenced in answer to the below questions. Please redact (erase, cover, or otherwise make unreadable) social security numbers or comparable private personal identifiers that appear in any attachments you submit.

1. Have you ever had another case before this court? ☑ Yes ☐ No
   If yes, state the name and number of each case.

   Larry Golden v. The United States; Case No. 22-1196
   Larry Golden v. Google; Case No. 22-1267

2. Did the trial court incorrectly decide or fail to take into account any facts?
   ☑ Yes ☐ No
   If yes, what facts?

   Fail to take into account the Magistrate's mistake of limiting Plaintiff's complaint to 35 pages, and failure to resubmit the previously rejected 300 page amended complaint (See the attached Appendix-Amended Complaint for Patent Infringement) before dismissing on "not enough factual allegations". See the attached Appendix-Memorandun of Facts

3. Did the trial court apply the wrong law? ☑ Yes ☐ No
   If yes, what law should be applied?

The standard the trial court should have applied before invalidating Plaintiff's claims: Patent Act of 1952, 35 U.S.C. § 282. Section 282 provides that:
"A patent shall be presumed valid. Each claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim. The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity." See the attached Appendix-Memorandun of Facts

4. Did the trial court fail to consider important grounds for relief?
   ☑ Yes ☐ No
   If yes, what grounds?

The trial court fail to consider the fact that Qualcomm is getting paid $12 to $20 per smartphone (CMDC device) as a whole device. Plaintiff receives nothing. Plaintiff holds the patents for 11 inventions that forms the CMDC (smartphone) device. See the attached Appendix-Memorandun of Facts

5. Are there other reasons why the trial court's decision was wrong?
   ☑ Yes ☐ No
   If yes, what reasons?

The trial court dismissed Plaintiff's case because he's an African-American (Black) inventor. See the attached Appendix-Memorandun of Facts

6. What action do you want this court to take in this case?

1- Preliminary injunction for the alledged infringing products of Apple, Samsung, LG, & Qualcomm. Over eight plus years the four defendants has had the opportunity to intervene, appear, submit a noninfringement defense, and a patent invalidity defense.
2- Instruct the trial court order an answer from the defendants.
3- Consider the likelihood that the Plaintiff-Appellant will prevail because he has submitted, on a preponderance of evidence standard, enough factual allegations to not only give the defendants notice, but to prove the defendants has infringed Plaintiff-Appellant's patents. See the attached Appendix-Memorandun of Facts; and, the attached Appendix-Amended Complaint for Patent Infringement.

Date: 12/30/2021

Signature: Larry Golden

Name: Larry Golden

AO 450 (SCD 04/2010) Judgment in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of South Carolina

Larry Golden,
*Plaintiff*
v.
Apple Inc., Samsung Electronics USA, LG Electronics, USA, Inc, Qualcomm Inc, Motorola Solutions Inc, Panasonic Corporation, AT&T Inc, Verizon Corporation Service Group, Sprint Corporation, T-Mobile USA, Inc., Ford Global Technologies LLC, Fairway Ford Lincoln of Greenville, General Motors Company, Kevin Whitaker Chevrolet, FCA US LLC, Big O Dodge Chrysler Jeep Ram,
*Defendant*

Civil Action No. 6:20-cv-04353-JD

## JUDGMENT IN A CIVIL ACTION

The court has ordered that *(check one)*:

■ the Court adopts the Report and Recommendation. Plaintiff's Complaint is dismissed without prejudice and without the issuance of service of process.

This action was *(check one)*:

❒ tried by a jury, the Honorable ______________ presiding, and the jury has rendered a verdict.

❒ tried by the Honorable ____________ presiding, without a jury and the above decision was reached.

■ decided by the Honorable Joseph Dawson, III

Date: December 1, 2021

*ROBIN L. BLUME, CLERK OF COURT*

s/Rob Weber
*Signature of Clerk or Deputy Clerk*

**Official Caption**

**LARRY GOLDEN,**
*Plaintiff-Appellant*

**v.**

**APPLE INC., SAMSUNG ELECTRONICS USA, LG ELECTRONICS USA, INC., QUALCOMM INCORPORATED, MOTOROLA SOLUTIONS, INC., PANASONIC CORPORATION, AT&T INC., VERIZON CORPORATION SERVICE GROUP, SPRINT CORPORATION, T-MOBILE USA, INC., FORD GLOBAL TECHNOLOGIES, LLC, FAIRWAY FORD LINCOLN OF GREENVILLE, GENERAL MOTORS COMPANY, KEVIN WHITAKER CHEVROLET, FCA US LLC, BIG O DODGE CHRYSLER JEEP RAM,**
*Defendants-Appellees*

**Short Caption**

Golden v. Apple Inc.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | |
|---|---|
| Larry Golden,<br><br>Plaintiff,<br><br>vs.<br><br>Apple Inc.; Samsung Electronics USA; LG Electronics USA, Inc.; Qualcomm Inc., Motorola Solutions, Inc.; Panasonic Corporation; AT&T Inc.; Verizon Corporation Service Group; Sprint Corporation; T-Mobile USA, Inc.; Ford Global Technologies, LLC; Fairway Ford Lincoln of Greenville; General Motors Company; Kevin Whitaker Chevrolet; FCA US LLC; Big 'O' Dodge Chrysler Jeep Ram,<br><br>Defendants. | Case No.: 6:20-cv-04353-JD-KFM<br><br>**OPINION & ORDER** |

This matter is before the Court with the Report and Recommendation of United States Magistrate Kevin F. McDonald ("Report and Recommendation" or "Report"), made in accordance with 28 U.S.C. § 636(b) and Local Civil Rule 73.02(B)(2) of the District of South Carolina.[1] Plaintiff Larry Golden ("Golden" or "Plaintiff"), proceeding *pro se*, filed this Complaint alleging patent infringement claims against the captioned Defendants. (DE 10.)

Specifically, Golden asserts that the Defendants have infringed on the following patents: 10,163,287 ('287 patent); 9,589,439 ('439 patent); 9,096,189 ('189 patent); RE43,990 ('990

[1] The recommendation has no presumptive weight, and the responsibility for making a final determination remains with the United States District Court. See Mathews v. Weber, 423 U.S. 261, 270-71 (1976). The Court is charged with making a de novo determination of those portions of the Report and Recommendation to which specific objection is made. The Court may accept, reject, or modify, in whole or in part, the recommendation made by the magistrate judge or recommit the matter with instructions. 28 U.S.C. § 636(b)(1).

patent); RE43,891 ('891 patent); and 7,385,497 ('497 patent) (DE 10; 10-1; 10-2; 10-3; 10-4; 10-5; 10-6.) These patents are entitled "multi sensor detection and lock disabling system" and "multi sensor detection, stall to stop and lock disabling system." (DE 10; 10-1; 10-2; 10-3; 10-4; 10-5; 10-6.) The patents appear to involve technology that can be used to detect explosives/radiation and then disable vehicles or other equipment wherein the explosives/radiation are detected. The Plaintiff's complaint alleges infringement of each patent by each Defendant in formulaic recitations of the elements of patent infringement. (DE 10.) For relief, the Plaintiff seeks a declaratory judgment that the Defendants have infringed on his patents, a permanent injunction enjoining the infringing activity by the Defendants, as well as money damages. (DE 10, pp. 6, 33.)

This Court possesses the inherent authority to review the *pro se* complaint to ensure that subject matter jurisdiction exists and that a case is not frivolous, even if the pleading is not subject to the pre-screening provisions of 28 U.S.C. § 1915. See Mallard v. U.S. Dist. Ct., 490 U.S. 296, 307–08 (1989) ("Section 1915(d) . . . authorizes courts to dismiss a 'frivolous or malicious' action, but there is little doubt they would have power to do so even in the absence of this statutory provision."); Ross v. Baron, 493 F. App'x 405, 406 (4th Cir. 2012) (unpublished) (finding that "frivolous complaints are subject to dismissal pursuant to the inherent authority of the court, even when the filing fee has been paid . . . [and] because a court lacks subject matter jurisdiction over an obviously frivolous complaint, dismissal prior to service of process is permitted." (citations omitted)).

Accordingly, on February 5, 2021, the Magistrate Judge issued the Report given his initial review of the pleadings. The Report recommended summary dismissal of the complaint with prejudice and without issuance of service of process or leave to amend his complaint. The Report further recommended that this Court consider the entry of sanctions in the amount of $400.00

against Golden because he has continued to file frivolous litigation in this Court.[2] (DE 20.) In support of the Magistrate's recommendation, the Report took judicial notice that the instant matter represents Golden's fifth unsuccessful action regarding his patents (and infringing actions). See Golden v. Apple, Inc., et al., C/A No. 6:20-cv-02270-JD (D.S.C.) ("Case Number 4"); Golden v. Apple Inc., et al., C/A No. 6:19-cv-02557-DCC, 2020 WL 415896 (D.S.C. Jan. 27, 2020), aff'd C/A No. 20-1508, --- F. App'x ---, 2020 WL 5240656 (Fed. Cir. Sept. 3, 2020) ("Case Number 3"); Golden v. United States, C/A No. 1:19-cv-00104-EGB (Fed. Cl.), dismissal aff'd 955 F.3d 981 (Fed. Cir. 2020) ("Case Number 2"); Golden v. United States, C/A No 1:13-cv-00307- SGB, stayed pending patent review, at doc. 186 (Fed. Cl.) ("Case Number 1"); and In re Patent Number RE 43,990, https://portal.uspto.gov/pair/PublicPair# (choose patent number, enter RE43990, and then click Image File Wrapper) (last visited September 26, 2021), petition denied June 25, 2020. The instant complaint seeks damages against many of the same defendants as named in Case Number 3 and Case Number 4; however, it appears that this action represents Golden's attempt to re-litigate the claims from Case Number 3 because Case Number 3 was dismissed as frivolous without prejudice.

Accordingly, the Report recommended dismissal of Plaintiff's complaint because *inter alia* Plaintiff's patent infringement claims are premised on unsuccessful patent infringements claims that have been adjudicated, and even if they were valid, his complaint still fails because "the plaintiff has failed to include factual allegations beyond the identities of the defendants, reference to the alleged infringing devices, and the alleged infringed-upon patents." (DE 20, p. 8.)

---

[2] Although this action represents Golden's third frivolous action based upon alleged patent infringement (and fifth case overall) and the Report recommends that this Court sanction Golden $400.00, this Court declines to order sanctions at this time. However, in the event Golden attempts to file another frivolous action in this Court, the Court will consider the imposition of sanctions as warranted.

Golden filed an objection to the Report on February 11, 2021 (DE 23); however, to be actionable, objections to the Report and Recommendation must be specific. Failure to file specific objections constitutes a waiver of a party's right to further judicial review, including appellate review, if the recommendation is accepted by the district judge. See United States v. Schronce, 727 F.2d 91, 94 & n.4 (4th Cir. 1984). "The Supreme Court has expressly upheld the validity of such a waiver rule, explaining that 'the filing of objections to a magistrate's report enables the district judge to focus attention on those issues -- factual and legal -- *that are at the heart of the parties' dispute*.'" Diamond v. Colonial Life & Accident Ins. Co., 416 F.3d 310, 315 (2005) (citing Thomas v. Arn, 474 U.S. 140 (1985) (emphasis added)). In the absence of specific objections to the Report and Recommendation of the magistrate judge, this Court is not required to give any explanation for adopting the recommendation. See Camby v. Davis, 718 F.2d 198, 199 (4th Cir. 1983).

Plaintiff makes the following "objections"[3] to the Report, which the Court will discuss *seriatim*. First, Golden objects to the Report's dismissal of the action as frivolous because he contends he is merely refiling a lawsuit with the deficiencies corrected. Upon review, however, Golden has not cured the frivolousness of his allegations. In reviewing a complaint for frivolousness or malice, the Court looks to see whether the Complaint raises an indisputably meritless legal theory or is founded upon clearly baseless factual contentions, such as fantastic or delusional scenarios. See Neitzke v. Williams, 490 U.S. 319 (1989). As noted by this Court previously, the Plaintiff's patent infringement claims in this action are subject to dismissal because the Plaintiff has failed to include factual allegations beyond the identities of the Defendants,

---

[3] Although Golden filed a 35-page Objection, most of the document discusses social editorials and citations to laws that do not focus this Court on the factual and legal issues at the heart of the parties' dispute and are, therefore, overruled.

reference to the alleged infringing devices, and the alleged infringed-upon patents. (DE 10; see also Golden v. Apple, Inc., et al., 819 F. App'x at 931 (affirming in Case Number 3 the dismissal of patent infringement claims because the complaint contained only "vague generalities and block quotes of statutes, cases, and treatises, but nowhere points us to any nonfrivolous allegations of infringement of any claim by any actual product made, used, or sold by any defendant"). For instance, Golden's amended complaint alleges in Count I that

> On information and belief, Apple is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing at least claim 5 of the '287 patent. The alleged infringing products are: iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, iPhone 12 series and Apple Watch series 3, 4, & 5.

(DE 10, ¶ 28.) Golden also attached the '287 Patent to his complaint as an exhibit but offers no additional facts regarding the same. However, simply naming a product and providing a conclusory statement that it infringes a patent is insufficient to meet the "plausibility" standard set forth in Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). Although Golden cites a district court opinion in the Central District of California (albeit not binding precedence) to support his claim that his pleadings are sufficient because he attached his patents just as the plaintiff in that case, his reliance and application of this authority misses the mark. See InCom Corp. v. Walt Disney Co., No. CV15-3011 PSG (MRWx), 2016 U.S. Dist. LEXIS 71319, at *8 (C.D. Cal. Feb. 4, 2016) (where the district court found that plaintiff's amended complaint did more than name a product and baldly conclude that it infringes plaintiff's patent, but that plaintiff attached the patents and described *inter alia* how "its Attendance Tracking System uses RFID technology and ID badges to track human presence in large volumes."). Even applying InCom as purported by Golden, Golden's amended complaint does not (among other things) describe specific systems developed and manufactured by Apple that are like Golden's '287 Patent and how the systems perform the same unique function as Golden's system or assert facts

regarding the availability of his technology prior to his invention.[4] In light of the vague conclusory allegations in the complaint in this action, and Golden's attempt to circumvent the prior dismissals of his patent infringement claims, the instant matter is subject to summary dismissal as frivolous. Although this Court agrees with the Report that Plaintiff's amended complaint should be dismissed because it is frivolous, the Court declines to dismiss the amended complaint with prejudice. Moreover, given the Court's modification of the Report, the Court declines to impose sanctions. Furthermore, the Court finds Golden's remaining objections to be non-specific and/or moot and, therefore, overrules them.

Accordingly, after a thorough review of the Report and Recommendation and the record in this case, the Court adopts the Report and Recommendation as modified and incorporates it herein.

**IT IS, THEREFORE, ORDERED** that Plaintiff's Complaint is dismissed without prejudice and without the issuance of service of process.

---

[4] The Court is mindful of the Magistrate's previous order (DE 1) imposing a thirty-five (35) page limit for Plaintiff's complaint and notifying him that his case is not in proper form for service because *inter alia* Rule 8, Fed. R. Civ. P., requires only that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). Plaintiff previously filed his complaint and exhibits numbering more than 300 pages. While Plaintiff's current complaint totals 34 pages and he has raised an objection to the 35-page limit imposed by the Magistrate, this Court modifies the Magistrate's previous order and the Report and hereby lifts the 35-page limit restriction for an amended complaint.

Although the Court has lifted this restriction, the Court notes that Golden's complaint in Case Number 3 numbered more than 150 pages (not counting exhibits) and his amended complaint numbered more than 250 pages (not counting exhibits) and the matter was still dismissed as frivolous. See Golden, Apple, Inc., et al., C/A No. 6:19-cv-02557-DCC. Likewise, Case Number 4, whose complaint numbers more than 80 pages, has equally been dismissed as frivolous. See Golden v. Apple, Inc., et al., C/A No. 6:20-cv-02270-JD. The lifting of the restriction should not be taken as an *imprimatur* for a successful no page limit complaint. As a reminder, the filing of excessive and unnecessary documents impedes judicial efficiency and the administration of justice. See Spencer v. Hedges, 838 F.2d 1210, 1988 WL 9621, at *1 (4th Cir. 1988) (unpublished table decision) (affirming dismissal of a complaint where a plaintiff failed to provide a short and plain statement of a claim under Rule 8). As Golden has experienced in his previous cases, ". . . length and complexity may doom a complaint by obfuscating the claim's essence." United States v. Lockheed-Martin Corp., 328 F.3d 374, 378 (7th Cir. 2003)

**AND IT IS SO ORDERED.**

Joseph Dawson, III
United States District Judge

Greenville, South Carolina
November 2, 2021

**NOTICE OF RIGHT TO APPEAL**

Plaintiff is hereby notified that he has the right to appeal this order within thirty (30) days from the date hereof, pursuant to Rules 3 and 4 of the Federal Rules of Appellate Procedure.

2:16

No: 2022-1229

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Larry Golden
*Petitioner*

v.

Apple Inc.; Samsung Electronics USA;
LG Electronics USA, Inc.; Qualcomm Inc.;
Motorola Solutions, Inc.; Panasonic Corporation;
AT&T Inc.; Verizon Corporation Service Group;
Sprint Corporation; T-Mobile USA, Inc.;
Ford Global Technologies, LLC;
Fairway Ford Lincoln of Greenville;
General Motors Company; Kevin Whitaker Chevrolet;
FCA US LLC; Big 'O' Dodge Chrysler Jeep Ram,
*Defendant*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF SOUTH CAROLINA—GREENVILLE DIVISION
IN 6:20-cv-04353-JD-KFM
JUDGE JOSEPH DAWSON, III

## PLAINTIFF-APPELLANT'S APPENDIX

LARRY GOLDEN
740 Woodruff Rd., #1102
Greenville, S.C. 29607
(864-288-5605)
Atpg-tech@charter.net

Appearing ProSe

December 30, 2021

# CONTENT PAGE

I. PLAINTIFF-APPELLANT'S MEMORANDUM OF FACTS........................... 1-105

II. AMMENDED COMPLAINT FOR PATENT INFRINGEMENT .................. 106-358

No: 2022-1229

---

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

---

LARRY GOLDEN
*Petitioner*

v.

Apple Inc.; Samsung Electronics USA;
LG Electronics USA, Inc.; Qualcomm Inc.;
Motorola Solutions, Inc.; Panasonic Corporation;
AT&T Inc.; Verizon Corporation Service Group;
Sprint Corporation; T-Mobile USA, Inc.;
Ford Global Technologies, LLC;
Fairway Ford Lincoln of Greenville;
General Motors Company; Kevin Whitaker Chevrolet;
FCA US LLC; Big 'O' Dodge Chrysler Jeep Ram,

*Defendants*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF SOUTH CAROLINA—GREENVILLE DIVISION
IN 6:20-cv-04353-JD-KFM
JUDGE JOSEPH DAWSON, III

---

# PLAINTIFF-APPELLANT'S MEMORANDUM OF FACTS

LARRY GOLDEN
740 Woodruff Rd., #1102
Greenville, S.C. 29607
(864-288-5605)
Atpg-tech@charter.net

Appearing ProSe

December 30, 2021

# CONTENT PAGE

I. STATEMENT OF JURISDICTION ............................................................. 1

II. FACTUAL BACKGROUND ............................................................... 1

III. HISTORY ................................................................................. 2

IV. INVALID REASON FOR "FRIVOLOUS" DISMISSAL ................................... 4

V. THE TRIAL COURT'S LACK OF SOUND DISCRETION ................................. 5

VI. TWELVE (12) INVENTIONS OF PLAINTIFF-APPELLANT WERE IMPROPERLY DISMISSED AS "FRIVOLOUS" ............................................. 7

VII. THE GOVERNMENT'S "DOUBLE STANDARD" FOR AFRICAN-AMERICAN PLEADINGS..................................................... 10

VIII. TRIAL COURT HAS DETERMINED PLAINTIFF-APPELLANT'S TWELVE (12) INVENTIONS ARE "FRIVOLOUS" WITHOUT THE DEFENDANTS' DEFENSE; AND, WITHOUT A JURY ............................ 30

IX. THE S.C. DISTRICT COURT MAGISTRATE JUDGE AND DISTRICT JUDGE *CONTRIDICTS* THE FINDINGS OF THE U.S. COURT OF FEDERAL CLAIMS SENIOR JUDGE ON PLEADINGS' REQUIREMENTS ................................................ 34

X. THE COMMON DENOMINATOR, WHICH CAUSES ALL THE ALLEGED INFRINGING PRODUCTS OF ALL THE DEFENDANTS TO FUNCTION SUBSTANTIALLY THE SAME, IS PLAINTIFF-APPELLANT'S CENTRAL PROCESSING UNITS (CPUs) ................................................ 58

XI. PLAINTIFF-APPELLANT HAS SATISFIED THE OBJECTIONS INTRODUCED BY THE DOJ IN THE RELATED COFC 13-307C CASE OF ALLEGED PATENT INFRINGEMENT UNDER § 271(a) ........................ 76

XII. PLAINTIFF-APPELLANT HAS SATISFIED THE OBJECTIONS INTRODUCED BY THE DOJ IN THE RELATED COFC 13-307C CASE FOR DEFENDANT'S INVALIDITY CONTENTIONS .............................. 87

XIII. AMERICAN BAR ASSOCIATION ........................................................................ 94

XIV. RELIEF .................................................................................................. 105

## STATEMENT OF JURISDICTION

This is an appeal from the Judgement, pursuant to the District Court's Opinion in Case No. 6:20-cv-04353-JD, filed December 1, 2021, granting a recommendation to dismiss the Plaintiff-Appellant's "infringement' claims asserted under 35 U.S.C. § 271(a); and, the District Court's Order in Case No. 6:20-cv-04353-JD, filed December 1, 2021, granting a recommendation to dismiss the Plaintiff-Appellant's "infringement" claims asserted under 35 U.S.C. § 271(a); Judge Dawson III presiding. The U.S. District Court for the District of South Carolina—Greenville Division had jurisdiction pursuant to § 271(a).

The Notice of Appeal was filed December 2, 2021. The U.S. Court of Appeals has jurisdiction under 28 U.S.C. § 1295(a)(1).

## FACTUAL BACKGROUND

The intellectual property subject matter that resulted in the Plaintiff-Appellant's patents asserted under 35 U.S.C. § 271(a), "Government Infringement" are, U.S. Patent No. 7,385,497 ('497 Patent), U.S. Patent No. 8,106,752 ('752 Patent), U.S. Patent No. 9,096,189 ('189 Patent), U.S. Patent No. 9,589,439 ('439 Patent), U.S. Patent No. 10,163,287 ('287 Patent) U.S. Patent No. 10,984,619 ('619 Patent), U.S. Patent No. RE43,891 ('891 Patent), and U.S. Patent No. RE43,990 ('990 Patent)

The above listed patents are lawfully issued, valid, and enforceable U. S. Patents. Plaintiff-Appellant is the sole owner of the entire intellectual property subject matter, right, title, and interest in and to the above listed patents.

## HISTORY

*I don't want the Judges (government) to feel or think they are the heroes for following a four-hundred-year-old tradition of taking ideas (property) from African-American inventors and either using it for themselves, or giving it to whites, or white-owned business. Heroes don't have to lie or re-shape the events that makes them a hero.*

*I don't want the Judges (government) to feel or think they are patriots or that they are loyalist, for paving the way to eliminate a liability that the Government themselves created. A true patriot is one who is willing to put his own life on hold to save the lives of others.*

*I do want the Judges (government) to think about the decisions they have made in this case. Contrary to the Judges opinions and orders, I am the one, for the last nineteen years, who has vigorously supported our country, and the one who owns the intellectual property that better prepares us to defend our country against its enemies.*

*So, tell me, who do you believe to be the hero and true patriot, when the choice is between the Judges (government) who is offering protection for the multi-billion-dollar corporations who has assisted the Government in taking the property of an African-American inventor, or the African-American inventor who has put forth strategies to restore our Nation after the 9/11 attacks, and designed technology to mitigate terrorist attacks and save lives?*

*Written by Larry Golden*

Plaintiff-Appellant spent five years (2002-2007) convincing members of the executive branch of government; members of congress; government agencies; federally funded research facilities; and some private companies, on following Plaintiff-Appellant's strategies outlined in three economic stimulus packages (i.e., SafeRack, ATPG, & V-Tection) if the government is interested in restoring the economy after the 9/11 attacks. The packages outlined how the Government could possibly stimulate and restore the economy following the 9/11 attacks, and provide protection against future terrorist activities.

Plaintiff-Appellant also expressed the need to develop new technology that require assembly ("product grouping") to form a Communicating, Monitoring, Detecting, and Controlling (CMDC) Device (i.e., new and improved cell phone, laptop; smartphone or smartwatch).

| | | |
|---|---|---|
| ***I. "SafeRack" Economic Stimulus / Terrorism Prevention Package*** | | |
| | "SafeRack" Product Grouping Strategies for Stimulating the Economy | |
| | | "SafeRack" Technology Rational—Multi Sensor Detection devices |
| ***II. "ATPG" Economic Stimulus / Terrorism Prevention Package*** | | |
| | "ATPG" Product Grouping Strategies for Stimulating the Economy | |
| | | "ATPG" Technology Rational—CMDC Device (cellphone, smartphone) |
| ***III. "V-Tection" Economic Stimulus / Terrorism Prevention Package*** | | |
| | "V-Tection" Product Grouping Strategies for Stimulating the Economy | |
| | | "V-Tection" Technology Rational—Stall, Stop, Vehicle Slowdown |

## INVALID REASON FOR "FRIVOLOUS" DISMISSAL

> "Golden's amended complaint does not ... assert facts regarding the availability of his technology prior to his invention ... [I]n light of the vague conclusory allegations... the instant matter is subject to summary dismissal as frivolous." S.C. District Court OPINION and ORDER: 6:20-cv-04353-JD Date Filed 11/02/21; Entry Number 26

Plaintiff-Appellant do not understand what the phase means to "assert facts regarding the availability of his technology prior to his invention". In the 2007 case of *Bell Atlantic Corp. v. Twombly*, the U.S. Supreme Court clarified the pleading requirements that Rule 8 imposes on plaintiffs asserting a cause of action must "state a claim for relief that is plausible on its face." And, to do that, the complaint must allege facts that, if true, give rise to a reasonable inference that the plaintiff will prevail on each element of its cause of action.

Plaintiff-Appellant do understand it is the United States Patent and Trademark Office responsibility to "assert facts regarding the availability of his [as a patent applicant] technology prior to his invention" during the patent application prosecution or re-examination of the patent after the patent issues.

Plaintiff-Appellant also understand it is the Defendants' responsibility to "assert facts regarding the availability of his technology prior to his invention", if

and when the Defendants' introduce a defense of non-infringement because they believe the patents are invalid.

For this reason alone, this case should be remanded back to the Trial Court with instructions on how to proceed with the case.

## THE TRIAL COURT'S LACK OF SOUND DISCRETION

The Trial Court must consider all designated evidence in the light most favorable to the Plaintiff-Appellant who opposed the Magistrate's recommendation for dismissal. With this goes Lord Mansfield's famous dictum, *Rex v. Wilkes* (177o, K. B.) 4 Burr. 2527, 2539. "Discretion, when applied to a court of justice, means sound discretion guided by law. It must be governed by rule not by humor; it must not be arbitrary, vague and fanciful, but legal and regular."

> "[T]he Court is mindful of the Magistrate's previous order (DE 1) imposing a thirty-five (35) page limit for Plaintiff's complaint and notifying him that his case is not in proper form for service because inter alia Rule 8, Fed. R. Civ. P., requires only that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). Plaintiff previously filed his complaint and exhibits numbering more than 300 pages. While Plaintiff's current complaint totals 34 pages and he has raised an objection to the 35-page limit imposed by the Magistrate, this

Court modifies the Magistrate's previous order and the Report and hereby lifts the 35-page limit restriction for an amended complaint. S.C. District Court OPINION and ORDER: 6:20-cv-04353-JD Date Filed 11/02/21; Entry Number 26

Before dismissing Plaintiff-Appellant's case as insufficient for not providing enough factual allegations to "state a claim for relief that is plausible on its face", the Trial Court could have very easily, after realizing the Magistrate's mistake, reviewed Plaintiff-Appellant's previously filed his complaint and exhibits numbering more than 300 pages, or asked the Plaintiff-Appellant to re-fill since the case is dismissed without prejudice.

The 300 pages was necessary because Plaintiff-Appellant alleged direct infringement; indirect infringement, infringement under the doctrine of equivalents, and joint direct infringement, for sixteen Defendants: Apple Inc.; Samsung Electronics USA; LG Electronics USA, Inc.; Qualcomm Inc., Motorola Solutions, Inc.; Panasonic Corporation; AT&T Inc.; Verizon Corporation Service Group; Sprint Corporation; T-Mobile USA, Inc.; Ford Global Technologies, LLC; Fairway Ford Lincoln of Greenville; General Motors Company; Kevin Whitaker Chevrolet; FCA US LLC; Big 'O' Dodge Chrysler Jeep Ram.

Plaintiff-Appellant alleged each Defendant has a minimum of 3 products or services that infringes Plaintiff-Appellant's patents-in-suit (16 defendants @ 3 products or services = 36 alleged products or services.

Plaintiff-Appellant is asserting seven (7) patents and at least thirty-two (32) patent claims; Plaintiff-Appellant is alleging the 16 defendants has infringed at least one or more of the thirty-two (32) patent claims.

Plaintiff-Appellant is asserting seven (7) patents and at least thirty-two (32) patent claims that covers twelve (12) of Plaintiff-Appellant's inventions. The twelve (12) inventions that was dismissed but the Trial Court as "frivolous", are discussed in greater detail in the following section.

## TWELVE (12) INVENTIONS OF PLAINTIFF-APPELLANT WERE IMPROPERLY DISMISSED AS "FRIVOLOUS"

In the S.C. District Court OPINION and ORDER: 6:20-cv-04353-JD; Date Filed 11/02/21; Entry Number 26: "Golden's amended complaint does not (among other things) describe specific systems developed and manufactured by Apple that are like Golden's '287 Patent and how the systems perform the same unique function as Golden's system".

Plaintiff-Appellant's CMDC device is designed to be mass developed, mass manufactured, mass marketed, and mass commercialized across all industries,

agencies, groups, demographics, races, ages, and genders to form a ubiquitous communicating, monitoring, detecting, and controlling environment.

The US Department of Homeland Security (DHS) published on 10/30/2007, its first solicitation (DHS S&T BAA07-10; *CELL-ALL Ubiquitous Biological & Chemical Sensing*) for the development of Plaintiff-Appellant's CMDC device. Apple, Samsung, Qualcomm, and LG were awarded contracts in 2007 under the *CELL-ALL* initiative to assemble Plaintiff-Appellant's communicating, monitoring, detecting, and controlling (CMDC) device.

Plaintiff-Appellant's independent patent claims of the various patents-in-suit illustrates and defines the patented invention(s). Plaintiff-Appellant is allegedly claiming Apple, Samsung, Qualcomm, and LG has assembled twelve (12) of his claimed inventions. The Patents describes eleven (11) of Plaintiff-Appellant's claimed inventions that are assembled by Apple, Samsung, LG, and Qualcomm, to form the CMDC device as a single invention.

Plaintiff-Appellant's twelve inventions are categorized as the "primary" invention of a Communicating, Monitoring, Detecting, and Controlling (CMDC) Device (i.e., smartphone, laptop, smartwatch, new and improved cell phone, etc.); with the "secondary" inventions designed and developed to be integrated with the CMDC (i.e., smartphone, laptop, smartwatch, and cell phone), devices.

Although the "species or secondary" inventions are integrated to form the CMDC device; each of the "species or secondary" inventions are claimed in Plaintiff-Appellant's patents as independent inventions. In other words, the CMDC device is an invention of inventions. The inventions are:

I. Communicating, Monitoring, Detecting, and Controlling (CMDC) Device (i.e., Smartphone).

a. Central Processing Units (CPUs) for Smartphones.

b. Camera CBR Sensor(s) for Smartphones.

c. Smartwatch CBR Detector for Smartphones.

d. Embedded CBRN Nanosensors for Smartphones.

e. Plurality of Interchangeable Sensor Device for Smartphones.

f. Near-Field Communication (NFC) CBR Tag for Smartphones.

g. Fingerprint Biometric Lock Disabler for Smartphones.

h. Remote/Electrical Lock Disabler for Smartphones.

i. Stall, Stop, or Vehicle Slowdown for Smartphones.

j. Control Components of a Vehicle with Smartphones.

k. Autonomous / Driverless Vehicle Monitoring with Smartphone

The invention(s) are designed to be assembled to form the CMDC device. The CMDC device is designed to mitigate and/or prevent terrorist activity. The

Government expressed the need to enhance the Nation's security after the 9/11 attacks.

Plaintiff-Appellant's various patents illustrates and defines the patented invention(s). Plaintiff-Appellant's is allegedly claiming the Defendants has infringed on twelve (12) of his claimed inventions. The Patents describes eleven (11) of Plaintiff-Appellant's claimed inventions that are grouped together to form the CMDC device.

## THE GOVERNMENT'S "DOUBLE STANDARD" FOR AFRICAN-AMERICAN PLEADINGS

Blitzsafe Texas, based in Marshall, has filed 15 lawsuits in four years against the world's largest automakers for allegedly infringing its two patents for a device that integrates a mobile device with a car's stereo system. The company sued General Motors Co., Fiat Chrysler Automobiles and Maserati North America. General Motors Co., Fiat Chrysler Automobiles and Maserati North America have joined a long list of auto manufacturers that have been sued by a Texas company that makes and sells integration devices that connect mobile devices to car stereo systems. Blitzsafe Texas, based in Marshall, has owned two patents since 2009 and 2012 for its device that allows people to link their smartphones and car audio systems, enabling them to take hands-free phone calls and play music. One patent

covers a wired integration device, and the other covers a Bluetooth device. Morris, A. (2019, Nov. 18). GM, Fiat, Maserati Among Automakers Sued for Alleged Patent Infringement. https://www.law.com/texaslawyer/ 2019/11/18/gm-fiat-maserati-among-automakers-sued-for-alleged-patent-infringement/

Blitzsafe Texas '342 Patent is titled "Multimedia Device Integration System," and relates "to a multimedia device integration system for integrating after-market components such as satellite receivers… cellular telephones, and other devices for use with factory-installed (OEM) or after-market car stereo and video systems." Claim 49. A multimedia device integration system, comprising: … wireless interface in communication with said integration subsystem… wireless interface in communication with a portable device external to the car … information about an audio file stored on the portable device, transmits the information to the car … instructs the portable device … receives audio generated by the portable device over said wireless communication link …"

Plaintiff-Appellant has alleged in this case, he owns the patent rights to exclude others (i.e., Apple, Samsung, LG, Qualcomm, Panasonic, Motorola, AT&T, Verizon, T-Mobile—Sprint) from making, using or selling his patented CMDC mobile device; and, he owns the patent rights to exclude others (i.e., GM, Ford, FCA USA, etc.) from unauthorized use, or using his patented CMDC devices "to control components of a vehicle". ***Claim 4; '287 Patent***: "A communication

device comprising: at least one central processing unit (CPU); … at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; … at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle… such that the communication device is capable of communicating, monitoring, detecting, and controlling." (Priority back to 04/05/2006)

Plaintiff-Appellant's Complaint allege sufficient facts to plausibly establish that the manufacture and use of the accused mobile devices named in this case by Apple, Samsung, LG, Qualcomm, Panasonic, Motorola is without authorization. The complaint also alleges enough facts that, if true, give rise to a reasonable inference that the Plaintiff-Appellant will prevail on its cause of action.

> "Patent infringement is any event of using the patented invention without the consent of the patent holder for profit … including making, using, offering, selling, and/or importing the patented item for those purposes."

Blitzsafe Texas, filed 15 lawsuits in 4 years against automakers for allegedly infringing 2 patents for one device. Plaintiff-Appellant filed 3 lawsuits in 2 years against 16 companies allegedly infringing 8 patents for 12 devices. Blitzsafe Texas—non-frivolous; African-American—frivolous; and recommended sanctions.

***List of 12 Devices, and at least one Supportive Claim per Device***

**I. Communicating, Monitoring, Detecting, and Controlling (CMDC) Device (i.e., smartphone) – Claim 23 of the '439 Patent**

Claim 23. A cell phone comprising:

a central processing unit (CPU) for executing and carrying out the instructions of a computer program;

| | |
|---|---|
| <br>Monitoring equipment of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone) interconnected to a product for communication therebetween, comprising | **Communicating, Monitoring, Detecting, and Controlling (CMDC) Device (i.e., smartphone)**<br><br>**Asserted Patent Specifications**:<br><br>"In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals<br><br>Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, web servers, desktop personal computers (PCs), notebook personal computers (PCs), laptops, satellite phones, cell phones, Universal Mobile Telecommunications System (UMTS) phones, personal digital assistants (PDAs), liquid crystal display (LCD) monitors, and satellite monitoring, remote control key fobs, two-way communication key fobs, handhelds; |

a transmitter for transmitting signals and messages to a cell phone detection device; a receiver for receiving signals from the cell phone detection device;

at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection;

the cell phone is at least a fixed, portable or mobile communication device interconnected to the cell phone detection device, capable of wired or wireless communication therebetween; and

whereupon the cell phone is interconnected to the cell phone detection device to receive

signals or send signals to lock or unlock doors, to activate or deactivate security systems, to activate or deactivate multi-sensor detection systems, or to activate or deactivate the cell phone detection device;

at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor capable of being disposed within, on, upon or adjacent the cell phone;

wherein at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection is capable of signal communication with the transmitter or the receiver;

wherein the cell phone is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature such that the cell phone is locked by the biometric lock disabler to prevent unauthorized use; and

whereupon a signal sent to the receiver of the cell phone detection device from at least one of the chemical sensor, the biological sensor, the explosive sensor, the human sensor, the contraband sensor, or the radiological sensor, causes a signal that includes at least one of location data or sensor data to be sent to the cell phone.

**II. Central Processing Units (CPUs) for CMDC Device – Claim 5 of the '287 Patent**

Claim 5. A monitoring device, comprising:

at least one central processing unit (CPU);

at least one temperature sensor in communication with the at least one CPU for monitoring temperature;

at least one motion sensor in communication with the at least one CPU;

at least one viewing screen for monitoring in communication with the at least one CPU;

at least one global positioning system (GPS) connection in communication with the at least one CPU;

at least one of an internet connection or a Wi-Fi connection in communication with the at least one CPU;

at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU;

| | |
|---|---|
|  | **Central Processing Units (CPUs) for Smartphone**<br><br>The "smartphone processor (CPU), also known as chipset, is a component that controls everything going on in your smartphone and ensures it functions correctly. You can compare it to the brain of the human body. Every action you perform on your smartphone goes straight to the processor." https://www.coolblue.nl/en/advice/smartphone-processors.html. "Unlike simpler mobile phones of the past, today's smartphones all have processors or CPUs. A smartphone CPU (central processing unit) is the brains of the entire device. Without one, no smartphone would be able to function" (smartphonedomain.com., 2021). |
| Example: Qualcomm often refers to the Snapdragon as a "mobile platform" (e.g., Snapdragon 865 5G Mobile Platform). Snapdragon semiconductors are embedded in devices of various systems, including Android devices (i.e., Samsung & LG). They are also used in cars and wearable devices such as Smart Watches. | Example: Qualcomm Technologies Inc. Qualcomm announced it was developing the Scorpion central processing unit (CPU) in November 2007. The Snapdragon system on chip (SoC) was announced in November 2006 and included the Scorpion processor. The Snapdragon's central processing unit (CPU) uses the ARM architecture. A single SoC may include multiple CPU cores; a Snapdragon wireless modem; and, other software and hardware to support a smartphone's global positioning system (GPS), camera, video, and audio. |

at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device;

at least one power source comprising at least one of a battery, electrical connection, or wireless connection, to provide power to the communication device;

at least one biometric sensor in communication with the at least once CPU for providing biometric authentication to access the communication device;

at least one sensor for chemical, biological, or human detection in communication with the at least one CPU;

one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents;

at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU; and,

at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or send signals to detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling.

**III. Camera CBR Sensor(s) for CMDC Device – Claim 4 of the '189 Patent**

Claim 4. A built-in, embedded multi sensor detection system for monitoring products with a plurality of sensors detecting at least two agents selected from the group consisting of chemical, biological, radiological, explosive, human, and contraband agents;








**Camera CBR Sensor(s) for Smartphone**

Camera Sensor for Radiological Detection: How can a cell phone detect radioactivity? Cell phones have cameras and camera sensors react to radioactivity. High energy particles strike a sensor array and register as small bright pinpoints or thin streaks of light. An app may not be as sensitive as a dedicated radiation detector, but it works well enough to alert users to dangerous levels of radiation.

Camera Sensor for Biological Detection: "In the diagnostic test, a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. Coronavirus RNA present, CRISPR proteins snip the molecular probes, whole sample to emit light. Fluorescence detected with a cell phone camera." (Image: Science at Cal).

Camera Sensor for Chemical Detection: The sensor that Rhevision and the University of California at San Diego responds to different chemicals by changing color; a single chip with many tiny pores, each respond to a different chemical; a standard cell-phone camera can resolve a picture finely enough to detect them; system relies on the phone's camera to watch the chip for color changes.

comprising a built-in sensor array or fixed detection device into the product that detects agents by means of two or more sensors combined from the following list of sensors: a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, and a radiological sensor;

comprising a communication device of at least one of a cell phone, a smart phone, a

desktop, a handheld, a PDA, a laptop, or a computer terminal for monitoring products, interconnected to a built-in sensor array or fixed detection device for communication therebetween;

wherein the communication device is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and signature such that the communication device that is at least one of the cell phone, the smart phone, the desktop, the handheld, the PDA, the laptop or the computer terminal is locked by the biometric lock disabler to prevent unauthorized use;

wherein the built-in embedded multi sensor detection device receives a signal via any of one or more products listed in any of the plurality of product grouping categories; and,

wherein, when an alarm occurs, the built-in, embedded multi sensor detection system communicates the alarm by way of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e. product-to-product, product-to-satellite, product-to-cellular, product-to-long or short range radio frequency, product-to-radio frequency (RF), product-to-internet, product-to-broadband, product-to-smartphone or cell phone, product-to-computer at monitoring site, product-to-WiFi, product-to-handheld, or product-to-laptop or desktop) for communication therebetween;

wherein the built-in embedded multi sensor detection device is implemented by business or government at a minimum cost by products grouped together by common features in at least one of several product groupings of design similarity.

**IV. Smartwatch CBR Detector for CMDC Device – Claim 19 of the '439 Patent**

Claim 19. A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, radiological agent, or compound, comprising:

a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human, or contraband agent or compound, capable of being disposed within, on, upon or adjacent a multi-sensor detection device;

monitoring equipment comprising at least one of a computer, personal computer (PC), laptop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone for at least one of a receipt or transmission of signals therebetween;

at least one cell phone tower interconnected to the monitoring equipment for sending

signals thereto and receiving signals therefrom or at least one satellite capable of transmitting signals to the monitoring equipment;

| | |
|---|---|
| <br>Homeland Security's Smartwatch Will Detect Nuclear Bombs https://www.popularmechanics.com/ military/research/a18161/homeland-security -smartwatch-detect-nuclear-bombs/ | **Smartwatch CBR Detector for Smartphone**<br><br>To use a smartwatch as a stand-alone detection device, you need a smartphone. On the smartphone, the user installs the app that comes with the smartwatch stand-alone detection device, such as Android Wear (Wear OS—operating system). By opening the accompanying app on the smartphone and turning on Bluetooth, the user can synchronize the smartwatch to function as a stand-alone detection device with the smartphone.<br><br>The US Military's Latest Wearables [Smart Watch] Can Detect Illness Two Days Before You Get Sick https://www.defenseone.com/technology/2020/09/militarys-latest-wearables-can-detect-illness-two-days-you-get-sick/168664/<br><br>Studies reveal smartwatch biometrics can detect COVID-19 before symptoms surface: "smartwatches and other wearables measuring biometrics like heart-rate variability have the ability to detect if a person is COVID-19 positive" https://www.biometricupdate.com/202101/studies-reveal-smartwatch-biometrics-can-detect-covid-19-before-symptoms-surface |

at least one satellite or at least one cell phone tower capable of signal communication between the multi-sensor detection device and the monitoring equipment;

at least one internet connection capable of communication between the multi-sensor detection device and the monitoring equipment;

whereupon a signal sent to a receiver of the multi-sensor detection device from a satellite; or to a cell phone tower; or through at least one of a short-range radio frequency or a long-range radio frequency; causes a signal to be sent to the monitoring equipment that includes at least one of location data or sensor data;

wherein the monitoring equipment or multi-sensor detection device receives a signal via any of one or more products of any product grouping categories;

wherein at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency connection, or short-range radio frequency (RF) connection is capable of signal communication with the transmitter, a receiver of the monitoring equipment, the multi-sensor detection device, or transceivers of the products;

wherein the monitoring equipment is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan or signature such that the monitoring device that is at least one of the computer, the laptop, the notebook, the PC, the handheld, the cell phone, the PDA, or the smart phone is locked by the biometric lock disabler to prevent unauthorized use;

wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group consisting of satellite, Bluetooth, WiFi, internet, radio frequency (RF), cellular, broadband, long range radio frequency, and short-range radio frequency (RF).

**V. Embedded CBRN Nanosensors for CMDC Device – Claim 16 of the '439 Patent**

Claim 16. A built-in, embedded multi sensor detection system for monitoring products with a plurality of sensors detecting at least two agents selected from the group consisting of chemical, biological, radiological, explosive, human, and contraband agents;

comprising a built-in sensor array or fixed detection device into the product that detects agents by means of two or more sensors combined from the following list of sensors: a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor;



**Embedded CBRN Sensors for Smartphone (NASA)**

A silicon-based sensing chip, which consists of 64 nanosensors and is less than one square centimeter, can turn a cell phone into a *portable poison detector*. (NASA). "New technology can turn your cellphone into a *portable "silent killer" detector*. And in the near future, this technology has the potential to convert the average cell phone into a *handheld detector* capable of warning you of chemical warfare attacks" https://www.foxnews.com/tech/smartphones-take-on-silent-killers-as-portable-danger-detectors

Nuclear Radiation Nanosensors and Nanosensory Systems https://link.springer.com/book/10.1007/978-94-017-7468-0

comprising a communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a personal digital assistant (PDA), a laptop, or a computer terminal for monitoring products, interconnected to a built-in sensor array or fixed detection device for communication therebetween;

wherein the communication device is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan or signature such that the communication device that is at least one of the cell phone, the smart phone, the desktop, the handheld, the PDA, the laptop or the computer terminal is locked by the biometric lock disabler to prevent unauthorized use;

wherein the built-in embedded multi-sensor detection device receives a signal via any of one or more products in any product grouping categories; and

wherein, when an alarm occurs, the built-in, embedded multi sensor detection system communicates the alarm by way of at least one of the products grouped together by common features in a product groupings category of design similarity comprising at least one of product-to-product, product-to-satellite, product-to-cellular, product-to-long range radio frequency, product-to-short range radio frequency, product-to-radio frequency (RF), product-to-internet, product-to-broadband, product-to-smartphone or cell phone, product-to-computer at monitoring site, product-to-WiFi, product-to-handheld, or product-to-laptop or desktop for communication therebetween;

wherein the built-in embedded multi-sensor detection device is implemented by business or government at a minimum cost by products grouped together by common features in at least one of the several product groupings of design similarity.

## VI. Plurality of Interchangeable Sensor Device for CMDC Device – Claim 20 of the '439 Patent

Claim 20. A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, radiological agents or compound, comprising:

a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human, or contraband agent or compound, capable of being disposed within, on, upon or adjacent a multi-sensor detection device;

monitoring equipment of at least one of products grouped together by common features in a product groupings category of design similarity comprising at least one of a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal digital assistant (PDA), or smart phone for at least one of a receipt or transmission of signals therebetween,

| | |
|---|---|
|  | **Plurality of Interchangeable Sensor Device for Smartphone: (NASA & Subtractor George Yu**<br><br>Building on the system he developed with NASA for the DHS Cell-All project, George Yu of Genel Systems Inc., created his NODE+ platform — a cylinder that can transmit data from sensors to a smartphone. The NODE+ operates independently of the cell phone and transmits the data it gathers using Bluetooth wireless technology. Variable converted sensors into *interchangeable modules* that can be snapped onto either end of smartphone. There is a module for carbon dioxide detection and another that senses carbon monoxide, nitric oxide and other gases. "Using a common platform for multiple sensor modules, you save a lot of money," Yu says. The NODE+ is compatible with Android and Apple smart devices. |

wherein the monitoring equipment is equipped with a lock disabling mechanism that is able to engage (lock), or disengage (unlock), or disable (to make unavailable) a product's lock, wherein the lock disabling mechanism disables the product's lock after a specific number of tries by an unauthorized user to disengage the lock by maintaining the product's lock in the current state of the product's lock regardless of input entered to change the state of the product's lock by the unauthorized user;

at least one cell phone tower interconnected to the monitoring equipment for sending signals thereto and receiving signals therefrom; or at least one satellite capable of transmitting signals to the monitoring equipment;

at least one satellite or at least one cell phone tower capable of signal communication between the multi-sensor detection device and the monitoring equipment;

at least one internet connection capable of communication between the multi-sensor detection device and the monitoring equipment; and

whereupon a signal sent to a receiver of the multi-sensor detection device from a satellite; or to a cell phone tower; or through at least one of a short-range radio frequency or a long-range radio frequency; causes a signal to be sent to the monitoring equipment that includes location data and/or sensor data;

wherein the multi-sensor detection device is implemented by business or government by products grouped together by common features in at least one of several product groupings of design similarity;

wherein the multi-sensor detection device is for any of one or more products comprising

a maritime cargo container, a lock, or the monitoring equipment;

wherein at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency connection, or short-range radio frequency connection is in signal communication with a transmitter and a receiver of the monitoring equipment or multi-sensor detection device and transceivers of the products.

**VII. Near-Field Communication (NFC) CBR Tag for CMDC Device – Claim 21 of the '439 Patent**

Claim 21. A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, or radiological agents and compounds, comprising:



MIT chemists devised a new way to wirelessly detect hazardous gases by using a simple sensor that can be read by a smartphone… [T]he researchers have demonstrated that they can detect gaseous ammonia, hydrogen peroxide, and cyclohexanone, among other gases… The new sensors are made from modified near-field communication (NFC) tags. NFC tags can be read by any smartphone that has near-field communication capability. Retrieved from: https://phys.org/news/2014-12-cheap-sensor-transmit-hazardous-chemicals.html

**Near-Field Communication (NFC) CBR Tag for Smartphone**

In November 2007, an international transportation security company, two Defense Department contractors, a container retailer, a university, and a U.S. city's bomb squad demonstrated how an RFID tag could send a signal to a detonator built from widely available, over-the-counter components. An undergraduate student spent about $20 to make the detonator. The RFID signal detonated a small amount of explosives in a container by means of a simple emission of a radio signal traveling on the approved RFID 433 MHz frequency. Officials from the Defense Department, Government Accountability Office, Department of Homeland Security and Coast Guard observed the demonstration. The office of the secretary of defense sent two observers, including the chief engineer of an RFID program and his supervisor. In the Defense Department's own words, the "Army representatives examined the device and wiring and confirm that a commercial RFID interrogator was used to 'wake up' a commercial RFID tag. When the RFID tag responded on the 433 MHz frequency, the relay closed and the blasting cap set off the explosive charge." https://www.nationaldefensemagazine.org/articles/2011/2/1/2011february-military-supply-chain-tracking-system-both-inefficient-and-dangerous

a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human, or contraband agent or compound, capable of being disposed within, on, upon or adjacent a multi-sensor detection device, wherein at least one of the sensors is

capable of detecting agents of an item of interest (IOI);

monitoring equipment of at least one of the products grouped together by common features in a product groupings category of design similarity comprising at least one of a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal digital assistant (PDA), or smart phone for at least one of a receipt or transmission of signals therebetween;

at least one satellite or at least one cell phone tower capable of signal communication between the multi-sensor detection device and the monitoring equipment;

at least one internet connection capable of communication between the multi-sensor detection device and the monitoring equipment;

whereupon a signal sent to a receiver of the multi-sensor detection device for detecting the agents of the item of interest causes a signal that includes at least one of location data or sensor data to be sent to the monitoring equipment;

wherein the multi-sensor detection device for any of one or more products comprising a maritime cargo container, a lock, or the monitoring equipment;

wherein at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, or broadband connection, is in signal communication with a transmitter, a receiver of the monitoring equipment, or transceivers of the products;

at least one tag that is read by the monitoring equipment that is capable of wireless near-field communication to achieve detection of at least one of the explosive agent, the nuclear agent, the contraband agent, the chemical agent, the biological agent, the human agent, or the radiological agent which allows radio frequency (RF) data to be received and/or transferred between the tag and the monitoring equipment.

**VIII. Fingerprint Biometric Lock Disabler for CMDC Device – Claim 1 of the '287 Patent**

Claim 1. Monitoring equipment that is at least one of products grouped together by common features of a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone interconnected to a lock for communication therebetween; the monitoring equipment comprising:

at least one of a central processing unit (CPU), a network processor, or a front-end processor for communication between the monitoring equipment and the lock;

a transmitter for transmitting signals and messages to at least one of a remote lock, an electrical lock, a mechanical lock, or automatic lock;

a receiver for receiving signals from at least one of a remote lock, an electrical lock, a mechanical lock, or automatic lock;

a lock disabling mechanism that is able to engage (lock), or disengage (unlock), or disable (make unavailable) the monitoring equipment after a specific number of tries;





**Fingerprint Biometric Lock Disabler for Smartphone**

Security feature: After several unsuccessful log-in attempts using a passcode or fingerprint, an Android or iOS device automatically locks itself up. If unable to log in after the security layers, the only option is to have the device unlocked. The wrong pin will launch to Account Login. On an Android or Apple Phone, multiple attempts (usually five attempts or more) with an unknown or a wrong pin will go either into a delay before further attempts are allowed or the phone will allow entry using the account to unlock

**FBI Failed Attempts to Unlock Phone**

The FBI recovered an Apple iPhone 5C—owned by the San Bernardino County, California government—that had been issued to its employee, Syed Rizwan Farook, one of the shooters involved in the December 2015 San Bernardino attack. The attack killed 14 people and seriously injured 22. The two attackers died four hours after the attack in a shootout with police, having previously destroyed their personal phones. Authorities were able to recover Farook's work phone, but could not unlock its four-digit passcode, and the phone was programmed to automatically delete all its data after ten failed password attempts (an anti-theft measure on smartphones).

a short-range radio frequency (RF) connection that is near-field communication (NFC);

at least one of the satellite connection, Bluetooth connection, WiFi connection, Internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection that is capable of signal communication with the transmitter or the receiver;

at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature recognition system; and,

the monitoring equipment being capable of sending signals to engage (lock), disengage (unlock), or disable (make unavailable) at least one of a remote lock, an electrical lock, a mechanical lock, or automatic lock, whereupon a signal is sent to the receiver of the monitoring equipment from at least one of the remote lock, electrical lock, mechanical lock, or automatic lock, the signal comprising at least one of location data or lock status data to be sent to the monitoring equipment.

**IX. Remote/Electrical Lock Disabler for CMDC Device – Claim 125 of the '990 Patent**

Claim 125. A multi-sensor detection system for monitoring products and capable of operating with at least one of a designated perimeter sensor, a range sensor, a human sensor, a light sensor, a video sensor, a tampering sensor, a breach sensor, a temperature sensor, or a door sensor for an unauthorized or unscheduled door opening, comprising:




**Remote/Electrical Lock Disabler for Smartphone (Gov. Contractor iControl's MATTs & mLOCK)**

Marine Asset Tag Tracking System (MATTS) is a DHS initiative to develop a "Future Smart Container". MATTS "gateway": a wireless electronic device that communicates with a sensor array; the communication device; and then the locking mechanism for reporting the GPS location and locking status. Both internal sensors and external sensors are interconnected and configured to operate with the MATTS device and can detect gas concentrations, radiation, humidity and moisture, atmospheric pressure, etc. The mLOCK communicates bi-directionally using addressed and encrypted messages between the lock and the MATTs readers or mobile devices (i.e., smartphone)

at least one communication device of a cell phone, a cell phone detector case, a smart phone, a handheld, a PDA, a laptop, or a computer terminal at a monitoring site, and wherein the communication device has a central processing unit (cpu);

at least one sensor that is a designated perimeter sensor, range sensor, human sensor, light sensor, video sensor, tampering sensor, breach sensor, temperature sensor, or door sensor for unauthorized or unscheduled door opening, interconnected to the at least one communication device for communication therebetween;

wherein the at least one interchangeable sensor is interconnected to an internal or external remote/electrical lock disabler;

at least one of an Internet connection, a GPS connection, or a power connection disposed within the internal or external remote/electrical lock disabler;

wherein the internal or external remote/electrical lock disabler communicates with the communication device and the internal or external remote/electrical lock disabler is mounted, embedded, affixed, or attached to a product for receiving transmission from the communication device to lock or disable a lock on the product and to prevent access to the product by unauthorized, untrained, and unequipped individuals, wherein the internal or external automatic/mechanical lock disabler detection device engages the lock on the product; and

whereupon detection causes a signal to be sent to the at least one communication device followed by communicating with the internal or external remote/electrical lock disabler.

**X. Stall, Stop, or Vehicle Slowdown for CMDC Device – Claim 11 of the '891 Patent**

Claim 11. A vehicle adapted for receipt of a signal from a remote location to control the vehicle's stall-to-stop means or vehicle slowdown means, comprising:

at least one of a brake, a foot peddle, a radar, a camera, a navigational system, a light, a speed control, an ignition system, a steering wheel, a transmission, a fuel system, and a motor;

an electrical system in electrical communication with at least one of the brake, the foot peddle, the radar, the camera, the navigational system, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor;

a computer system in signal transmission communication with at least one of the brake, the foot peddle, the radar, the camera, the navigational system, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor;

a receiver in electrical communication with the electrical system and adapted to receive at least one control signal from a remote location to activate a stall-to-stop means or vehicle slowdown means to stall or slow down the vehicle;

a receiver in computer communication with the computer system and adapted to receive at least one control signal from a remote location to activate a stall-to-stop means or vehicle slowdown means to stall or slow down the vehicle; and

wherein the at least one control signal is communicated from the receiver to the electrical system or the computer system to control at least one of the brake, the foot peddle, the light, the

speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor;

| | |
|---|---|
| <br>Owners of driverless cars will need to securely connect their smartphones and their cars, and then authorize the phone to control selected functions in the car. Here are some [one] of the functions that smartphones will potentially partake in the driverless technology: Instant braking is among the features that set autonomous cars apart from the rest. They use sensors to detect possible interferences in the form of road obstacles and oncoming cars, and then apply instant breaks to avoid collisions. Using a smartphone connected to the car could provide additional braking or act as a backup in case the car fails to brake automatically. | **Stall, Stop, or Vehicle Slowdown for Smartphone**<br>Remote Vehicle Shutdown refers to a system which helps the user to enable the option of remotely shutting down the vehicle, to which it is connected, using radio pulses. The technology was intended for police, military and security use in order to help lower down the damage that can be caused due to dangerous driving. With the help of this technology, one can remotely find and disable stolen vehicles. Remote vehicle disabling systems can provide the authorized users at remote locations, the ability to prevent an engine from starting, prevent movement of a vehicle, and to stop or slow an operating vehicle. It also allows the dispatcher or other authorized personnel to gradually decelerate a vehicle by downshifting, limiting the throttle capability, or bleeding air from the braking system from a remote location. Some systems can provide a history of the speed of the vehicle, ignition status and control, motion detection of vehicle, as well as other events. These systems can also improve the security of carriers that undergo high-value or high-risk cargo, like hazardous materials. Security features that Remote Vehicle Shutdown provides. https://www.globenewswire.com/en/news-release/2019/12/17/1961557/0/en/Remote-Vehicle-Shutdown-Market-To-Reach-USD-723-65-Million-By-2026-Reports-And-Data.html |

wherein the at least one control signal is sent due to unauthorized use of the vehicle, and wherein an originating first signal that eventually causes the at least one control signal to be sent is generated upon initial verification of the unauthorized use of the vehicle;

at least one mobile, portable, or fixed device capable of sending the at least one control signal from the remote location that is of electromagnet pulse, electrostatic discharge, microwave beam or radio frequency, to disable the computer, electrical, fuel and air systems of the vehicle or a combination of the computer, electrical, fuel and air systems that include but are not limited to the brakes, foot peddle, lights, speed controls, ignition, steering, transmission, and horsepower of the motor.

**XI. Control Components of a Vehicle with CMDC Device – Claim 4 of the '287 Patent**

Claim 4. A communication device comprising:

at least one central processing unit (CPU);

at least one motion sensor in communication with the at least one CPU;

at least one viewing screen for monitoring in communication with the at least one CPU;

at least one global positioning system (GPS) connection in communication with the at least one CPU;

<table>
<tr>
<td>
</td>
<td>Control Components of a Vehicle with Smartphone<br><br>CarLink™ is a Smartphone interface that allows you to start your vehicle, unlock your doors or pop the trunk from virtually any distance, or help you find your car in a large garage after a sporting event or a trip to the mall. It is as easy as the click of a button or the tap of your finger.<br>• Compatible with iPhone, BlackBerry and Android<br>• Remote Start Compatible<br>• Door lock and unlock<br>• Two-way confirmation<br>• Car find feature (horn honk and/or flashing lights)<br>• Two auxiliary outputs (i.e., control trunk release or sliding door open)<br>• Compatible with Pursuit security or remote start systems with data port<br>• Virtually unlimited operating range (in cellular service areas)</td>
</tr>
</table>

at least one of an internet connection Wi-Fi connection in communication with the at least one CPU;

at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU;

at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device;

at least one power source comprising at least one of a battery, electrical connection, or wireless connection, to provide power to the communication device;

at least one biometric sensor in communication with the at least one CPU for providing biometric authentication to access the communication device;

at least one or more detectors in communication with the art least one CPU for detecting at least one of a chemical, biological, radiological, or explosive agents;

at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU; and,

at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or send signals to detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling.

**XII. Autonomous and Driverless Vehicle Monitoring with CMDC Device – Claim 23 of the RE43,891 ('891) Patent**

Claim 23. A vehicle adapted for receipt of a signal from a pre-programmed automated system to control the vehicles' stall-to-stop means or vehicle slowdown means, comprising:

at least one of a brake, a foot peddle, a radar, a camera, a navigational system, a light, a speed control, an ignition system, a steering wheel, a transmission, a fuel system, and a motor:

an electrical system in electrical communication with at least one of the brake, the foot peddle, the radar, the camera, the navigational system, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor;

a computer system in signal transmission communication with at least one of the brake, the foot peddle, the radar, the camera, the navigational system, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor;

a receiver in electrical communication with the electrical system and adapted to receive at least one control signal from a pre-programmed automated system to activate a stall-to-stop means or vehicle slowdown means to stall or slow down the vehicle;

a receiver in computer communication with the computer system and adapted to receive at least one control signal from a pre-programmed automated system to activate a stall-to-stop means or vehicle slowdown means to stall or slow down the vehicle; and

wherein the at least one control signal is communicated from the receiver to the electrical system or the computer system to control at least one of the brake, the foot peddle, the radar, the navigational system, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor;




**Autonomous and Driverless Vehicle Monitoring with Smartphone**




wherein the receivers, the computer system, and the electrical system are part of at least one pre-programmed operating system of unintended acceleration, pre-crash, reverse acceleration, stabilization, lane departure, cruise control, driverless vehicle, and chemical biological radiological nuclear explosive (CBRNE) detection;

wherein the control signal to activate the stall-to-stop or vehicle slowdown is not remote from the vehicle and the signal to activate is initiated when at least one of the vehicle's operating systems for monitoring the vehicle's condition exceeds a pre-programmed vehicle operating system parameter.

## <u>TRIAL COURT HAS DETERMINED PLAINTIFF-APPELLANT'S TWELVE (12) INVENTIONS ARE "FRIVOLOUS" WITHOUT THE DEFENDANTS' DEFENSE; AND, WITHOUT A JURY</u>

On June 9, 2011, the Supreme Court in *Microsoft Corp. v. i4i Limited Partnership*, 564 U.S. ___ (2011), held that a party seeking to establish the invalidity of a patent (i.e., patents that claims 12 inventions) must prove such

invalidity by clear and "convincing evidence". At issue in *i4i* was the meaning of § 282 of the Patent Act of 1952, 35 U.S.C. § 282. Section 282 provides that:

> "A patent shall be presumed valid. Each claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim. The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity."

Acknowledging that § 282 "includes no express articulation of the standard of proof," the Court focused its analysis on Congress's use of the term "presumed valid." According to the Court, that term had a "settled meaning at common law," under which it "encompassed not only an allocation of the burden of proof but also an imposition of a heightened standard of proof"; on the assumption that Congress intended to codify the common-law presumption when it enacted § 282, the Court concluded that § 282 requires an invalidity defense to be proved by "clear and convincing evidence".

The Trial Court fail to prove the any one of the patent claims of the patents-in-suit are invalid; fail to provide any new evidence that challenges the heightened standard of "clear and convincing evidence; thereby, fail to show Plaintiff-Appellant's case as "frivolous".

"[T]he Court's decision in i4i does not alter the standard of proof that lower courts have been applying to claims of patent invalidity. The Federal Circuit already applies a heightened standard to such claims. The Court's decision does, however, make clear to district courts that they "can" and "most often should" instruct juries on the effect of new evidence in cases in which invalidity defenses are raised."

A frivolous claim, often called a bad faith claim, refers to a lawsuit, motion or appeal that is intended to harass, delay or embarrass the opposition. A claim is frivolous when the claim lacks any arguable basis either in law or in fact, *Neitze v. Williams*, 490 U.S. 319, 325 (1989).

Typically, courts find that a claim or defense is frivolous when it conflicts with a judicially noticeable fact or is logically impossible. The Supreme Court has weighed in on defining a frivolous lawsuit as well. *In Denton v. Hernandez*, the Court said that a frivolous claim is one that is meritless or irrational. The Court held that:

"[s]ome allegations may be "strange but true," and hence, dismissals for frivolous litigation should be used moderately. A frivolous lawsuit is a lawsuit that has no legal merit. To put it simply, a frivolous lawsuit has no basis in law or fact. A frivolous lawsuit has no legitimate legal or factual

support. Ridiculous, absurd, ludicrous, and nonsensical—these are all words that can be used to describe a frivolous lawsuit."

The Trial Court has failed to prove Plaintiff-Appellant's patents that claims 12 inventions; the assembly of the 12 inventions by Apple, Samsung, Qualcomm, & LG; and, the use of the 12 inventions by hundreds of millions of consumers, as ridiculous, absurd, ludicrous, and nonsensical

A frivolous invention is an invention with no use. U.S. patents are only granted for a "new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof" (35 USC 101). If someone tries to patent an invention and the idea has already been published, the U.S. Patent and Trademark Office won't grant them a patent. A patent doesn't give the owner a right to use the patented invention, rather, "the patent owner has the right to exclude others from making, using, or selling anything that uses the patented invention".

The Government and the Defendants Apple, Samsung, Qualcomm, & LG in Plaintiff-Appellant's related COFC case no. 13-307C, *Larry Golden v. The United States* had over eight years to present to the Claims Court evidence that the 12 inventions had already been published; that they hold patents for the 12 inventions that antedates Plaintiff-Appellant's patents; or, to present other patents that invalidates Plaintiff-Appellant's patents because of obviousness or anticipation.

Unauthorized use or selling of a patented product is a violation of Plaintiff-Appellant's right to exclude others from making, using or selling his patented invention. Under the Industrial Property Law Act of 30 June 2000 (Journal of Laws 2017, item 776 uniform text, as amended) "the holder of a breached patent, or a person authorized to do so under the Act, may bring legal claims against the infringing party. A patent infringement is any event of using the patented invention without the consent of the patent holder for profit or professional purposes, including making, using, offering, selling, and/or importing the patented item for those purposes."

This means that the Defendants that sells at least one of the 12 patented products without the consent of the Plaintiff-Appellant's (patent holder) may face liability under civil law.

Therefore, if the seller assigns ownership of the patented product onto the buyer (AT&T, Verizon, T-Mobile—Sprint), who then resells it, both the seller and the buyer may be deemed to be in breach of the patent. This also applies to each and every subsequent buyer who decides to resell the patented product.

## <u>THE S.C. DISTRICT COURT MAGISTRATE JUDGE AND DISTRICT JUDGE *CONTRIDICTS* THE FINDINGS OF THE U.S. COURT OF FEDERAL CLAIMS SENIOR JUDGE ON PLEADINGS' REQUIREMENTS</u>

**Senior COFC Judge Eric G. Bruggink's "ORDER" in Larry Golden v. The United States: Case 1:13-cv-00307-EGB Document 215 Filed 02/26/21 Pgs. 6-7**

"[W]e allowed the filing of the Sixth Amended Complaint without limitation. Thus, the filing of that complaint did not violate our prior rulings. Further, we read the complaint as asserting infringement from the 2011 demonstration forward. It appears that Mr. Golden asserts that the Cell-All initiative resulted in the manufacture of a variety of devices that infringe his patents. We can reasonably infer that he is pointing the finger at the federal government for the inclusion of his technology in these third-party devices. Thus, whether ultimately true or not, the complaint has put at issue events that may have happened after the patent priority dates. We therefore find no basis to dismiss on either of those grounds. We note that any activity that took place prior to a patent's priority date cannot have been infringing because no right to exclusive use existed prior to the priority date."

"As to defendant's argument that plaintiff's current infringement allegations are too "vague as to the nature of the Cell-All project and exactly how plaintiff alleges the Cell-All Project infringed the '497 Patent," we disagree. Def. Mot. to Dismiss at 12. In alleging infringement of his patented CMDC technology, plaintiff attached a lengthy series of "claim charts"

illustrating allegations of how the government, and third parties at the government's behest, are infringing certain of his patents' claims. Sixth Am. Compl. Ex. 7 at 100-108. Defendant's motion has not attempted to wrestle with that chart or otherwise explain with any detail why those claims fail as a matter of law."

"In exhibit 7 to his present complaint, plaintiff's claim chart illustrates instances of alleged infringement of the '189 patent, '287 patent, '439 patent, '497 patent, and the '752 patent. E.g., id. at 100-108. He includes separate charts for a device manufactured by LG, one by Apple, and Samsung. The next chart in exhibit 7 explains why he believes that the Cell-All initiative resulted in the manufacture of these devices for DHS. More detail is appended regarding each of the accused devices in charts and diagrams that follow. In short, we cannot conclude on the face of these documents without more detailed briefing and examination that no valid patent claim has been presented. Read together with the sixth amended complaint, it is clear that Mr. Golden is alleging that the government caused the manufacture of all of these devices or caused these devices to use his technology. In light of his *pro se* status, we cannot say that he has failed to allege a patent infringement claim as a matter of law on the face of the

complaint nor for any reason presented by defendant's motion. See *McZeal v. Sprint Nextel Corp.*, 501 F.3d 1354, 1356-58 (Fed. Cir. 2007)."

**Freshman S.C. District Judge Joseph Dawson, III "OPINION & ORDER" in Larry Golden v. Apple, Inc. et al: Case 6:20-cv-04353-JD Date Filed 11/02/21 Entry Number 26**

"Accordingly, on February 5, 2021, the Magistrate Judge issued the Report given his initial review of the pleadings. The Report recommended summary dismissal of the complaint with prejudice and without issuance of service of process or leave to amend his complaint. The Report further recommended that this Court consider the entry of sanctions in the amount of $400.00 against Golden because he has continued to file frivolous litigation in this Court… The instant complaint seeks damages against many of the same defendants as named in Case Number 3 and Case Number 4; however, it appears that this action represents Golden's attempt to re-litigate the claims from Case Number 3 because Case Number 3 was dismissed as frivolous without prejudice… Accordingly, the Report recommended dismissal of Plaintiff's complaint because *inter alia* Plaintiff's patent infringement claims are premised on unsuccessful patent infringements claims that have been adjudicated, and even if they were valid, his complaint still fails because "the plaintiff has failed to include factual allegations

beyond the identities of the defendants, reference to the alleged infringing devices, and the alleged infringed-upon patents." … Although this action represents Golden's third frivolous action based upon alleged patent infringement (and fifth case overall) and the Report recommends that this Court sanction Golden $400.00, this Court declines to order sanctions at this time. However, in the event Golden attempts to file another frivolous action in this Court, the Court will consider the imposition of sanctions as warranted… First, Golden objects to the Report's dismissal of the action as frivolous because he contends, he is merely refiling a lawsuit with the deficiencies corrected. Upon review, however, Golden has not cured the frivolousness of his allegations. In reviewing a complaint for frivolousness or malice, the Court looks to see whether the Complaint raises an indisputably meritless legal theory or is founded upon clearly baseless factual contentions, such as fantastic or delusional scenarios… in Case Number 3 the dismissal of patent infringement claims because the complaint contained only "vague generalities and block quotes of statutes, cases, and treatises, but nowhere points us to any nonfrivolous allegations of infringement of any claim by any actual product made, used, or sold by any defendant" … simply naming a product and providing a conclusory statement that it infringes a patent is insufficient to meet the "plausibility"

> standard set forth in *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)… Plaintiff previously filed his complaint and exhibits numbering more than 300 pages. While Plaintiff's current complaint totals 34 pages and he has raised an objection to the 35-page limit imposed by the Magistrate, this Court modifies the Magistrate's previous order and the Report and hereby lifts the 35-page limit restriction for an amended complaint… Although the Court has lifted this restriction, the Court notes that Golden's complaint in Case Number 3 numbered more than 150 pages (not counting exhibits) and his amended complaint numbered more than 250 pages (not counting exhibits) and the matter was still dismissed as frivolous… As a reminder, the filing of excessive and unnecessary documents impedes judicial efficiency and the administration of justice… As Golden has experienced in his previous cases, ". . . length and complexity may doom a complaint by obfuscating the claim's essence." *United States v. Lockheed-Martin Corp.*, 328 F.3d 374, 378 (7th Cir. 2003)"

**Plaintiff-Appellant's Repeated Filings is Due to the District Court's Incompetence**

What the District Court Judges fail to mention, is what cause the repeated filings and appeals. When Plaintiff-Appellant first filed this case against the Defendants i.e., Apple, Inc. et al, the Magistrate Judge recommended dismissal

because he stated it was a duplicate case; the District Judge agreed with the Magistrate Judge that the case be dismissed because it is a duplicate of another pending case; on appeal at the Federal Circuit, the Circuit determined the case not to be a duplicate case and dismissed without prejudice; upon refiling, the District Court refuse to admit its mistake and dismissed the case again.

Plaintiff-Appellant filed an Antitrust Law Violation case. The Magistrate Judge changed the cause of action to a that of Patent Infringement and dismissed the case because there weren't enough factual allegations to support a patent infringement claim in the Antitrust Law Violation pleadings. The District Judge disagreed with the change of the cause of action, but agreed with the Magistrate Judge recommendation to dismissed the case because there weren't enough factual allegations to support a patent infringement claim in the Antitrust Law Violation pleadings. How could there be when the case was never a patent infringement cause of action from the start?

Plaintiff-Appellant filed a new case (present case) but the District Court rejected the case because the Magistrate Judge imposed a 35-page limit to plead 16 companies, 7 patents, 32 patent claims, and 48 alleged infringing products. The District Court acknowledges the Magistrate Judge's error but continued to dismiss Plaintiff-Appellant's case because it fails to state enough factual allegations.

I have lived in the Strom Thurmond state of South Carolina all my life. I was born in Laurens, SC where the first confederacy "redneck" shop in the Nation was open for the Klan (see the movie "Burden"), and has lived in "Bob Jones University" Greenville, SC, for the past thirty years. I know what racism, discrimination, and prejudice looks like, feels like, and smells like; and, I can truly say the U.S. District Court stinks.

**Example of Plaintiff-Appellant's Pleadings for the Alleged Apple Products**

<u>COUNT I</u>

(Infringement of the '287 Patent)

Golden realleges and incorporates herein the allegations set forth in Paragraphs 1-154.

Upon information and belief, defendants Apple Inc. ("Apple"), Samsung Electronics, USA ("Samsung"), LG Electronics, USA, Inc. ("LG"), Qualcomm Inc. ("Qualcomm"), Motorola Solutions Inc. ("Motorola"), Panasonic Corporation ("Panasonic"), AT&T Inc. ("AT&T"), Verizon Corporation Services Group ("Verizon"), Sprint Corporation ("Sprint"), T-Mobile USA, Inc. ("T-Mobile"), Ford Global Technologies, LLC ("Ford"), Fairway Ford Lincoln of Greenville ("Fairway Ford"), General Motors Company ("GM"), Kevin Whitaker Chevrolet ("Whitaker Chevrolet"), FCA US LLC ("FCA"), and Big O Dodge Chrysler Jeep Ram

("Big O") has directly infringed or infringed under the doctrine of equivalents, at least independent claims 1, 4, or 5 of the '287 patent that covers Plaintiff's communication, monitoring, detecting and controlling (CMDC) device. ***Exhibit K: Claim Chart for the '287 Patent***

On information and belief, Apple is jointly, directly and/or indirectly infringing at least claim 5 of the '287 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling and/or importing computerized communications devices (i.e. iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, and Apple Watch series 3, 4, & 5) included without limitation Plaintiff's CMDC devices. As set forth in Golden's preliminary infringement contentions that Apple is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '287 patent and Apple is thereby liable for infringement of the '287 patent pursuant to 35 U.S.C. § 271. Apple have caused damage to Golden, which infringement and damage will continue unless and until Apple is enjoined. ***Exhibit L: Claim Chart for Apple Inc.***

On information and belief, Apple is jointly, directly and/or indirectly infringing at least claim 5 of the '287 patent in this judicial district and

elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling and/or importing computerized communications devices (i.e. iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, and Apple Watch series 3, 4, & 5) included without limitation the Plaintiff's CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking; the CMDC's internet used with CMDC devices for mobile internet to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's chemical / biological monitoring used with CMDC devices for monitoring human heartrate; the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that Apple is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '287 patent and Apple is thereby liable for

infringement of the ‘287 patent pursuant to 35 U.S.C. § 271. Apple have caused damage to Golden, which infringement and damage will continue unless and until Apple is enjoined.

The alleged infringement of Apple identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

Plaintiff-Appellant named five of the eleven inventions (underlined above) that forms Plaintiff-Appellant’s communication, monitoring, detecting and controlling (CMDC) device (i.e., smartphone).

The Claim Chart submitted for Apple (***Exhibit L***) to provide “enough factual allegations” when combined with the Amended Complaint (sample of pleadings are above) in this case, include:

- ➢ A chart comparison to Apple’s first design patent
- ➢ A chart illustration of Apple products being assembled for the Government
- ➢ A chart of the alleged infringing Apple products compared to patent claims
- ➢ Technical and Domestic claim charts
- ➢ Comparison diagrams of Apple products to the CMDC device
- ➢ Description of each numbered component in the comparison diagrams

- List of specifications (i.e., CPU) of each alleged infringing Apple product
- Smartwatch diagrams and description of each numbered component
- DHS S&T *Cell-All* request for Apple to assemble the CMDC device
- Apple's assembled product Commercial Opportunities
- Apple's assembled product Demonstrations

The Claim Chart(s) listed above, that was submitted with the Amended Complaint, was submitted "data specific" for each of the named Defendants in this case, and was never intended to be a Preliminary Infringement Contentions Chart.

A sample of the Preliminary Infringement Contentions Chart(s) submitted to supplement the pleadings in COFC case no. 13-307C and provide notice, included:

- Thirty (30) alleged infringing products of Apple Inc. that, upon information and belief; Plaintiff allege infringes twenty-five (25) independent claims of Plaintiff's '497, '752, '189, '439, & '287 patents.
- Twenty-seven (27) alleged infringing products of Samsung Electronics Inc. that, upon information and belief; Plaintiff allege infringes twenty-five (25) independent claims of Plaintiff's '497, '752, '189, '439, & '287 patents.
- Twenty-seven (27) alleged infringing products of LG Electronics Inc. that, upon information and belief; Plaintiff allege infringes twenty-five (25) independent claims of Plaintiff's '497, '752, '189, '439, & '287 patents.

| Patent #: 9,589,439; Independent Claim 13 | Apple Inc.'s iPhone 7 & iPhone 8 Series and Apple Watch Series 3 |
|---|---|
| A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a personal digital assistant (PDA), a laptop, or a computer terminal for monitoring products, interconnected to a product for communication therebetween, comprising: | **Plaintiff believes the Defendant and third-party contractor; Apple Inc. is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).**<br><br>**Apple Inc.'s iPhone 7 & iPhone 8 Series** are believed to be communicating, monitoring, detecting, and controlling (CMDC) devices of at least one of the *new and improved* products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone); that comprises, are interconnected to, or integrated with, at least a Central Processing Unit (CPU), that is vital for processing instructions; an Operating System (OS); mobile apps developed for the CMDC devices operating system (OS) such as Android, Apple® iOS®, BlackBerry®, or Windows® Mobile; wireless protocol of Cellular, Bluetooth, Wi-Fi, etc., and CBRNE-H sensors that are placed in, on, upon, or adjacent the *new and improved* CMDC devices; interconnected to the CMDC devices for communication therebetween.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, "built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device". Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015<br><br>**The Department of Homeland Security's Cell-All project**. "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals in the surrounding environment. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server, which will then contact appropriate agencies and first responders. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…" "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their current phones before |

integrated sensors are fully operational and readily available." Retrieved from: Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks. Torin Monahan
& Jennifer T. Mokos: A Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA; and, a Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."




**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**CMDC Device Geiger Counter for Radiological Detection:** Below is a picture of a "Smart Geiger Counter Nuclear Radiation Dosimeter "X-Ray" and "Gamma" Detector Smartphone Android iOS with App". Real-time display of measurement results. Ultra-low power consumption. World smallest Geiger Counter (30mm). Compatible with Android and iOS.

| | |
|---|---|
| | <br><br><br>**Smartwatch**: To use a smartwatch as a stand-alone detection device, you need a smartphone. On the smartphone, the user installs the app that comes with the smartwatch stand-alone detection device, such as Android Wear (Wear OS—operating system from Samsung's Tizen software) or Watch from Apple (i.e., watchOS 7—operating system). By opening the accompanying app on the smartphone and turning on Bluetooth, the user can synchronize the smartwatch to function as a stand-alone detection device with the smartphone.<br><br>**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) is the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The Patent Owner's CPU is capable of arithmetic operations such as add and divide and flow control operations such as conditionals. The Patent Owner's central processing unit (CPU) is the electronic circuitry within the CMDC device that is vital and essential processes and executes program instructions.<br><br>**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween… or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted… The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174… |

<table>
<tr>
<td>at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; that is wired or wireless, capable of being disposed within, on, upon or adjacent the communication device;</td>
<td>

**Plaintiff believes the Defendant and third-party contractor; Apple Inc. is infringing Plaintiff's claim limitation under the "doctrine of equivalents"**

**Interchangeable Sensors**: Building on the system he developed with NASA for the DHS Cell-All project, George Yu of Genel Systems Inc., created his NODE+ platform — a cylinder not much bigger than a thumb that can transmit data from sensors to a smartphone or other smart device or store it to be uploaded to any computer. The NODE+ operates independently of the cell phone and transmits the data it gathers using Bluetooth wireless technology. Variable converted off-the-shelf sensors, such as infrared thermometers, color referencers, motion sensors and barcode readers, into *interchangeable modules* that can be snapped onto either end of smartphone or other smart device, so two modules can be used simultaneously. There is a module for carbon dioxide detection and another that senses carbon monoxide, nitric oxide and other gases. "Using a common platform for multiple sensor modules, you save a lot of money," Yu says. The NODE+ is compatible with Android and Apple smart devices.



The NODE+ platform can be outfitted with an array of different sensor modules and can store data or transmit it to a smart device using Bluetooth wireless technology. **Credits: Variable Inc.**

</td>
</tr>
<tr>
<td>at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program, a network processor which is specifically targeted at the networking application domain, or a front-end processor for communication between a host computer and other devices;</td>
<td>

**Plaintiff believes the Defendant and third-party contractor; Apple Inc. is literally infringing Plaintiff's claim limitation**

Apple's iPhone 7 & iPhone 8 Series: The CPU, or central processing unit, is responsible for most of the functions on your smartphone, such as running the operating system (Apple's iOS) and relaying touch-screen input. The performance of the CPU, that's a part of the chipset, is vital for processing instructions. The SiP in Apple Watch Series 1 is called S1P and looks superficially identical to the S1, but it includes most of the new features of the Apple S2 except notably for the on-chip GPS functionality. It contains the same dual-core CPU with the same new GPU capabilities as the S2 making it about 50% faster than the S1

</td>
</tr>
</table>

| | |
|---|---|
| a transmitter for transmitting signals and messages to at least one of a multi-sensor detection device, a maritime cargo container, a cell phone detection device, or a locking device; | **Plaintiff believes the Defendant and third-party contractor; Apple Inc. is literally infringing Plaintiff's claim limitation**<br><br>Apple's iPhone 7 & iPhone 8 Series transmits signals and messages to at least one of plurality product groups.<br><br>**Patent Specifications**: Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars...Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans... Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to... Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds... Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF)... Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature... Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |

| | |
|---|---|
| a receiver for receiving signals, data or messages from at least one of the multi-sensor detection device, the maritime cargo container, the cell phone detection device, or the locking device; | **Plaintiff believes the Defendant and third-party contractor; Apple Inc. is literally infringing Plaintiff's claim limitation**<br><br>Apple's iPhone 7 & iPhone 8 Series receives signals, data or messages from at least one of plurality product groups.<br><br>**Patent Specifications**: Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars...Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans... Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to... Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds... Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF), Global Positioning System (GPS)... Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature... Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |
| at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection | **Plaintiff believes the Defendant and third-party contractor; Apple Inc. is literally infringing Plaintiff's claim limitation**<br><br>Apple's iPhone 7 & iPhone 8 Series are literally infringing the wireless protocols listed in the claim limitation of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS connection. |

| | |
|---|---|
| the communication device is at least a fixed, portable or mobile communication device interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween; and | **Plaintiff believes the Defendant and third-party contractor; Apple Inc. is literally infringing Plaintiff's claim limitation**<br><br>When you use Apple Pay in stores that accept contactless payments, Apple Pay uses Near Field Communication (NFC) technology between your device and the payment terminal. NFC is an industry-standard, contactless technology that's designed to work only across short distances. Apple Pay is a contactless payment technology for Apple devices. Your debit and credit cards are on your iPhone or Apple Watch, allowing you to pay using your device instead of a card. To accept payments, have customers hold their iPhone, iPad or Apple Watch near the reader until four green lights appear and a chime sound. When you see the check mark on your screen, the transaction is complete. |
| whereupon the communication device, is interconnected to a product equipped to receive signals from or send signals to lock or unlock locking devices, activate or deactivate security systems, activate or deactivate multi-sensor detection systems, or to activate or deactivate cell phone detection systems; | **Plaintiff believes the Defendant and third-party contractor; Apple Inc. is literally infringing Plaintiff's claim limitation**<br><br>Apple's iPhone 7 & iPhone 8 Series Security feature: The devices are is capable of sending signals to lock and unlock doors; activate or deactivate security systems in homes, buildings, or vehicles; detect for Chemical, Biological, Radiological, Nuclear, or Explosive's agents; to stop, stall, or slowdown vehicles, to include driverless land and aerial vehicles; of diagnosing biological and/or chemical medical conditions, and receiving data that the intended task has been accomplished. |
| wherein the communication device receives a signal via any of one or more products in any product grouping categories; | **Plaintiff believes the Defendant and third-party contractor; Apple Inc. is literally infringing Plaintiff's claim limitation**<br><br>Apple's iPhone 7 & iPhone 8 Series receives signals, data or messages from at least one of plurality product groups.<br><br>**Patent Specifications:** Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), |

| | |
|---|---|
| | notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF), Global Positioning System (GPS)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |
| wherein the at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, or short-range radio frequency (RF) connection is capable of signal communication with the transmitter, the receiver of the communication device, or transceivers of the products; | **Plaintiff believes the Defendant and third-party contractor; Apple Inc. is literally infringing Plaintiff's claim limitation**<br><br>Apple's iPhone 7 & iPhone 8 Series are literally infringing the wireless protocols listed in the claim limitation of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS connection. |
| wherein the communication device is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature such that the communication device that is at least one of the cell phone, the smart phone, the desktop, the handheld, the PDA, the laptop or the computer terminal is locked by the biometric lock disabler to prevent unauthorized use; | **Plaintiff believes the Defendant and third-party contractor; Apple Inc. is infringing Plaintiff's claim limitation under the "doctrine of equivalents" for Plaintiff's "lock disabling system".**<br><br>**Patent specifications**: "FIG. 1 is a perspective view of the… an automatic/mechanical lock disabler and a fingerprint biometric lock with disabler… FIG. 14 is a representative schematic view of the… lock disabling system of the present invention illustrating interconnection of the… fingerprint biometric lock with disabler for engaging and disengaging the fingerprint biometric lock as part of the process of detection and safeguarding the public… The fingerprint biometric lock with disabler 62 is interconnected to the cpu 40… for receiving transmissions therefrom after detection… has occurred so that the lock… can be locked or disabled. Moreover, resetting of the fingerprint biometric lock with disabler 62 occurs when the fingerprint of the individual is placed on the fingerprint-matching pad 64, and if a match occurs with a known fingerprint stored by the cpu 40, then the individual can reset the fingerprint biometric lock with disabler 56… a fingerprint that matches stored and authorized fingerprints 102 would indicate an authorized individual, and would allow the individual to disable and disarm 104 the lock… The fingerprint biometric lock with disabler 62 would then be reset 106 after the appropriate safety… and protection measures are completed, and the system 10 would be reset and placed back in the detection mode 108" |

| | |
|---|---|
| | **Example:** "If your Apple ID is locked or disabled; if you or someone else enters your password or other account information incorrectly too many times; if your account has been disabled for security reasons; or, if you see one of the following messages, your Apple ID automatically locked to protect your security and you can't sign in to any Apple services: "This Apple ID has been disabled for security reasons"; "You can't sign in because your account was disabled for security reasons"; "This Apple ID has been locked for security reasons", you need to reset your password to regain access. Reset your password or fingerprint: "Use the steps below to reset your password from any trusted iPhone, iPad, iPod touch, or Mac. You can also use a friend or family member's iPhone, iPad, or iPod touch. If that doesn't work, you may not be signed into iCloud on an eligible device or have two-factor authentication enabled for your Apple ID. https://support.apple.com/enus/HT201487 Apple's iPhone 7 & iPhone 8 Series Security feature:<br> |
| wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group consisting of satellite, Bluetooth, WiFi, internet, radio frequency (RF), cellular, broadband, long range radio frequency (RF), and short-range radio frequency (RF). | **Plaintiff believes the Defendant and third-party contractor; Apple Inc. is literally infringing Plaintiff's claim limitation**<br><br>Apple's iPhone 7 & iPhone 8 Series Security feature: In the event that cellular service isn't available, and WiFi Calling has been enabled, emergency calls may be made over Wi-Fi. Emergency calls on the iPhone are routed through cellular service when available. In the event that cellular service isn't available, and you have enabled Wi-Fi Calling, emergency calls may be made over Wi-Fi, and the device's location information may be used for emergency calls to aid response efforts, regardless of whether the user has enabled Location Services. Some carriers may use the address registered with the carrier when signing up for Wi-Fi Calling as the user's location. When connected to Wi-Fi calling, the iPhone may not receive emergency alerts. |

"It's easy to dismiss what you don't understand or what you don't want to understand". *From Josh from God's Not Dead (2014)*

One of the most significant ways information processing and decision-making becomes warped is through motivated reasoning, when biased reasoning

leads to a particular conclusion or decision, a process that often occurs outside of conscious awareness.

It's hard to say right now if the District Court (Government) is basing its decisions and actions on biased reasoning, to ensure at any cost, that African-American Inventors never get a chance to protect their intellectual property in S.C. District Courts. Biased reasoning that leads to pre-existing beliefs about African-American inventors, has been deeply rooted into the Judicial system of S.C. government, for a couple of centuries. American history provides evidence.

"Motivated reasoning" is what social scientists call the process of deciding what evidence to accept based on the conclusion one prefers. Most decisions the S.C. District Court has made, conscious or unconscious, were influenced by motivation; there is an intended purpose underlying those decisions. The purpose is to ensure an African-American Inventor never gets a chance to protect his intellectual property in the S.C. District Court.

Confirmation bias involves favoring ideas that confirm preexisting beliefs; it is the tendency for people to believe evidence that confirms their preexisting beliefs and discount information that counters those beliefs. (Accepting the lie that Steve Jobs invented the smartphone is easier than accepting the truth that the smartphone (CMDC device) was invented by the Plaintiff-Appellant; assembled by the government; to be used for the benefit of the public).

The United States House Speaker Nancy Pelosi, admitted at a hearing on the Democratic National Convention platform, Thursday, June 9, 2016; that it was the Federal Government who invented the smartphone, not Steve Jobs. Mrs. Pelosi implied that GPS technology, special alloys and other government-funded research projects were enough to deem the federal government the inventor of the iPhone. Here's some of the transcript: "Anybody here have a smartphone? In this smartphone, almost everything came from federal investments and research. GPS, created by the military, flatscreens, LLD [sic], digital camera, wireless data compression, research into metal alloys for strength and lightweight, voice recognition — the list goes on and on.... They say Steve Jobs did a good idea designing it and putting it together. Federal research invented it."

"It's easy [for the trial court] to dismiss what [it does not] understand or what [it does not] want to understand". In other words, "how can you see the hand writing on the wall, when your back is already against it"? Here's an example of *hand writing on the wall* that is simply ignored by the trial court because it goes against the trial court's preexisting beliefs:

"As Steve Jobs said in 1994, "Picasso had a saying, 'Good artists copy, great artists steal,' and we have you know [we have] always been shameless about stealing great ideas." "Almost every Apple product has features that were

first developed by others; rarely do its technologies wholly originate within the company." https://www.washingtonpost.com/news/innovations /wp/2018/04/30/my-advice-to-the-worlds-entrepreneurs-copy-and-steal-the-silicon-valley-way/

Apple, Samsung, Qualcomm, and LG were contracted under the following government solicitation—DHS S&T BAA07-10; *CELL-ALL Ubiquitous Biological & Chemical Sensing*; published 10/30/2007"— to assemble a communicating, monitoring, detecting, and controlling (CMDC) device. The fact that Apple, Samsung, Qualcomm, and LG refer to the assembled CMDC device as a smartphone, laptop, or smartwatch, only confirms the "*technological rational*" for the assembly of "CMDC devices grouped together by common features of design similarities" … *Golden's Patent Specifications*

*The common denominator that causes all the alleged infringing products of all the Defendants to function substantially the same, is Plaintiff-Appellant's central processing unit (CPU).*

Apple has a total of 72054 patents globally. These patents belong to 24279 unique patent families. Out of 72054 patents, 55757 patents are active. https:// insights.greyb.com/apple-patents/ All that is required of Apple, provided the S.C. District Court remove themselves as Defendants, is to present at least one of the 72054 patents to the Court that antedates Plaintiff-Appellant's patents.

**THE COMMON DENOMINATOR, WHICH CAUSES ALL THE ALLEGED INFRINGING PRODUCTS OF ALL THE DEFENDANTS TO FUNCTION SUBSTANTIALLY THE SAME, IS PLAINTIFF-APPELLANT'S CENTRAL PROCESSING UNITS (CPUs).**

Plaintiff-Appellant's CMDC (i.e., new and improved cell phones; smartphones) devices; the CPU—Chipsets of the alleged infringers are responsible for the execution of most of the functions of the alleged infringing mobile devices. These functions include running apps and the operating system, as well as relaying input instructions from the user to the rest of the device.

The smartphone processor (CPU), also known as chipset, is a component that controls everything going on in the smartphone and ensures it functions correctly. The CPU is often compared to the "brain" of the human body. Every action performed on the smartphone goes straight to the processor. https://www.coolblue.nl/en/advice/smartphone-processors.html

"Unlike simpler mobile phones of the past, today's smartphones all have processors or CPUs. A smartphone CPU (central processing unit) is the brains of the entire device. Without one, no smartphone would be able to function" (smartphonedomain.com., 2021).

A CPU, at its most basic level, consists of five parts:

- *Arithmetic and logic unit (ALU)*: The ALU is responsible for performing calculations on data. An uncomplicated CPU might contain just one ALU that can perform only addition, subtraction, and basic logic. The more sophisticated CPUs may contain several ALUs that are capable of advanced floating-point operations (McGrath, 2014).
- *Control unit (CU)*: The CU controls the movement of instructions in and out of the processor, as well as the operation of the ALU (McGrath, 2014).
- *Register array*: A register array consists of small units of internal memory used for quick storage and retrieval of data and instructions. All processors contain at least one program counter, an instruction register, an accumulator, a memory address register, and a stack pointer register (McGrath, 2014).
- *System bus*: The system bus comprises a data bus, an address bus, and a control bus and is used to transfer data between the processor, memory, and peripherals. The address bus carries the address of a specified location. The data bus carries information between the CPU and memory, or between the CPU and I/O devices. The control bus carries commands from the CPU and returns status signals from the devices (McGrath, 2014).
- *Memory*: Although not actually part of the CPU, memory is an essential part of CPU operation as it stores data and the program being executed (McGrath, 2014).

While, a sensor and a lock are important stand-alone components of Plaintiff-Appellant's CMDC devices, so too is the GPS tracking, internet (Wi-Fi), biometric authentication, near-field communication (NFC), and other wireless protocols (i.e., Bluetooth, cellular, satellite, RF). But, the one component of Plaintiff-Appellant's CMDC devices that interconnects with all of the aforementioned components, is Plaintiff-Appellant's CPUs.

The central processing unit or CPU is the "brains" of a smartphone, and is central to its functionality. It governs how quickly a device can perform various functions, and determines how well a device can perform multiple different functions simultaneously.

> "The district court construed "integrated circuit card" to mean "a card containing a single semiconductor substrate [i.e., a chip] having a central processing unit and all program memory." J.A. 31. The court construed "programmable device" as "a single semiconductor substrate integrating electronic circuit components that includes a central processing unit and all program memory making it suitable for use as an embedded system. J.A. 33… [w]e thus agree with the district court that the programmable device of claim 3 of the '727 patent should be construed as "a single semiconductor substrate integrating electronic circuit components that includes a central processing unit and all program memory making it suitable for use as an

embedded system. J.A. 33." *GEMALTO S.A. v. HTC CORPORATION, HTC AMERICA, INC., et. al.* CAFC Case No. 13-1397; Decided June 19, 2014.

Defendant Qualcomm was strongly positioned to benefit from the growth of smartphone sales, and from high demand for increasingly fast data and processing capabilities into thinner smartphones and other mobile devices. Since 2007, Qualcomm has released four different series of Snapdragon mobile processors—the 200 series, 400 series, 600 series, and the 800 series—each of which included the capability of accessing both 3G and 4G/LTE wireless networks, something that Qualcomm's competitors were not able to do until at least the second half of 2014. This was significant because by the end of 2013, some of the largest smartphone markets in the world—the United States, Europe, and China (with nearly 1 billion subscribers alone) had launched lightning fast 4G/LTE wireless networks and Qualcomm had the only 4G/LTE SoC for premium-tier smartphones. *JAMES HAYS, Derivatively on Behalf of QUALCOMM INCORPORATED v. PAUL E. JACOBS, et. al, UNITED STATES DISTRICT COURT DISTRICT OF DELAWARE*, Case 1:17-cv-00603-UNA, https://www.courthousenews.com/wp-content/uploads/2017/05/qualcomm.pdf

In January 2017, the FTC sued Qualcomm for equitable relief, alleging that Qualcomm's interrelated policies and practices excluded competitors and harmed competition in the modem chip markets, in violation § 5(a) of the FTC Act, 15

U.S.C. § 45(a), and §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2. After a ten-day bench trial, the district court concluded that "Qualcomm's licensing practices are an unreasonable restraint of trade under § 1 of the Sherman Act and exclusionary conduct under § 2 of the Sherman Act." *Qualcomm*, 411 F. Supp. 3d at 812 (citing *United States v. Microsoft Corp.*, 253 F.3d 34, 58–59 (D.C. Cir. 2001)). The district court ordered a permanent, worldwide injunction prohibiting Qualcomm's core business practices. *Id.* at 820–24.

Multiple intellectual property rights may themselves be combined into packages (Qualcomm's Snapdragon chipsets). Mandatory package licensing occurs when Qualcomm refuses to license its SEPs cellular-modems unless a licensee accepts an entire package that includes Plaintiff-Appellant's patented CPUs (or where Qualcomm's royalty scale has this effect).

> "Defendant Qualcomm charges a 5% royalty, or about $12 to $20, per smartphone plus a large "CDMA tax," Apple's chief operating officer testified in an antitrust case here. The testimony put on the record some details of Qualcomm's licensing practices that have long drawn industry complaints. "For many years Qualcomm has unfairly insisted on charging royalties for technologies they have nothing to do with," Apple said in its lawsuit against Qualcomm. 'Qualcomm charges the 5% royalty on every hand set (smartphone) sold'."

For example, "Microsoft maintained its dominance in computer operating systems (the tying product) by "[t]echnologically binding" the Internet Explorer browser (the tied product) to the Windows operating system, to prevent other browsers from competing with Windows as a platform on which users could access computer applications." *Microsoft*, 253 F.3d at 60-67.

A "technological tie" may be defined as one in which the tying (Qualcomm's cellular-modem) and tied products (Plaintiff-Appellant's central processing units (CPUs)) are bundled together physically, or produced in such a way that they are compatible only with each other. We have already established that without the CPU(s), the requested devices cannot function.

Plaintiff-Appellant own the rights to charge a royalty fee for every hand set (smartphone) sold; not Qualcomm. Qualcomm continues to contract with the Government to avoid direct infringement claims brought against them by the Plaintiff-Appellant. The allegations of infringement have to be made against the United States, and under 28 U.S.C. § 1498(a), "remedy shall be by action against the United States in the United States Court of Federal Claims". The Claims Court only recognized Qualcomm for possibly submitting a proposal to the Cell-All solicitation.

Plaintiff-Appellant's central processing units (CPUs) are designed to fetch, decode, execute, and store, for his CMDC (new and improved cell phones)

devices. Like Qualcomm's Snapdragon CPUs are designed to fetch, decode, execute, and store, for the third-part contractors Apple, Samsung, & LG devices.




Qualcomm's Snapdragon is a suite of system on a chip (SoC) semiconductor product for mobile devices designed and marketed by Qualcomm Technologies Inc. The Snapdragon system on chip (SoC) was announced in November 2007 and included the Scorpion processor. The Snapdragon's central processing unit (CPU) uses the ARM architecture. A single SoC may include multiple CPU cores; a Snapdragon wireless modem; and, other software and hardware to support a smartphone's global positioning system (GPS), camera, video, and audio. As such, Qualcomm often refers to the Snapdragon as a "mobile platform" (e.g., Snapdragon 865 5G Mobile Platform). Snapdragon semiconductors are embedded in devices of various systems, including Android devices (i.e., Samsung; LG).

Qualcomm's Snapdragon semiconductors are also used in cars and wearable devices such as Smart Watches and other devices. In addition to the processors, the Snapdragon line includes modems, Wi-Fi chips and mobile charging products.

**Defendant Qualcomm's Joint Direct Infringement**

Patent claims 4, 5, & 6 of the '287; and, claims 1, & 11 of the '619 patent demonstrates how Apple and Samsung; Qualcomm and LG; and, Qualcomm and Samsung are potentially liable under the provisions of *joint direct infringement. Akamai Techs*., 629 F.3d at 1319-21 (holding there must be a contractual or agency relationship between the parties for a finding of joint infringement).

Although joint infringement is similar to contributory infringement (which is a form of indirect infringement), joint infringement is considered a form of direct infringement. *BMC Resources Inc. v. Paymentech L.P.*, 498 F.3d 1373, 1381, 84 USPQ2d 1545 (Fed. Cir. 2007) (74 PTCJ 644, 9/28/07). Joint infringement does not change the traditional standard of direct infringement that requires a single party to perform all the steps of a claimed method. *BMC at 1380*. Rather, joint infringement can be viewed a special case where application of the law of agency treats two parties as a single party for purposes of determining infringement.[1]

[1] Apple and Samsung's Contract: Apple first used SoCs in early versions of the iPhone and iPod touch. They combine in one package a single ARM-based processing core (CPU), a graphics processing unit (GPU), and other electronics necessary for mobile computing. The APL0098 (also 8900B or S5L8900) is a package on package (PoP) system on a chip (SoC) that was introduced on June 29, 2007, at the launch of the original iPhone. It includes a 412 MHz single-core ARM11 CPU

*In Travel Sentry, Inc. v. David A. Tropp (Travel Sentry III)*, a panel of the Court of Appeals for the Federal Circuit (CAFC) broadened the scope of potential liability for joint patent infringement by expanding the definition of direct infringement. Direct infringement requires that all steps of a patented method to be performed by or attributable to a single actor.

Traditionally, attribution was based on traditional agency principles or contracts. *In Akamai V*, the CAFC established a two-prong test stating "an alleged infringer conditions participation in an activity or receipt of a benefit upon performance of a step or steps of a patented method and establishes the manner or timing of that performance." The CAFC, in *Akamai V*, established that "[w]hether a single actor directed or controlled the acts of one or more third parties are a question of fact."

one or more third parties, regardless of whether such right or ability has basis in traditional agency principles or a

---

The Apple A4 is a PoP SoC manufactured by Samsung, the first SoC Apple designed in-house. It combines an ARM Cortex-A8 CPU – also used in Samsung's S5PC110A01 SoC – and a PowerVR SGX 535 graphics processor (GPU), all built on Samsung's 45-nanometer silicon chip fabrication process. The design emphasizes power efficiency. The A4 commercially debuted in 2010, in Apple's iPad tablet, and was later used in the iPhone 4 smartphone.

The Apple A5 is an SoC manufactured by Samsung that replaced the A4. The chip commercially debuted with the release of Apple's iPad 2 tablet in March 2011, followed by its release in the iPhone 4S smartphone later that year. Compared to the A4, the A5 CPU "can do twice the work" and the GPU has "up to nine times the graphics performance", according to Apple.

The Apple A6 is a PoP SoC introduced on September 12, 2012, at the launch of the iPhone 5. The A6 is manufactured by Samsung on a high-κ metal gate (HKMG) 32 nm process. The A6 is said to use a 1.3 GHz custom Apple-designed ARMv7 based dual-core CPU…

The CAFC panel reiterated the importance of correctly identifying the relevant "activity" or "benefit" that is being conditioned upon performance of one or more claim steps. The panel also emphasized that the context of the claims and conduct in a particular case will inform whether attribution is proper under *Akamai V's* two-prong test.

When facts presented in a case are sufficient to establish that an accused infringer "has the right and ability to stop or limit" infringing activity performed by contract(s), such facts should be presented to a [Judge(s)] or jury to determine whether or not the third-party activity is attributable to the accused infringer.

*In BMC Resources Inc. v. Paymentech L.P.,* BMC relied upon dicta from *On Demand Machine Corp. v. Ingram Industries Inc.*, 424 F.3d 1293, 1322-24, 76 USPQ2d 1662 (Fed. Cir. 2005) (70 PTCJ 631, 10/7/05), that the law on joint infringement had been changed by the Federal Circuit such that a single party was no longer required to perform all the steps to infringe a method claim.

The Federal Circuit disagreed, and stated that "*On Demand* did not change this Court's precedent with regard to joint infringement." The precedent appears

---

The Apple A9 is a 64-bit ARM-based SoC that first appeared in the iPhone 6S and 6S Plus, which were introduced on September 9, 2015. Apple states that it has 70% more CPU performance and 90% more graphics performance compared to its predecessor, the Apple A8. It is dual sourced, a first for an Apple SoC; it is manufactured by Samsung on their 14 nm FinFET LPE process and by TSMC on their 16 nm FinFET process. It was subsequently included in the first-generation iPhone SE, and the iPad (5th generation). The Apple A9 was the last CPU that Apple manufactured through a contract with Samsung, as all A-series chips after are manufactured by TSMC.

Qualcomm, Inc.'s Contracts with Samsung & LG for Snapdragon Processors: Snapdragon is a suite of system on a chip (SoC) semiconductor product for mobile devices designed and marketed by

limited, but includes *Cross Medical Products v. Medtronic Sofamor Danek*, 424 F.3d 1293, 1322-24, 76 USPQ2d 1662 (Fed. Cir. 2005) (70 PTCJ 631, 10/7/05), discussed infra. *Id. at 1380.* The court stated:

"A party cannot avoid infringement, however, simply by contracting out steps of a patented process to another entity. In those cases, the party in control would be liable for direct infringement. It would be unfair indeed for the mastermind in such situations to escape liability." *Id. at 1381.*

Apple (2021), Samsung (2021), LG (2012), & Qualcomm (2019) were all issued notices to appear in COFC case no. 13-307C, *Larry Golden v. The United States*, to protect any interest they may have in the allegations set forth by the Plaintiff-Appellant. The four Defendants fail to appear. Relief granted by default.

---

Qualcomm Technologies Inc. Qualcomm announced it was developing the Scorpion central processing unit (CPU) in November 2007. The Snapdragon system on chip (SoC) was announced in November 2006 and included the Scorpion processor. The Snapdragon's central processing unit (CPU) uses the ARM architecture. A single SoC may include multiple CPU cores; a Snapdragon wireless modem; and, other software and hardware to support a smartphone's global positioning system (GPS), camera, video, and audio. As such, Qualcomm often refers to the Snapdragon as a "mobile platform" (e.g., Snapdragon 865 5G Mobile Platform). Snapdragon semiconductors are embedded in devices of various systems, including Android devices (i.e., Samsung & LG). They are also used in cars and wearable devices such as Smart Watches and other devices. In addition to the processors, the Snapdragon line includes modems, Wi-Fi chips and mobile charging products.

Qualcomm, Inc.'s Contracts with Apple, Samsung & LG for Qualcomm's patented wireless cellular technology: The case of *Fed Trade Comm'n v. Qualcomm Inc.*, (N.D. Cal. 2017, Case No. 17-CV-00220-LH) ("Qualcomm"). Qualcomm specifically concerns standard-essential patents and their misuse to restrain and monopolize commerce. "Qualcomm has long been a leading provider of highly specialized modem chips and related technologies for use in smartphones and other smart devices. After emerging as an industry leader, it applied for and obtained standard-essential patents ("SEPs") for various chips and technologies that must be used to make the most popular and sophisticated smartphones and other smart devices." The alleged infringement occurs when Qualcomm uses, offers for sale, and sells, as a third-party contractor for the Government, Plaintiff's covered CPUs for use with Plaintiff's CMDC (i.e., cell phones, smartphones; smartwatches) devices in a single unit (chipset).

**Plaintiff-Appellant's Central Processing Unit (CPU)—Invention**

Claims 4, 5, & 6 of Patent No. 10,163,287 [the '287 patent] claims a "communication device", "monitoring device", and, "monitoring equipment", that comprises: "at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or send signals to detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling."

4. A communication device comprising:

at least one central processing unit (CPU);

at least one motion sensor in communication with the at least one CPU;

at least one viewing screen for monitoring in communication with the at least one CPU;

at least one global positioning system (GPS) connection in communication with the at least one CPU;

at least one of an internet connection Wi-Fi connection in communication with the at least one CPU;

at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU;

at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device;

at least one power source comprising at least one of a battery, electrical connection, or wireless connection, to provide power to the communication device;

at least one biometric sensor in communication with the at least one CPU for providing biometric authentication to access the communication device;

at least one or more detectors in communication with the art least one CPU for detecting at least one of a chemical, biological, radiological, or explosive agents;

at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU; and,

at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or send signals to detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling.

**5.** A monitoring device, comprising:

at least one central processing unit (CPU);

at least one temperature sensor in communication with the at least one CPU for monitoring temperature;

at least one motion sensor in communication with the at least one CPU;

at least one viewing screen for monitoring in communication with the at least one CPU;

at least one global positioning system (GPS) connection in communication with the at least one CPU;

at least one of an internet connection or a Wi-Fi connection in communication with the at least one CPU;

at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU;

at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device;

at least one power source comprising at least one of a battery, electrical connection, or wireless connection, to provide power to the communication device;

at least one biometric sensor in communication with the at least once CPU for providing biometric authentication to access the communication device;

at least one sensor for chemical, biological, or human detection in communication with the at least one CPU;

one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents;

at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU; and,

at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or send signals to detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling.

6. A monitoring equipment, comprising:

at least one central processing unit (CPU);

at least one motion sensor in communication with the at least one CPU;

at least one light indicator in communication with the at least one CPU;

at least one viewing screen for monitoring in communication with the at least one CPU;

at least one global positioning system (GPS) connection in communication with the at least one CPU;

at least one of an internet connection or Wi-Fi connection in communication with the at least one CPU;

at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU;

at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device;

at least one power source comprising at least one of a battery, electrical connection, or wireless connection, to provide power to the communication device;

at least one biometric sensor in communication with the at least one CPU for providing biometric authentication to access the communication device;

at least one or more detectors in communication with the art least one CPU for detecting at least one of a chemical, biological, radiological, or explosive agents;

at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU; and,

at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or send signals to detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling.

Claims 1, of Patent No. 10,984,619 [the '619 patent] claims a "communication device" that comprises a "central processing unit", capable of ... "processing instructions for operational and functional execution, and is capable of providing feedback of the execution, and storing the feedback into memory."

1. A communication device that is at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, comprising at least a central processing unit (CPU), capable of:

processing instructions to lock, unlock, or disable the lock of the communication device;

processing instructions to activate a lock, unlock, or disabling lock means by engaging a vehicle with a two-way communication key-fob;

processing instructions to activate a start, stall, stop, or disabling means by engaging a vehicle's ignition system;

processing instructions to activate a lock, unlock, or disabling lock means; a start, stall, stop, or disabling vehicle means by engaging the operational systems of the unmanned aerial vehicle;

processing instructions to authenticate or identify a user by at least one of biometric fingerprint recognition, biometric facial recognition, biometric iris recognition, or biometric retina recognition;

processing instructions to scan a senor or tag using the short-range wireless technology of radio frequency near-field communication (NFC);

processing instructions to monitor or detect at least one of a chemical sensor, a biological sensor, a motion sensor, a biometric sensor, a signature sensor, or a human sensor;

processing instructions to monitor or detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent, or explosive agent, weapons of mass destruction (WMDs);

processing instructions received through at least one of a Bluetooth, a Wi-Fi, a satellite, a global positioning system (GPS), or a cellular transmission;

processing instructions to connect the communication device to the internet or internet-of-things (IoTs) platform to sync, to at least one of a building's computer or security system, a vehicle's computer or security system, a lock, a detection device, or another communication device; and,

whereupon, the communication device is capable of processing instructions for operational and functional execution, and is capable of providing feedback of the execution, and storing the feedback into memory.

Claims 11, of Patent No. 10,984,619 [the '619 patent] claims a "central processing unit" of at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, capable of … "processing instructions for operational and functional execution, and is capable of providing feedback of the execution, and storing the feedback into memory."

11. A central processing unit (CPU) of at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, capable of:

processing instructions to lock, unlock, or disable the lock of the communication device;

processing instructions to activate a lock, unlock, or disabling lock means by engaging a vehicle with a two-way communication key-fob;

processing instructions to activate a start, stall, stop, or disabling means by engaging a vehicle's ignition system;

processing instructions to activate a lock, unlock, or disabling lock means; a start, stall, stop, or disabling vehicle means by engaging the operational systems of the unmanned aerial vehicle;

processing instructions to authenticate or identify a user by at least one of biometric fingerprint recognition, biometric facial recognition, biometric iris recognition, or biometric retina recognition;

processing instructions to scan a senor or tag using the short-range wireless technology of radio frequency near-field communication (NFC);

processing instructions to monitor or detect at least one of a chemical sensor, a biological sensor, a motion sensor, a biometric sensor, a signature sensor, or a human sensor;

processing instructions to monitor or detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent, or explosive agent, weapons of mass destruction (WMDs);

processing instructions received through at least one of a Bluetooth, a Wi-Fi, a satellite, a global positioning system (GPS), or a cellular transmission;

processing instructions to connect the communication device to the internet or internet-of-things (IoTs) platform to sync, to at least one of a building's computer or security system, a vehicle's computer or security system, a lock, a detection device, or another communication device; and,

whereupon, the central processing unit (CPU) of the communication device is capable of processing instructions for operational and functional execution, and is capable of providing feedback of the execution, and storing the feedback into memory.

**Plaintiff-Appellant's Patents are not Frivolous "fanciful delusional scenarios"**

The five primary requirements for patentability are:

(1) patentable subject matter requirement addresses the issue of which types of inventions will be considered for patent protection. Under 35 U.S.C. § 101, the categories for patentable subject matter are broadly defined as any process, machine, manufacture, or composition of matter, or improvement;

(2) utility requirement for patentability is that the invention be useful. See 35 U.S.C. § 101. The PTO has developed guidelines for determining compliance with the utility requirement. The guidelines require that the utility asserted in the application be credible, specific, and substantial Credible utility requires that logic and facts support the assertion of utility, or that a person of ordinary skill in the art would accept that the disclosed invention is currently capable of the claimed use;

(3) novelty requirement described under 35 U.S.C. § 102 consists of two distinct requirements; novelty and statutory bars to patentability. Novelty

requires that the invention was not known or used by others in this country, or patented or described in a printed publication in this or another country, prior to invention by the patent applicant. See 35 U.S.C. § 102(a). To meet the novelty requirement, the invention must be new. The statutory bar refers to the fact that the patented material must not have been in public use or on sale in this country, or patented or described in a printed publication in this or another country more than one year prior to the date of the application for a U.S. patent. See 35 U.S.C. § 102(b);

(4) nonobviousness requirement to the test for patentability with the enactment of the Patent Act of 1952. The test for nonobviousness is whether the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious to a person having ordinary skill in the art at the time the invention was made. See 35 U.S.C. § 103; and,

(5) enablement requirement is directly related to the specification, or disclosure, which must be included as part of every patent application. The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms.

## PLAINTIFF-APPELLANT HAS SATISFIED THE OBJECTIONS INTRODUCED BY THE DOJ IN THE RELATED COFC 13-307C CASE OF ALLEGED PATENT INFRINGEMENT UNDER § 271(a)

**Apple, Samsung, and LG's Accused Devices (i.e., Smartphones)**



**Central Processing Units (CPUs) for Smartphones**




**Multi-Sensor Detector: Smart Watch for Smartphone**



**Camera CBR Sensor(s) for Smartphone**



**Fingerprint Biometric Lock Disabler for Smartphone**



**Plaintiff-Appellant's CPUs**

If the Claims Court had asked the question: what is it that enables so many different products, from so many different companies, to be grouped together by common features of design similarities, instead of following up on the distractions [enhancement; enlargement; introduced as new] the Defendant, the United States, put forth, the Claims Court could have easily recognized the fact that it's the Plaintiff-Appellant's central processing units (CPUs).

Plaintiff-Appellant's patented central processing unit (CPU) is what allows multiple products [the accused products of Apple, Samsung, & LG] to be grouped together by common features of design similarities. Plaintiff-Appellant's CPU is designed to function as the "brain" of Apple, Samsung, & LG's smartphones, smartwatches, and laptops. Without Plaintiff-Appellant's patented central processing unit (CPU) for processing operational and functional instructions; Apple, Samsung, & LG's smartphones, smartwatches, and laptops cannot function.

As a last-ditch effort to discredit and dismiss Plaintiff-Appellant's patented central processing unit (CPU), the Claims Court accused the Plaintiff-Appellant of disobeying a Court order and enlarging the infringement pled. Not true.

Plaintiff-Appellant's first (1st) patent claim of his first patent issued (claim 1 of the '497 patent), and the first (1st) patent claim of his first patent asserted in this

case, claim 1 of the '497 patent has eight (8) claim limitations, of which the CPU is identified as an element five (5) times in 4 of the 8 limitations.

Plaintiff-Appellant's claim 10 of the second (2nd) patent asserted in this case (the '752 patent), has eight (8) claim limitations, of which the CPU is identified as an element, five (5) times in 4 of the 8 limitations.

Plaintiff-Appellant has always described and given notice of Plaintiff-Appellant's central processing units (CPUs). In the "AMENDED COMPLAINT FOR REDUCED PLEADINGS", DKT 195 CFC 13-307C *Larry Golden v. The United States*, Plaintiff-Appellant described the functional and operational specifications, requirements and conditions at: CPU: pgs. 3, 4, 100, 109, 118, & 127; CPU for CMDC device (diagrams): pgs. 140, 141, 142, 143, 144, 145, 147, 148, 149, 150, 151, 152, 154, 155, 156, 157, 158, & 159; CPU for detection device (diagrams): pgs. 142, 143, 149, 150, 156, & 157; and, CPU for smartwatch device (diagrams): pgs. 144, 145, 151, 152, 158, & 159.

In the "PLAINTIFF'S STATUS REPORT AND LEAVE OF THE COURT TO FILE A MOTION FOR DEFAULT JUDGEMENT", DKT 223 CFC 13-307C *Larry Golden v. The United States*, Plaintiff-Appellant described the functional and operational specifications, requirements and conditions at: CPU: pgs. 5, 8, & 9; DKT 223-2 CFC 13-307C; CPU: pgs. 8, 17, 26, & 35; CPU for CMDC device (diagrams): pgs. 48, 49, 50, 51, 52, 53, 55, 56, 57, 58, 59, 60, 62, 63, 64, 65, 66, &

67; CPU for detection device (diagrams): pgs. 50, 51, 57, 58, 64, & 65; and, CPU for smartwatch device (diagrams): pgs. 52, 53, 59, 60, 66, & 67.

Claims 4, 5, & 6, of the '287 patent has a combined total of forty-two (42) limitations. Three (3) *claims preamble* of the (42) limitations, describes the alleged infringing device that includes the "name and model number" [*local patent rule 4c*] of the central processing units (CPUs) and chipsets. Thirty-six (36) of the (42) limitations identify the central processing unit (CPU) as the element found within each accused product [*local patent rule 4c*]. Within the (36) claim limitations, Plaintiff-Appellant identify the element as the central processing unit.

The Claims Court granted the Amended Complaint and allowed the Status Report. Therefore, as noted above, the Claims Court had wide discretion in determining whether the Plaintiff-Appellant's central processing units (CPUs) "enlarge and materially change the infringement pled".

The enlargement, as required by RCFC Patent Rule 4(b) "[t]his identification must include the name and model number, if known, of the accused product, process, or method", and 4(c) "identifying where each element of each asserted claim is found within each accused product, process, or method, including the name and model number", does not constitute an amendment. Plaintiff-Appellant did not disobey the Court's order. Examples of the CPU diagrams:


COMPLAINANT'S COMMUNICATION, MONITORING DETECTING, CONTROLLING (CMDC) DEVICE
CELLULAR
WIRELESS/ CELLULAR MODEM
OPERATING SYSTEM (OS)
GATEWAY - INTERFACE
COMPLAINANT'S CENTRAL PROCESSING UNIT (CPU)
GLOBAL POSITIONING SYSTEM (GPS)
INTERNET WiFi
SATELLITES
DISABLING LOCK MECHANISM AFTER MULTIPLE FAILED ATTEMPTS
BIOMETRIC FINGERPRINT FACIAL IRIS
RADIO FREQUENCY (RF) NEAR FIELD COMMUNICATION (NFC)
INTERCONNECTION CAPABILITIES
CBRN-E DETECTION DEVICE
INFRARED DETECTION OF HUMANS
BIOMETRIC IDENTIFICATION DEVICE
WEARABLE MEDICAL DEVICE - CHEM/BIO MONITORING
SMARTWATCH DETECTION CHEM/BIO/HUMAN+HEARTRATE
VEHICLE STALL-STOP-SLOWDOWN, LOCKS, IGNITION, TEMPERATURE
UNMANNED VEHICLES; LAND,AIR,WATER AUTONOMOUS VEHICLES
HOME BUILDING MONITORING LOCK, UNLOCK DOOR, ETC
RESPONDENT'S MOBILE DEVICE LG V30
OPERATING SYSTEM (OS)
WIRELESS/ CELLULAR MODEM
RESPONDENT'S CENTRAL PROCESSING UNIT (CPU)
INTERNET WiFi
GLOBAL POSITIONING SYSTEM (GPS)
RADIO FREQUENCY (RF) NEAR FIELD COMMUNICATION (NFC)
BIOMETRIC FINGERPRINT FACIAL IRIS
DISABLING LOCK MECHANISM AFTER MULTIPLE FAILED ATTEMPTS


COMPLAINANT'S COMMUNICATION, MONITORING DETECTING, CONTROLLING (CMDC) DEVICE
WIRELESS/ CELLULAR MODEM
OPERATING SYSTEM (OS)
COMPLAINANT'S CENTRAL PROCESSING UNIT (CPU)
GATEWAY - INTERFACE
GLOBAL POSITIONING SYSTEM (GPS)
INTERNET WiFi
DISABLING LOCK MECHANISM AFTER MULTIPLE FAILED ATTEMPTS
BIOMETRIC FINGERPRINT FACIAL IRIS
RADIO FREQUENCY (RF) NEAR FIELD COMMUNICATION (NFC)
CELLULAR
CBRNE - H DETECTION DEVICE:
PLACED IN, ON, UPON OR ADJACENT THE COMMUNICATION MONITORING, DETECTING CONTROLLING (CMDC) DEVICE
SATELLITE
LOCATION CAPABILITY
LOCATION CAPABILITY
CPU
SENSORS
INTERFACE
POWER SOURCE
RESPONDENT'S MOBILE DEVICE GALAXY S8
OPERATING SYSTEM (OS)
WIRELESS/ CELLULAR MODEM
RESPONDENT'S CENTRAL PROCESSING UNIT (CPU)
INTERNET WiFi
GLOBAL POSITIONING SYSTEM (GPS)
RADIO FREQUENCY (RF) NEAR FIELD COMMUNICATION (NFC)
BIOMETRIC FINGERPRINT FACIAL IRIS
DISABLING LOCK MECHANISM AFTER MULTIPLE FAILED ATTEMPTS




Plaintiff-Appellant believes the Claims Court consented to, and then authorized the unlawful, unethical, dishonest, and untruthful tactics introduced by the Defendant, the United States, to show non-infringement at the stage of simply providing enough factual allegations to give the Defendant, the United States, fair notice of Plaintiff-Appellant's infringement contentions under 28 U.S.C. § 1498(a).

Instead of accepting the "fair notice" provided by the Plaintiff-Appellant, the Claims Court raised the bar and required Plaintiff-Appellant to show, on the heightened standard of "clear and convincing" evidence; the Defendant, the United States, has most likely infringed Plaintiff-Appellant's patented inventions covered in patents issued by the United States with the "presumption of validity".

The Federal Circuit issued a decision in *Disc Disease Solutions, Inc. v. VGH Solutions, Inc.*, 888 F.3d 1256 (Fed. Cir. 2018) finding a conclusory allegation [assertions of the bare conclusions necessary to support a cause of action] of infringement to be sufficient under *Iqbal/Twombly*.

**Plaintiff-Appellant's CBR Camera Sensor**

Below is an image of how a smartphone camera work. The Claims Court made the mistake of accusing Plaintiff-Appellant of identifying his CPU as a sensor for detecting hazardous agents, and has dismissed Plaintiff-Appellant's case based on the incorrect diagnosis. Further, the Claims Court had every opportunity to investigate the schematics provided by Plaintiff-Appellant that describes both the CPU and the sensor(s) for detecting hazardous agents. As seen below the processor (CPU) and the camera sensor are separate components integrated to enable the camera to work.



Below is an image of an add-on device that displays C/B sensor data for the smartphone (CMDC device) that illustrates how the smartphone sensors are adapted to perform *biochemical* detection. The image is Plaintiff-Appellant's proof of where the C/B sensors are located inside the phone and is *native* to the devices manufacture by Apple, Samsung, or LG [a single entity § 271(a)].




**Defendants Devices Camera Sensor for *Chemical* Detection:** The sensor that Rhevision and the University of California at San Diego have worked on

responds to different chemicals by changing color. It's possible to pack a single chip with many different tiny pores, each of which respond to a different chemical. The human eye may not be able to see the tiny changes, but a standard cell-phone camera can resolve a picture finely enough to detect them. So, their system relies on a digital camera to watch the chip for color changes.



**Defendants Devices Camera Sensor for *Biological* Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**Defendants Devices Camera Sensor for *Radiological* Detection:** How can a cell phone detect radioactivity? Cell phones have cameras and camera sensors react to radioactivity. High energy particles strike a sensor array and register as small bright pinpoints or thin streaks of light. An app may not be as sensitive as a dedicated radiation detector, but it works well enough to alert users to dangerous levels of radiation.



**Plaintiff-Appellant's Biometric Fingerprint Disabling Locking System**

The FBI recovered an Apple iPhone 5C—owned by the San Bernardino County, California government—that had been issued to its employee, Syed Rizwan Farook, one of the shooters involved in the December 2015 San Bernardino attack. The attack killed 14 people and seriously injured 22.

The two attackers died four hours after the attack in a shootout with police, having previously destroyed their personal phones. Authorities were able to recover Farook's work phone, but could not unlock its four-digit passcode, and the phone was programmed to automatically delete all its data after ten failed password attempts (an anti-terrorism measure on smartphones designed to mitigate terrorist use; not to protect terrorist rights to privacy).

It amazes how the Claims Court can adjudicate the technical aspects, features, and characteristics of the third-party defendants' accused products, when compared element-by-element to the specifications of Plaintiff-Appellant's alleged infringed patent claims, without having the core technical documents related to the accused product(s); that include, but not limited to operation manuals, product literature, schematics, and specifications. [the Court fail to introduce evidence]

It is the belief of the Plaintiff-Appellant that the Claims Court's lack of knowledge, information, and experience resulted in a haste decision to dismiss Plaintiff-Appellant's case under 35 U.S.C. § 271(a) [a single entity].

## PLAINTIFF-APPELLANT HAS SATISFIED THE OBJECTIONS INTRODUCED BY THE DOJ IN THE RELATED COFC 13-307C CASE FOR DEFENDANT'S INVALIDITY CONTENTIONS

Apple has a total of 72054 patents globally. These patents belong to 24279 unique patent families. Out of 72054 patents, 55757 patents are active. https:// insights.greyb.com/apple-patents/ All that is required of Apple, provided the S.C. District Court remove themselves as Defendants, is to present at least one of the 72054 patents to the Court that antedates Plaintiff-Appellant's patents.

Samsung Electronics holds more than 200,000 patents worldwide. The company held 205,816 patents as of the end of June 2021, according to a half-year report it released on Aug. 22. This was a 4.1 percent increase from 197,749 patents it held at the end of 2020. By country, Samsung Electronics had the largest number of patents (80,633) in the United States. Most patents were related to smartphones, & smart TVs.

http://www.businesskorea.co.kr/news/articleView.html?idxno=74626.

All that is required of Samsung, provided the S.C. District Court remove themselves as Defendants, is to present at least one of the 80633 patents to the Court that antedates Plaintiff-Appellant's patents.




Taken from the chart above, Samsung was granted 5,836 U.S. patents for year 2018; LG was granted 2,473 U.S. patents for year 2018; Qualcomm was granted 2,300 U.S. patents for year 2018. All that is required of LG and Qualcomm, provided the S.C. District Court remove themselves as Defendants, is to present at least one of the combined 4,773 patents to the Court that antedates Plaintiff-Appellant's patents.

| | |
|---|---|
| Each asserted independent claim of the '891, '990, '752, '189, '439, '287, & '619 patents (i.e., 32 patent claims) are allegedly entitled to the filing date of the '497 patent. | Filing date of the '497 patent is ***04/05/2006*** |

| | |
|---|---|
| Each asserted independent claim of the '497, '891, '990, '752, '189, '439, '287, & '619 patents (i.e., 33 claims) are allegedly entitled to the filing date of the Plaintiff's Disclosure Document filed with USPTO. Doc. No. 565732 | Disclosure Document filed on ***11/26/2004*** |

| | |
|---|---|
| Each asserted independent claim of the '497, '891, '990, '752, '189, '439, '287, '619 patents (i.e., 33 claims) are allegedly entitled to the "conception of the technical rational"; inventions Plaintiff alleged are major components to the completion of Plaintiff's three economic stimulus packages submitted to the Government. The Affidavit submitted under 37 CFR §1.131 and §1.132 into record of the '752 patent (IFW) on 07/21/2010, establishes a priority date of Dec. 16, 2002 to overcome 102 and 103 objections. ***A true copy of the document is attached*** | Earlier conception filed with the Honorable Congressman Elijah E. Cummings: ***12/16/2002*** |

| **Apple's 1st Patent for the electronic device (i.e., smartphone) ornamental design: First application filing date is January 5, 2007 (App. # D/270,887)** | **Plaintiff's Patent for the Detector Case (i.e., CMDC device) ornamental design: USPTO Disclosure Document filed Nov. 26, 2004; (*Doc. No. 565732)* First application filing date is April 5, 2006 (App. # 11/397,118)** |
|---|---|
| Electronic Device: "The device (i.e., electronic device) which controls the flow of electrons is called electronic device. These devices are the main building blocks of electronic circuits. The various electronic devices are computers, mobile phones, etc." *https://www.physics-and-radio-electronics.com/electronic-devices-and-circuits.html* | The communicating, monitoring, detecting, and controlling (CMDC) device: The detector case [CMDC device] includes a power source (battery or electrical) … A cpu 40 is mounted within the detector case [CMDC device] 12 and electrically interconnects, routes, and transmits signals among items hereinafter further described and also communicates |
| FIG. 1 is a front perspective view of an electronic device in accordance with the present design. | The detector case [CMDC device] 12 includes a top 22, a bottom 24, a pair of opposed sides 26 and a front side or panel 28 and an opposite rear or back side 30 |
| FIG. 2 is a rear perspective view for the electronic device. | The detector case [CMDC device] includes a top 22, a bottom 24, a pair of opposed sides 26 and a front side or panel 28 and an opposite rear or back side 30 |
| FIG. 3 is a front view for the electronic device. | The detector case [CMDC device] 12 includes a top 22, a bottom 24, a pair of opposed sides 26 and a front side or panel 28 and an opposite rear or back side 30 |

| | |
|---|---|
| FIG. 4 is a rear view for the electronic device. | The detector case [CMDC device] 12 includes a top 22, a bottom 24, a pair of opposed sides 26 and a front side or panel 28 and an opposite rear or back side 30 |
| FIG. 5 is a top view for the electronic device. | The detector case [CMDC device] 12 includes a top 22, a bottom 24, a pair of opposed sides 26 and a front side or panel 28 and an opposite rear or back side 30 |
| FIG. 6 is a bottom view for the electronic device. | The detector case [CMDC device] 12 includes a top 22, a bottom 24, a pair of opposed sides 26 and a front side or panel 28 and an opposite rear or back side 30 |
| FIG. 7 is a left side view for the electronic device; and, | The detector case [CMDC device] 12 includes a top 22, a bottom 24, a pair of opposed sides 26 and a front side or panel 28 and an opposite rear or back side 30 |
| FIG. 8 is a right-side view for the electronic device | The detector case [CMDC device] 12 includes a top 22, a bottom 24, a pair of opposed sides 26 and a front side or panel 28 and an opposite rear or back side 30 |
| The broken lines depicted in FIGS. 1, 2, and 6 of the inner rectangle, at the center bottom of the electronic device, represent the bounds of the claimed design, while the broken lines inside the rectangle, shown only in FIG. 6, are directed to environment and are for illustrative purposes only; the broken lines from no part of the claimed design. | Fig. 1 is an illustrative drawing of the rectangle design of the detector case [CMDC device]; and, Fig. 17 are illustrative drawings of the rectangle design of the cell phone (i.e., smartphone) and the cell phone detector case |
| The article is not limited to the scale shown herein. As indicated in the title, the article of manufacture to which the ornamental design has been applied is an electronic device. **Examples of an electronic device are a computer, a portable or hand-held device, a personal digital assistant, a communication device (e.g., cellular phone),** a novelty item, toy, and/or the like. | FIG. 15 is a representative schematic view of… a monitoring PC or computer terminal. It is another objective of the present invention to provide… products grouped together by common features in several product groupings such as design similarity… product grouping strategy has been developed wherein products… having the same or similar design… [i]n addition to grouping products together by features, designs and materials… **FIG. 17 is a perspective view... of the present invention illustrating the incorporation of the features and elements of the detector case to a cell phone and cell phone case** |

| | |
|---|---|
| The first iPhone featured a two-tone back that was mostly made of aluminum — a design element that the company would return to this year with the release of the iPhone 5 with a predominantly metal back. Apple's interim devices opted for different materials: The iPhone 3G and 3GS had plastic backs, while the iPhone 4 and 4S backs were made of glass. *Retrieved from: https://appleinsider.com/articles/12/12/18/apple-wins-patent-for-first-iphone-designed-by-jobs-ive* | ... [P]roduct grouping strategy has been developed wherein products made from the same or similar material, products having the same or similar design... [i]n addition to grouping products together by features, designs and materials... the products grouped into what may be referred to as Product grouping 4 (monitoring & communication devices) include... mobile communication devices... personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs)... handhelds |

Defendant submitted its Notice to the Court in Case 1:13-cv-00307-EGB; Document 238; Filed 07/08/21: "Defendant the United States (the Government) hereby provides notice that on Friday, June 25, 2021, the Government served its Preliminary Disclosure of Invalidity Contentions on Plaintiff, pursuant to the Court's March 29, 2021 Scheduling Order (Dkt. 221) and PRCFC 6." The Defendant asserted the patent references of Breed, Benson, Webb, Garabedian, Astrin, and Mostov.

The Breed reference is the only reference that antedates the conception date established under Patent Local Rule 4(e) by Plaintiff of December 16, 2002. The Breed reference nullifies and renders redundant the other refences of Benson, Webb, Garabedian, Astrin, and Mostov because the Breed reference, under 102-anticipation, has the earlier priority date. See the chart below.

> "[a]nticipation under 35 U.S.C. § 102 requires the presence in a single prior art disclosure of each and every element of a claimed invention.... [t]hat which would literally infringe if later in time anticipates if earlier than the date of invention."

**Breed does not qualify as a valid prior art reference to Plaintiff's asserted patents-in-suit ('497, '752, '189, '439, & '287) for the following reasons:**

- The Breed reference was asserted against the Plaintiff in an IPR trial. "IPR estoppel applies to "any ground that the petitioner raised or reasonably could have raised during that *inter partes review*." 35 U.S.C. § 315(e). As recently as 2018, there was uncertainty about the scope of *inter partes review* (IPR) estoppel under 35 U.S.C. § 315(e)(2). Under a broad interpretation, IPR estoppel precludes petitioners from asserting in a district court any grounds raised or that could have been raised in their IPR petitions."
- During the 18 months of the IPR trial, the Plaintiff sent the Breed reference over to the USPTO for prosecution of the nine (9) patent claims asserted in this case, of the now issued '189 patent. The USPTO stated the Breed reference does not cover the Plaintiff's patent claims as a hold. Plaintiff submitted as "information disclosure statements", the Breed reference to the USPTO for prosecution of the eleven (11) patent claims asserted in this case of the now issued '439 patent, and the prosecution of the three (3) patent claims asserted in this case of the now issued '287 patent.
- Submitting the Breed reference violates Patent Local Rule 7(b). "PATENT RULES OF THE UNITED STATES COURT OF FEDERAL CLAIMS: Rule 7. Document Production Accompanying Preliminary Disclosure of Invalidity Contentions. Together with the Preliminary Disclosure of Invalidity Contentions, the defendant and any defendant-intervenors must produce to each opposing party, or make available for inspection or copying: (b) a copy of any additional items of prior art identified that do not appear in the file history of each patent at issue."
- Plaintiff's patents are presumed valid. "[w]ith *Microsoft v. i4i*, the Supreme Court confirmed the status quo, that the clear-and-convincing standard is the single standard for proving patent invalidity. The Court acknowledged, however, that the burden of proof may be easier to meet when evidence

touching the validity of the patent was not considered by the PTO… Much of the uncertainty leading up to the i4i decision derived from language in the Supreme Court's recent decision in *KSR International Co. v. Teleflex Inc.*, 550 U.S. 398 (2007) ("KSR"). KSR stated that, when evidence before the fact finder was not before the PTO during procurement, "the rationale underlying the presumption-that the PTO, in its expertise, has approved the claim-seems much diminished." *In i4i*, the Supreme Court harmonized KSR with its conclusion that the statute requires a clear-and-convincing standard of proof of invalidity. New evidence supporting an invalidity defense may 'carry more weight' before the fact finder than evidence previously considered by the PTO." As articulated by Judge Rich in *American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350 (Fed. Cir. 1984):

> When new evidence touching validity of the patent not considered by the PTO is relied on, the tribunal considering it is not faced with having to disagree with the PTO or with deferring to its judgment or with taking its expertise into account. The evidence may, therefore, carry more weight and go further toward sustaining the attacker's unchanging burden.

| **Order of Priority** | **Asserted References** |
|---|---|
| **1ST** | Breed, Appl. No.: 11/946,928, filed on Nov. 29, 2007, Pub. No.: US 2008/0094212 A1, Pub. Date.: April 24, 2008, Provisional application No. 60/387,792, filed on ***Jun. 11, 2002***. |
| **2ND** | Webb, Appl. No.: 10/464,523, filed on ***June 17, 2003***, Pub. No.: US 2004/025722 A1, Pub. Date.: Dec. 23, 2004, No Provisional application filed. |
| **3RD** | Mostov, Appl. No.: 11/343,560, filed on Jan. 30, 2006, Pub. No.: US 2006/0181413 A1, Pub. Date.: Aug. 17, 2006, Provisional application No. 60/648,260, filed on ***Jan. 28, 2005***. |

| | |
|---|---|
| **4TH** | Garabedian, Appl. No.: 11/065,865, filed on ***Feb. 25, 2005***, Pub. No.: US 2006/0191324 A1, Pub. Date.: Aug. 31, 2006, No Provisional application filed. |
| **5TH** | Benson, Appl. No.: 11/418,380, filed on May 3, 2006, Pub. No.: US 2007/OO3O143 A1, Pub. Date.: Feb. 8, 2007, Provisional application No. 60/677,164, filed on ***May 3, 2005***. |
| **6TH** | Astrin, Appl. No.: 11/414,479, filed on April 28, 2006, Pub. No.: US 2006/0250235 A1, Pub. Date.: Nov. 9, 2006, Provisional application No. 60/678,454, filed on ***May 4, 2005***. |

## AMERICAN BAR ASSOCIATION

We all know what has transpired over the past nineteen (19) years (almost nine (9) of those years in the Court of Federal Claims). I shared my ideas for restoring the economy after the 9/11 attacks; my intellectual property technological subject matter for mitigating terrorist activity; and, my product grouping strategies for enhancing and building markets over multiple industries throughout the World; with the President (Bush) and Vice-President (Cheney) of the United States and certain members of the U.S. Senate and House; who shared the information with the Department of Homeland Security (DHS); who contracted with multi-billion dollar corporations (Apple, Samsung, LG, & Qualcomm); and, other government agencies (i.e., DoD, NASA, etc.) to develop and commercialized my inventions.

The Government, and many businesses that are represented by White-Americans, has a long history of depriving and stealing the ideas of African-Americans. In 1858, the United States Attorney General (Government) issued an

opinion, Invention of a Slave, declaring inventions by African Americans, enslaved and free, unpatentable.

"[L]aws mandating segregation decreased access to patenting institutions and to social networks and institutions that support invention and innovation. "White-only" commercial districts, where patent attorneys (all white at the time) would have their offices, hindered application for patents by African American inventors. With limited access to the legal system, African Americans would have found it difficult to defend against patent infringement, despite representation by white attorneys. Segregation of public buildings led to "Negro Day" during major scientific fairs or "Negro fairs" that were completely separated from major exhibitions. Either implied that inventions by African American inventors received limited attention from their peers and potential clients" … task of verifying patentees was complicated by a widespread perception that African American patents might be undervalued if the inventor's race were revealed …" Lisa D. Cook, Michigan State University. *"Violence and Economic Growth: Evidence from African American Patents, 1870- 1940"*

**American Bar Association**: Shontavia Jackson Johnson (2019). *The Colorblind Patent System and Black Inventors*. Published in Landslide Vol. 11 No. 4, ©2019 by the American Bar Association. Retrieved from: https://www.

americanbar.org/groups/intellectual_property_law/publications/landslide/2018-19/march-april/colorblind-patent-system-black-inventors/

> The patent system simply was not available at that time to enslaved people—they were not considered American citizens, and the rights and provisions of the Constitution did not extend to them. In addition, states enacted laws that prevented enslaved people from owning any kind of property, presumably including patents.
>
> For black inventors who were either born free or otherwise acquired their freedom, there were also legal barriers. After 1793, the Patent Act "included a 'Patent Oath,' which eventually required patent applicants to swear to be the 'original' inventor of the claimed invention and to their country of citizenship." The U.S. Supreme Court's 1857 *Dred Scott* opinion held that black Americans could not be citizens of the United States.
>
> Arguably, free blacks were precluded from patenting their inventions after *Dred Scott* because they did not have a country of citizenship and presumably could not swear to the Patent Oath. Even after the *Dred Scott* opinion was superseded by the Thirteenth and Fourteenth Amendments after the Civil War, "the economic and educational conditions that many free blacks faced . . . simply were not conducive to pursuing whatever incentives and opportunities U.S. patent law provided."

There was and continues to be a consistently wide gap between the colorblind American patent system and certain groups of inventors, especially black inventors. These gaps show the reality of the times—black inventors faced significant barriers whether free or enslaved.

These unsung inventors never obtained patents or the financial gains of their inventions—though slave masters and other white men often did. Some would take undue credit for these inventions and/or secretly patent the inventions themselves, ignoring the true inventors.

**The Federal Government; Not Steve Jobs Who Invented the Smartphone**

The United States House Speaker Nancy Pelosi, admitted at a hearing on the Democratic National Convention platform, Thursday, June 9, 2016; that it was the Federal Government who invented the smartphone, not Steve Jobs.

Mrs. Pelosi implied that GPS technology, special alloys and other government-funded research projects were enough to deem the federal government the inventor of the iPhone. Here's some of the transcript:

> "Anybody here have a smartphone? In this smartphone, almost everything came from federal investments and research. GPS, created by the military, flatscreens, LLD [sic], digital camera, wireless data compression, research into metal alloys for strength and lightweight, voice recognition — the list

goes on and on.... They say Steve Jobs did a good idea designing it and putting it together. Federal research invented it."

As part of my Anti-Terrorism Product Grouping (ATPG) Economic Stimulus Package, I introduced to the President (Bush) and Vice-President (Cheney) of the United States and certain members of the U.S. Senate and House, who shared the information with the Department of Homeland Security (DHS); a strategy to get various Government agencies involved in funding, developing, and commercializing my communicating, monitoring, detecting, and controlling (CMDC) devices [you may recognize the devices today as your smartphones].

**Strategy**: Massive funding and developing leads to massive production and commercialization; which leads to massive competition. The end result is a CMDC device (i.e., smartphone) designed to prevent or mitigate terrorist activity that's affordable and available to 250 – 300 million consumers.

The smartphone was invented by me (Larry Golden), a Black man who not only invented the smartphone, but also described how the smartphone is designed for both government and business; how the smartphone is designed to mitigate terrorist activity; and, how mass commercialization and world-wide use of the smartphone will help restore the Nation's economy after the 9/11 attacks.

The first Government initiative to cover my strategies and technological rational for the development of my CMDC device was released as: "The United

States (US) Department of Homeland Security (DHS) Science & Technology (S&T) Directorate Broad Agency Announcement (BAA07-10) *CELL-ALL* Ubiquitous Biological & Chemical Sensing solicitation; published 10/30/2007".

> "DHS S&T secured Cooperative Research and Development Agreements with four primary cell phone manufacturers—Qualcomm, LG, Apple, and Samsung—with the objective of accelerating the ''commercialization of technology developed for government purposes'' (U.S. Department of Homeland Security, 2010). U.S. Department of Homeland Security, 2010. *Cell-All: Super Smartphones Sniff Out Suspicious Substances*. (Accessed 17.09.12)."

I realize, as I have stated earlier, it is easy to overlook Black Inventors such as myself, because we are considered less than a full human with limited privileges to own property.

The Government would rather give the intellectual property of an African-American to foreign companies like Samsung, & LG, to help or enable them to generate hundreds of billions of dollars annually in revenues, than to honor the African-American's patents and force the foreign companies like Samsung, & LG to pay royalties for the use of a United States patent(s).

The Government would rather give the intellectual property of an African-American to a multibillion-dollar corporation like Apple, to help or enable Apple

to generate hundreds of billions of dollars annually in revenues, than to honor the African-American's patents and force the multibillion-dollar corporation like Apple to pay royalties for the use of a United States patent(s). Apple's former CEO Steve Jobs openly admits he steals the ideas of others.

> "As Steve Jobs said in 1994, "Picasso had a saying, 'Good artists copy, great artists steal,' and we have you know [we have] always been shameless about stealing great ideas." "Almost every Apple product has features that were first developed by others; rarely do its technologies wholly originate within the company."
>
> https://www.washingtonpost.com/news/innovations/wp/2018/04/30/my-advice-to-the-worlds-entrepreneurs-copy-and-steal-the-silicon-valley-way/

The Government would rather give the intellectual property of an African-American to a multibillion-dollar corporation like Qualcomm, to help or enable Qualcomm to generate tens of billions of dollars annually in revenues, than to honor the African-American's patents and force the multibillion-dollar corporation like Qualcomm, who has been found liable for antitrust law violations [charging as much as a 5% royalty on the price of each smartphone sold without having a patent for the smartphone as a whole] to pay royalties for the use of a U. S. patent(s).

The vast majority of Government members still believe African-Americans do not deserve to be compensated for their ideas. My case has never been officially

taken up by the Supreme Court. But, unofficially, and as another case of a Black man being misrepresented and found guilty before his case ever gets to trial, Justice Breyer prejudice my case *in Return Mail Inc. v. The United States Postal Service et. al*. No. 17–1594: Cite as: 587 U. S. _ (2019): BREYER, J., dissenting:

> "[P]atent infringement suits against the Government still threaten to impose large damages awards. See, e.g., *Hughes Aircraft Co. v. United States*, 31 Fed. Cl. 481, 488 (1994) (indicating that the value of the infringing technologies developed by the Government exceeded $3.5 billion). When, for example, the Department of Homeland Security recently instituted a research initiative to equip cell phones with hazardous-materials sensors in order to mitigate the risk of terrorist attacks, it faced an infringement lawsuit that threatened to interfere with the project. See *Golden v. United States*, 129 Fed. Cl. 630 (2016)

I strongly believe Justice Breyer overlooked three important points in writing his opinion piece. First, the DHS has the right under eminent domain to take the private property of any African-American for use with the public, but only with paying just compensation. The lawsuit was not because I interfered with the Government's initiative to equip cell phones with hazardous-materials sensors in order to mitigate the risk of terrorist attacks, the lawsuit was because the Government refuse to pay another Black Inventor "just compensation" for the Fifth

Amendment "taking" of his private property; and, for refusing to pay another Black Inventor a "reasonable royalty" for authorizing and consenting to the infringement of my invention(s), that are covered in patent(s) issued with the "presumption of validity" from the United States Patent and Trademark Office (USPTO).

Second, the Government had every opportunity since year 2002, to work with me on negotiating a contract for the use of my intellectual property. The Government was so hell-bent on taking the private property of another Black Inventor, that today the Government is still lying and twisted the truth about why, when, and how the smartphone originated. The Government is determined to take another Black Inventor's private property at any and all cost; here the dollar cost for the Government is represented as zero.

Third, the Government does not have to bear the monetary burden of directly paying for infringement liability:

The FAR's patent indemnity provision provides that a contractor shall indemnify the Government and its officers, agents, and employees against liability, including costs, for any infringement of any United States patent . . . Under the FAR, the government must inform the contractor "as soon as practicable" of any action for patent infringement so that the contractor has an opportunity to participate in its defense… To participate in its defense, a contractor may opt to

join the § 1498(a) litigation as a third-party defendant. Under Rule 14(b) of the Rules of the United States Court of Federal Claims (RCFC), the court "may notify any person with the legal capacity to sue or to be sued who is alleged to have an interest in the subject matter of the suit." [The Federal Circuit noted, however, that a third-party defendant cannot assert any counterclaims against a plaintiff, as such claims would result in litigation between private parties and "impermissibly exceed the scope of the Court of Federal Claims' limited jurisdiction."] ... While a contractor need not participate in the § 1498 litigation, contractors should be aware that failure to appear in response to a notice under Rule 14(b) acts as a waiver of any later argument that the contractor should not indemnify the government on grounds that the USCFC incorrectly decided the patent was valid and infringed. As the USCFC held in *Bowser, Inc. v. United States*:

> "We think there is implicit in the whole plan and purpose of Subsection 14(b) a congressional intent that the issues of fact and law decided in a suit against the United States in the Court of Claims may not be retried in another court at the insistence of a third party, who had a "possible" interest in the case in this court but who failed to appear and protect his interest after timely notice or summons had been served upon him."

Qualcomm, Apple, Samsung, & LG fail to appear in response to a notice under Rule 14(b). That failure acts as a waiver of any later argument that the

contractor should not indemnify the government on grounds that the USCFC incorrectly decided the patent was valid and infringed.

In my opinion, Qualcomm, Apple, Samsung, & LG took into consideration the fact that the Government takes the property of Black Inventors; the Government never awards Black Inventors for the taking of their property; and, the criticism the Court Judge and the DOJ would receive for being a "negro lover" if they decided my patents are valid and that Qualcomm, Apple, Samsung, & LG infringed; and, decided not to appear. They were right to consider the criticism, but wrong to allow the unpredictable criticism influence the outcome of this case.

*NONE*, of my cases were ever dismissed because of non-infringement. *NONE*, of my cases were ever dismissed because of the Defendants proved my asserted patents or patent claims are invalid. The Judges and the DOJ have spent eight plus years the simple truth that all that was needed to prove non-infringement is to show the Defendants has not infringed any of the 11 claimed inventions that forms the CMDC invention, and/or present patents of the Defendants (or licensing agreements) the antedates Plaintiff-Appellant's conception and patents' priority dates.

Instead of adjudicating my case on the merits of the patents being invalid and/or noninfringement, the Judges and the DOJ introduced a mammoth of insubstantial procedural matters that were basically lies to frame a dismissal.

**RELIEF**

- Recommend a "reasonable royalty" for the alleged infringement products under Section 271(a).
- Recommend "preliminary injunction" on the alleged infringing products of Apple, Samsung, LG, & Qualcomm, under Section 271(a). (Apple, Samsung, LG, & Qualcomm were given eight plus years to intervene, join, or appear in this case and in the related case; COFC 13-307C, with defenses of noninfringement and patent invalidity).
- Recommend a review for possible infringement under Section 271(a) for the 11 patented inventions of Plaintiff-Appellant that forms the assembly of the CMDC (smartphone) device; and, the 3 patented inventions that forms the Pre-programmed stall, stop & vehicle slow-down system for driverless cars (i.e., pre-crash, lane departure, adjusted cruise control).

Respectfully submitted,

Larry Golden

Larry Golden, Plaintiff, Pro Se
740 Woodruff Rd., #1102
Greenville, South Carolina 29607
atpg-tech@charter.net
864-288-5605

RECEIVED
USDC. CLERK GREENVILLE, SC
2019 OCT 15 AM 10:49

**UNITED STATES DISTRICT COURT**
**FOR THE**
**DISTRICT OF SOUTH CAROLINA - GREENVILLE**

LARRY GOLDEN,

Plaintiff,

V.

(1) APPLE INC.
(2) SAMSUNG ELECTRONICS, USA
(3) LG ELECTRONICS, USA, INC.
(4) QUALCOMM INC.
(5) MOTOROLA SOLUTIONS INC.
(6) PANASONIC CORPORATION
(7) AT&T INC.
(8) VERIZON CORPORATE SERVICES GROUP
(9) SPRINT CORPORATION
(10) T-MOBILE USA, INC.
(11) FORD GLOBAL TECHNOLOGIES, LLC
(12) FAIRWAY FORD LINCOLN OF GREENVILLE
(13) GENERAL MOTORS COMPANY
(14) KEVIN WHITAKER CHEVROLET
(15) FCA US LLC
(16) BIG O DODGE CHRYSLER JEEP RAM

Defendants.

CASE NO: 6:19-cv-2557-DCC-KFM

**JURY TRIAL DEMANDED**

October 14, 2019

AMENDED **COMPLAINT FOR PATENT INFRINGEMENT**

This is an action of patent infringement in which plaintiff, Larry Golden ("Golden"), complains against defendants, Apple Inc. ("Apple"), Samsung Electronics, USA ("Samsung"), LG Electronics, USA, Inc. ("LG"), Qualcomm

Inc. ("Qualcomm"), Motorola Solutions Inc. ("Motorola"), Panasonic Corporation ("Panasonic"), AT&T Inc. ("AT&T"), Verizon Corporation Services Group ("Verizon"), Sprint Corporation ("Sprint"), T-Mobile USA, Inc. ("T-Mobile"), Ford Global Technologies, LLC ("Ford"), Fairway Ford Lincoln of Greenville ("Fairway Ford"), General Motors Company ("GM"), Kevin Whitaker Chevrolet ("Whitaker Chevrolet"), FCA US LLC ("FCA"), and Big O Dodge Chrysler Jeep Ram ("Big O") as follows:

## THE PARTIES

1. Plaintiff Larry Golden is a citizen of South Carolina and has a principal place of business and residence at 740 Woodruff Road, #1102, Greenville, S.C. 29607.

2. On information and belief, Apple is a California corporation with a principal place of business at 1 Infinite Loop, Cupertino, CA 95014 and does business in this judicial district by, among other things, committing jointly, directly and/or indirectly the tort of patent infringement giving rise to this complaint. Apple may be served at its principal place of business at 1 Infinite Loop, Cupertino, CA 95014.

3. On information and belief, Samsung is a New Jersey corporation with a principal place of business at 85 Challenger Rd. Ridgefield Park, New Jersey 07660 and does business in this judicial district by, among other things,

committing jointly, directly and/or indirectly the tort of patent infringement giving rise to this complaint. Samsung may be served at its principal place of business at 85 Challenger Rd. Ridgefield Park, New Jersey 07660.

4. On information and belief, LG is a New Jersey corporation with a principal place of business at 1000 Sylvan Avenue, Englewood Cliffs, New Jersey 07632 and does business in this judicial district by, among other things, committing jointly, directly and/or indirectly the tort of patent infringement giving rise to this complaint. LG may be served at its principal place of business at 1000 Sylvan Avenue, Englewood Cliffs, New Jersey 07632.

5. On information and belief, Qualcomm is a California corporation with a principal place of business at 5775 Morehouse Drive, San Diego, CA 92121 and does business in this judicial district by, among other things, committing jointly, directly and/or indirectly the tort of patent infringement giving rise to this complaint. Qualcomm may be served at its principal place of business at 5775 Morehouse Drive, San Diego, CA 92121.

6. On information and belief, Motorola is an Illinois corporation with a principal place of business at 500 W Monroe Street, Suite 4400, Chicago, IL 60661 and does business in this judicial district by, among other things, committing jointly, directly and/or indirectly the tort of patent infringement giving

rise to this complaint. Motorola may be served at its principal place of business at 500 W Monroe Street, Suite 4400, Chicago, IL 60661.

7. On information and belief, Panasonic is a New Jersey corporation with a principal place of business at Two Riverfront Plaza, 828 McCarter Hwy, Newark, NJ 07102 and does business in this judicial district by, among other things, committing jointly, directly and/or indirectly the tort of patent infringement giving rise to this complaint. Panasonic may be served at its principal place of business at Two Riverfront Plaza, 828 McCarter Hwy, Newark, NJ 07102.

8. On information and belief, AT&T is a Texas corporation with a principal place of business at 208 S. Akard St. Dallas, TX 75202 and does business in this judicial district by, among other things, committing jointly, directly and/or indirectly the tort of patent infringement giving rise to this complaint. AT&T may be served at its principal place of business at 208 S. Akard St. Dallas, TX 75202.

9. On information and belief, Verizon is a New Jersey corporation with a principal place of business at 295 N. Maple Ave. Basking Ridge, NJ 07920 and does business in this judicial district by, among other things, committing jointly, directly and/or indirectly the tort of patent infringement giving rise to this complaint. Verizon may be served at its principal place of business at 295 N. Maple Ave. Basking Ridge, NJ 07920.

10. On information and belief, Sprint is a Kansas corporation with a principal place of business at 6200 Sprint Pkwy. Overland Park, KS 66251 and does business in this judicial district by, among other things, committing jointly, directly and/or indirectly the tort of patent infringement giving rise to this complaint. Sprint may be served at its principal place of business at 6200 Sprint Pkwy. Overland Park, KS 66251.

11. On information and belief, T-Mobile is a Washington corporation with a principal place of business at 12920 SE 38th St. Bellevue, WA 98006 and does business in this judicial district by, among other things, committing jointly, directly and/or indirectly the tort of patent infringement giving rise to this complaint. T-Mobile may be served at its principal place of business at 12920 SE 38th St. Bellevue, WA 98006.

12. On information and belief, Ford is a Michigan corporation with a principal place of business at Fairlane Plaza South, Suite 800, 330 Town Center Drive, Dearborn, Michigan 48126 and does business in this judicial district by, among other things, committing jointly, directly and/or indirectly the tort of patent infringement giving rise to this complaint. Ford may be served at its principal place of business at Fairlane Plaza South, Suite 800, 330 Town Center Drive, Dearborn, Michigan 48126.

13. On information and belief, Fairway Ford is a South Carolina corporation with a principal place of business at 2323 Laurens Road, Greenville, SC 29607and does business in this judicial district by, among other things, committing jointly, directly and/or indirectly the tort of patent infringement giving rise to this complaint. Fairway Ford may be served at its principal place of business at 2323 Laurens Road, Greenville, SC.

14. On information and belief, GM is a Michigan corporation with a principal place of business at 300 Renaissance Center, Detroit, MI 48243 and does business in this judicial district by, among other things, committing jointly, directly and/or indirectly the tort of patent infringement giving rise to this complaint. GM may be served at its principal place of business at 300 Renaissance Center, Detroit, MI 48243.

15. On information and belief, Whitaker Chevrolet is a South Carolina corporation with a principal place of business at 2320 Laurens Rd. Greenville, SC 29607 and does business in this judicial district by, among other things, committing jointly, directly and/or indirectly the tort of patent infringement giving rise to this complaint. Whitaker Chevrolet may be served at its principal place of business at 2320 Laurens Rd. Greenville, SC 29607.

16. On information and belief, FCA is a Michigan corporation with a principal place of business at 1000 Chrysler Drive, Auburn Hills, MI 48326 and

does business in this judicial district by, among other things, committing jointly, directly and/or indirectly the tort of patent infringement giving rise to this complaint. FCA may be served at its principal place of business at 1000 Chrysler Drive, Auburn Hills, MI 48326.

17. On information and belief, Big O is a South Carolina corporation with a principal place of business at 2645 Laurens Rd. Greenville, SC 29607 and does business in this judicial district by, among other things, committing jointly, directly and/or indirectly the tort of patent infringement giving rise to this complaint. Big O may be served at its principal place of business at 2645 Laurens Rd. Greenville, SC 29607.

## JOINDER OF PARTIES (35 U.S. Code § 299)

18. "(a)Joinder of Accused Infringers.—With respect to any civil action arising under any Act of Congress relating to patents, other than an action or trial in which an act of infringement under section 271(e)(2) has been pled, parties that are accused infringers may be joined in one action as defendants or counterclaim defendants, or have their actions consolidated for trial, only if—

(1) any right to relief is asserted against the parties jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences relating to the making, using, importing into the United States, offering for sale, or selling of the same accused product

Case: 22-1229 Document: 6 Page: 130 Filed: 01/04/2022

or process; *In re EMC Corporation, Misc.* Dkt. No. 100 (Fed. Cir. May 4, 2012). "On May 4, 2012, a Federal Circuit panel decided the circumstances when a plaintiff may join multiple defendants with unrelated products in a patent infringement suit. The court concluded that independent defendants satisfy the same transaction-or-occurrence test required for joinder when there is a logical relationship between the separate causes of action. This occurs if there is substantial evidentiary overlap in the facts giving rise to the cause of action. That is, the defendants' allegedly infringing acts, which give rise to the individual claims of infringement, must share an aggregate of operative facts. The Plaintiff is making the argument that the defendants' in this case has satisfied the same transaction-or-occurrence test, and that substantial evidentiary overlap in the facts give rise to this cause of action: The defendants Apple, Samsung, LG, Qualcomm, Motorola, and Panasonic all share the same or similar series of transactions or occurrences relating to the making, offering for sale, or selling of the same accused product (a smartphone—Plaintiff's CMDC device); Qualcomm provides the same or similar wireless modems, system-on-a-chip (SoC), and central processing units (CPUs) for each of the above named smartphone manufacturers relating to the making, offering for sale, or selling of the same accused process. Substantial evidentiary overlap occurs: Qualcomm supplies essential parts to the CMDC device(s) the Plaintiff is alleging the smartphone manufacturers are making; the

service providers (i.e. AT&T, Verizon, Sprint, & T-Mobile), are providing essential connectivity to the CMDC device(s) the Plaintiff is alleging the smartphone manufacturers are making, the development process of the car manufactures (i.e. Ford, Chevrolet, & FCA), and a connected vehicle feature offered for sale by the car dealerships (i.e. Fairway Ford, Whitaker Chevrolet, & Big O Dodge).

(2) questions of fact common to all defendants or counterclaim defendants will arise in the action. "[a]fter the Plaintiff's claims are construed, the claims are compared to the accused (allegedly infringing) device or method. The Plaintiff's invention described in the patent is not determinative – the claims set forth what is protected. Infringement cannot be determined by comparing the Plaintiff's invention that is disclosed in the patent to the accused device or method (an iPhone for comparison, or a Samsung phone for comparison). For infringement to exist, each element (or its equivalent under certain circumstances) of the claim must be present in the accused device or method. Although the Plaintiff's patent may have many claims, only one claim need be infringed for the patent to be infringed. In an infringement action, this step is a question of fact."

19. With respect to any civil action arising under any Act of Congress relating to patents, other than an action or trial in which an act of infringement under section 271(e)(2) has been pled, parties that are accused

infringers may be joined in one action as defendants or counterclaim defendants, or have their actions consolidated for trial…

Section 271(e)(2):

> (e)(2). It shall be an act of infringement to submit—(A)an application under section 505(j) of the Federal Food, Drug, and Cosmetic Act or described in section 505(b)(2) of such Act for a drug claimed in a patent or the use of which is claimed in a patent; (B)an application under section 512 of such Act or under the Act of March 4, 1913 (21 U.S.C. 151–158) for a drug or veterinary biological product which is not primarily manufactured using recombinant DNA, recombinant RNA, hybridoma technology, or other processes involving site specific genetic manipulation techniques; (C) if the purpose of such submission is to obtain approval under such Act to engage in the commercial manufacture, use, or sale of a drug, veterinary biological product, or biological product claimed in a patent…

20. Joinder allows a plaintiff to aggregate multiple defendants into a single lawsuit for cost, efficiency, strategy, and other reasons. Under the Federal Rules of Civil Procedure, a plaintiff can join multiple defendants to a single lawsuit only if any claim raised against each defendant arises out of the "same transaction, occurrence, or series of transactions or occurrences."

21. Apple, Samsung, LG, Qualcomm, Motorola, and Panasonic induces the service provider companies (i.e. AT&T, Verizon, Sprint, & T-Mobile) to offer for sell, or sale the alleged infringement device(s). Apple, Samsung, LG, Qualcomm, Motorola, and Panasonic induces the automobile manufacturers (i.e. Ford, General Motors, & FCA) to manufacture the hardware and develop the software that enables the alleged infringement device(s) to be interconnected and used with their vehicles offered for sell, or sold. Apple, Samsung, LG, Qualcomm, Motorola, and Panasonic induces the car dealers (i.e. Fairway Ford, Whitaker Chevrolet, & Big "O") to offer for sell, or sale vehicles adapted to received signals from the alleged infringement device(s). "On June 2, 2014, the US Supreme Court unanimously held that a party cannot be liable for indirect infringement under § 271(b) without a threshold showing of direct infringement under § 271(a) in *Limelight Networks, Inc. v. Akamai Techs., Inc.*, No. 12–786 (2014). This opinion reverses the previous standard proffered by the federal circuit that a showing of direct infringement was not necessary so long as the patentee could demonstrate that every claimed method step was performed by entities under the control and encouragement of the accused inducer. Inducement of infringement under 35 U.S.C. § 271(b):

> "[Apple, Samsung, LG, Qualcomm, Motorola, and Panasonic], would be liable for inducement of infringement under 35 U.S.C. § 271(b) for sales

made by a third party of an infringing product on the marketplace after [Apple, Samsung, LG, Qualcomm, Motorola, and Panasonic] has been duly notified of the infringement. It seems that [Apple, Samsung, LG, Qualcomm, Motorola, and Panasonic] has thus far somehow avoided any lawsuit properly pleading this form of infringement, which carries the same liability as direct infringement including injunction and damages. So the patent owner in such a case could seek full recourse from [Apple, Samsung, LG, Qualcomm, Motorola, and Panasonic], even where the actual direct infringer is a foreign entity and/or judgment-proof. To prove inducement of infringement, a patent owner must show "that the accused inducer took an affirmative act to encourage infringement with the knowledge that the induced acts constitute patent infringement." This requirement resolves into two parts: 1) inducement, and 2) knowledge. As to the first part, [Apple, Samsung, LG, Qualcomm, Motorola, and Panasonic] offering and providing the reach and services… to the seller of an infringing product goes beyond the typical inducement fact pattern. [Apple, Samsung, LG, Qualcomm, Motorola, and Panasonic] entices sellers by advertising the benefits of its [product], it provides the very platform through which the product is advertised and made available for sale and each sale is transacted, and it facilitates the consummation of each sale such as by calculating and sending

net funds to the seller's account. These are affirmative acts that inherently encourage each sale, whether or not [Apple, Samsung, LG, Qualcomm, Motorola, and Panasonic] also fulfills ("picks, packs, and ships") the sales itself. [Apple, Samsung, LG, Qualcomm, Motorola, and Panasonic] actions may be generally directed to a class more so than particularized to a specific seller or sale, but they are no less inducements. [Apple, Samsung, LG, Qualcomm, Motorola, and Panasonic] makes these inducements because it earns a significant "fee" as a percentage of each sale. The second part of the inducement requirement means that [Apple, Samsung, LG, Qualcomm, Motorola, and Panasonic] must have knowledge that a product is covered by one or more claims of a patent that the seller isn't authorized to practice. On this point it likely behooves one to retain a skilled patent attorney to ensure that [Apple, Samsung, LG, Qualcomm, Motorola, and Panasonic] is given notice (letters and claim charts was mailed out to each of the smartphone manufacturing companies named in this action beginning in year 2010) that the unauthorized product is covered by specific patent claims. To preclude a defense by [Apple, Samsung, LG, Qualcomm, Motorola, and Panasonic] that it didn't have adequate basis to know that a product met one or more of a patent's claims, an attorney can prepare and furnish [Apple, Samsung, LG, Qualcomm, Motorola, and Panasonic] a letter providing a detailed

comparison of the elements of the claims to the parts of the infringing product, such as with a "claim chart" and/or pictures of the product's parts." https://www.keyip.law/amazon-can-be-sued-for-products-sold-on-its-marketplace-that-infringe-a-patent/

## RELATED CASES

22. Plaintiff Larry Golden has filed an action of patent infringement on September 11, 2019, at the United States District Court for the District of South Carolina; Greenville Division (Case No. 6:19-cv-2557) against defendants, Apple Inc. ("Apple"), Samsung Electronics, USA ("Samsung"), LG Electronics, USA, Inc. ("LG"), Qualcomm Inc. ("Qualcomm"), Motorola Solutions Inc. ("Motorola"), Panasonic Corporation ("Panasonic"), AT&T Inc. ("AT&T"), Verizon Corporation Services Group ("Verizon"), Sprint Corporation ("Sprint"), T-Mobile USA, Inc. ("T-Mobile"), Ford Global Technologies, LLC ("Ford"), Fairway Ford Lincoln of Greenville ("Fairway Ford"), General Motors Company ("GM"), Kevin Whitaker Chevrolet ("Whitaker Chevrolet"), FCA US LLC ("FCA"), and Big O Dodge Chrysler Jeep Ram ("Big O").

23. The Plaintiff has filed on August 2, 2019 in the Court of Appeals for the Federal Circuit (Case No. 2019-2134) an appeal from the Judgement, pursuant to the Court of Federal Claims Order in Case No. 19-104C, filed May 14, 2019, granting Defendant's motion to dismiss the Plaintiff's "Government Takings of

Property under the Fifth Amendment Clause" claim asserted under 28 U.S.C. § 1491(a); Judge Bruggink presiding. The U.S. Court of Federal Claims has jurisdiction pursuant to 28 U.S.C. § 1491.

24. The Plaintiff has filed on 07/02/2019, a petition at the Patent Office (under the Administrative Procedures Act) to withdraw / unwind the cancellation certificate regarding the independent claims 11, 74, & 81 of the Plaintiff's RE43,990 patent. The *Return Mail, Inc. v. United States Postal Service* decision was based on "subject matter jurisdiction," which means it is Supreme Court law now that the entire action against Plaintiff's patent was outside of the agency's statutory authority. The "cure" will be to ask them to nuke the resulting certificate. Plaintiff respectfully submitted the Petition to strike from the prosecution file of his U.S. Patent No. RE43,990, a purported *Inter Partes Review* Certificate, ostensibly created under 35 U.S.C. § 318(b). The USPTO lacked statutory authorization to generate this document. The existence of the Certificate is *ultra vires* agency authority. The fact of the Certificate being outside agency authority only became apparent on June 10, 2019, with issuance of the Supreme Court's opinion in *Return Mail, Inc. v. United States Postal Service*. The Certificate is the culmination of an *inter partes review* (IPR) proceeding commenced (unlawfully, it turns out) by an agency of the United States government: the Department of Homeland Security ("DHS"). DHS filed its

original IPR petition in 2014, a time when the USPTO was freely accepting and ruling on Federal Government agency-filed petitions. The Plaintiff appeared *pro se* and attempted to defend his patent claims. Eventually, though, the Patent Trial and Appeal Board (PTAB) sided with the Department of Homeland Security (DHS) under the claim construction and review standards of the time, finding all three challenged claims (11, 74, & 81) unpatentable. *"It does seem like the deck is stacked against a private citizen who is dragged into these proceedings. They've got an executive agency acting as judge with an executive director who can pick the judges, who can substitute judges, can reexamine what those judges say, and change the ruling, and you've got another government agency being the prosecutor at the same time. In those situations, shouldn't you have a clear and express rule?" – Justice Sonia Sotomayor*

## JURISDICTION AND VENUE

25. This is a civil action for patent infringement arising under the patent laws of the United States, Title 35 of the United States Code. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§§ 1331, 1332(a) and 1338(a).

26. Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(c) and 1400(b). On information and belief, each defendant has purposely transacted business in this judicial district and has committed acts of joint, direct and/or indirect infringement in this judicial district.

27. On information and belief, each defendant is subject to this Court's specific and general personal jurisdiction, due at least to their substantial business in this forum, including: (A) at least part of their infringing activities alleged herein, and (B) regularly doing or soliciting business, engaging in others persistent causes of conduct, and/or deriving substantial revenue from goods and services provided to persons and other entities in South Carolina and this judicial district. Each defendant has allegedly used, sold, and/or offered products for sale in South Carolina and is licensed to do business in this state.

28. The Plaintiff in any matter before any Court cannot decide jurisdiction for that particular Court. Judge Susan Braden, presiding Judge in case no. 13-307C, in June, 2016 stated she cannot precede because the Government has challenged jurisdiction. Judge Braden said she has to "stay" the case until she finds out whether or not she has jurisdiction to adjudicate the case. The Judge also said that we need to determine if the CFC has jurisdiction because if not, I (Plaintiff) may be able to file in another Court that has jurisdiction. The Government submitted its Motion to Dismiss for "Lack of Jurisdiction" and on Nov. 30, 2016 the CFC Judge Braden denied the Government's motion for the following reasons: "[t]he Government argues that, under section 1498(a), a patent owner can sue the United States for patent infringement only if the United States, a contractor, a subcontractor, a person, or a corporation uses or manufactures the patented

invention… [t]he Government concedes that NSF Research Grant Awards may be treated as contacts to establish jurisdiction under the Tucker Act… [u]nder the Tucker Act, the United States Court of Federal Claims has jurisdiction to adjudicate a claim if the statute, regulation, or constitutional provision that is the basis for that claim "can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained… claims also allege sufficient facts to plausibly establish that the use of the accused devices was "with the authorization or consent of the Government. "Authorization or consent can be implied from the circumstances" e.g., by contracting officer instructions, [or] specifications or drawings which impliedly sanction and necessitate infringement." Hughes Aircraft Co., 534 F.2d at 901. For example, in TVI Energy Corp., the United States Court of Appeals for the Federal Circuit held that the Government impliedly sanctioned the use of a patented invention when it issued a solicitation that required bidders to submit for inspection, and perform live demonstrations of, the accused device… in this case, the relevant NSF grants anticipate that the awardees will develop and test the devices proposed in their applications… [t]he relevant NSF grants are being used to develop: "a portable smartphone attachment that can be used to perform sophisticated field testing to detect viruses and bacteria… "[a device] that derives biological signals from your smartphone's accelerometer . . . [and] [t]his information is useful to base medical diagnoses in

real-life conditions and to help track chronic health conditions and effects of therapeutic interventions... "a cradle and app for the iPhone to make a handheld biosensor that uses the phone's own camera and processing power to detect any kind of biological molecules or cells... "a handheld instrument to help contain the spread of Ebola, HIV, Tuberculosis, and Malaria... [a portable device for] real-time detection of explosives, toxicants, and radiation... and highly sensitive rapid medical diagnostic tests"... Government funding of research that will lead to the development and testing of an accused device supports a reasonable inference that the Government impliedly sanctioned infringing activity." *Judge Braden's Opinion in (Case No. 13-307C; filed Nov 30 2016; Dkt. No. 94); "Memorandum Opinion and Order Denying the Government's Motion to Dismiss"*

29. Two days after the CFC Judge Braden denied the Government's motion to dismiss and stated the Plaintiff has proven the CFC has jurisdiction, Judge Braden changed her mind and decided to give the Government another chance at showing my pleading lack jurisdiction for the CFC. The Government submitted its Motion to Dismiss for "Lack of Jurisdiction" and on March 29, 2018 the CFC Judge Braden granted the Government's motion for the following reasons: "d. Patent Infringement Allegations Concerning The Government's Alleged Use Of "Smartphones And Other Consumer Devices" Must Be Dismissed Under RCFC 12(b)(l) And 12(b )( 6). "[t]he Government argues that patent infringement

allegations “relating generally to smartphones and other consumer devices” should be dismissed under RCFC 12(b )(1 ), because the... Complaint "fails to sufficiently allege actual 'use' by the [G]overnment of the various combinations of consumer devices, nor would the [G]overnment's use be plausible... (“Incidental benefit to the [G]overnment is insufficient” to satisfy the requirements of 28 U.S.C. § 1498(a).)” Accordingly, these paragraphs of the... Complaint must be dismissed under RCFC 12(b)(l). In the alternative, the Government argues that the same allegations should be dismissed under RCFC 12(b)(6), for “improperly alleg[ing] infringement by or for the [G]overnment in irreconcilably vague and omnibus fashion... [c]omplaint does not contain factual allegations supporting that, “[a]s a result of *contracts, agreements, and procurements* with various Government Agencies ... the United States has used, authorized the use, and manufactured ... Plaintiffs inventions[.]”... the allegations contained therein failed to state a claim upon which relief may be granted and must be dismissed under RCFC 12(b)(6)... (“Incidental benefit to the [G]overnment is insufficient” to satisfy the requirements of 28 U.S.C. § 1498(a).).” *Judge Braden's Opinion in (Case No. 13-307C; filed March 29, 2018; Dkt. No. 130); “Memorandum Opinion and Order Granting-in-Part and Denying-in-Part the Government's Motion to Dismiss”*

30. The *ONLY* reason the Plaintiff is filing in this Court at this time is because the Court of Federal Claims has determine it lacks jurisdiction to

adjudicate the Plaintiff's claims of third party developers and manufacturers of, the smartphone, has and possibly is, infringing the Plaintiff's CMDC device.

31. This Court has specific jurisdiction over each defendant because each has committed acts giving rise to this action and has established minimum contacts within this judicial district such that the exercise of jurisdiction over each defendant would not offend traditional notions of fair play and justice.

## GOLDEN AND THE PATENTS-IN-SUIT

32. Plaintiff's patents involve covered and claimed inventions evolved as a result of the patents technological "product grouping" strategies. The "product grouping" strategies as outlined in the Plaintiff's patent specifications are: the grouping of communication devices and products; the grouping of monitoring devices and products; the grouping of detection devices and products; the grouping of controlling devices and products; the grouping of stall, stop, and vehicle devices and products; and, the grouping of disabling locking devices and products. Patent Specifications: "[d]espite the ingenuity of the above devices, methods, and systems, there remains a need for a multi-detector and disabling lock system for use with various types of products collected together by common characteristics… [i]t is another objective of the present invention to provide… products grouped together by common features in several product groupings such as design similarity, similarity in the presentation of security problems and similarity with

regard to the presentation of solutions to preventing terrorist solutions… the disabling lock system prevents the unauthorized entry, access and further contamination of the products included in the several product groupings… utilizes a multi-task device for preventing terrorist activity to vulnerable products that are collected or arranged by product grouping categories… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, web servers, desktop personal computers (PCs), notebook personal computers (PCs), laptops, satellite cell phones, cell phones, Universal Mobile Telecommunications System (UMTS) phones, personal digital assistants (PDAs), liquid crystal display (LCD) monitors, and satellite monitoring, remote control key fobs, two-way communication key fobs, handhelds… system that can be implemented by business or government at a minimum cost by organizing the products to be protected into product grouping categories."

33. Significant advancements in mobile technology have occurred since September 11, 2001, both in the advancement of the Plaintiff's claimed Communicating, Monitoring, Detecting, and Controlling (CMDC) devices and the infrastructures that support them.

34. Since Golden began, his planned strategy for the CMDC device was: to have a device capable of communicating, monitoring, detecting, and controlling; to have a device capable of interconnecting with other computing devices, products, methods, and systems from various governmental agencies, industries, and private companies; to have a device capable of detecting for chemical and biological biometric signatures of humans; to have a device capable of monitoring and reporting over cellular networks, government mobile networks, satellite networks, Wi-Fi networks, and capable of viewing the environment in real time; and, to have a CMDC mobile device that can operate equally and seamlessly via traditional cellular networks, as well as with infrastructure/ad hoc wireless networks.

35. Plaintiff's CMDC device was, and is, designed for integration with at least that of remote locking mechanisms, remote and pre-programmed stall, stop, and/or vehicle slowdown systems, and mobile detection devices (e.g. smartwatches).

36. Plaintiff's CMDC devices are being manufactured, sold, used, and offered for sale by the alleged infringers as new and improved desktop computers, new and improved PDAs, PCs, laptops, cell phones, tablets, smartphones, and other wearables such as smartwatches, etc. Golden has obtained several United

States patents that cover various aspects of his Communicating, Monitoring, Detecting, and Controlling (CMDC) device:

37. On December 25, 2018, the United States Patent and Trademark Office (the "PTO") issued Patent No. 10,163,287 ("the '287 Patent"), entitled "Multi Sensor Detection, Stall to Stop and Lock Disabling System", to Larry Golden. A true and correct copy of the '287 Patent is attached hereto as **Exhibit A**.

38. On March 07, 2017, the United States Patent and Trademark Office (the "PTO") issued Patent No. 9,589,439 ("the '439 Patent"), entitled "Multi Sensor Detection, Stall to Stop and Lock Disabling System", to Larry Golden. A true and correct copy of the '439 Patent is attached hereto as **Exhibit B**.

39. On August 04, 2015, the United States Patent and Trademark Office (the "PTO") issued Patent No. 9,096,189 ("the '189 Patent"), entitled "Multi Sensor Detection, Stall to Stop and Lock Disabling System", to Larry Golden. A true and correct copy of the '189 Patent is attached hereto as **Exhibit C**.

40. On February 12, 2013, the United States Patent and Trademark Office (the "PTO") re-issued Patent No. RE43,990 ("the '990 Patent"), entitled "Multi Sensor Detection, Stall to Stop and Lock Disabling System", to Larry Golden. A true and correct copy of the '990 Patent is attached hereto as **Exhibit D**.

41. On January 01, 2013, the United States Patent and Trademark Office (the "PTO") issued Patent No. RE43,891 ("the '891 Patent"), entitled "Multi

Sensor Detection, Stall to Stop and Lock Disabling System", to Larry Golden. A true and correct copy of the '891 Patent is attached hereto as **Exhibit E**.

42. On June 10, 2008, the United States Patent and Trademark Office (the "PTO") issued Patent No. 7,385,497 ("the '497 Patent"), entitled "Multi Sensor Detection, and Lock Disabling System", to Larry Golden. A true and correct copy of the '497 Patent is attached hereto as **Exhibit F**.

43. Golden is the owner by assignment of all rights, title and interest to and in the '287 Patent, the '439 Patent, the 189 Patent, the '990 Patent, the '891 Patent and the '497 Patent.

**CHALLENGE TO PLAINTIFF's '990 PATENT**

44. Plaintiff's '990 patent has a total of 153 claims. Of the total 153 claims there are eight (8) independent claims (11, 33, 56, 74, 81, 125, 136, & 145). Of the eight (8) independent claims only three (3) claims 11, 74, & 81 was challenged by the DHS and DOJ in a Petition for *Inter Partes Review* (IPR) (it is Supreme Court law now that the entire action against Plaintiff's patent was outside of the agencies statutory authority). The DHS and DOJ challenged the Plaintiff's three (3) independent claims with three (3) references (Astrin, Breed, and Mostov) under statue 102 'anticipation' (the standard for USPTO examination for 102 'anticipation' is only one reference); eighteen (18) publications; and one Expert Declaration. The Plaintiff sent the three references; the eighteen publications; and,

one Expert Declaration over to the USPTO for examination. The USPTO said, "none of the references and disclosures cover the Plaintiff's patents' specifications and patent claims as a whole under 102 'anticipation' or 103 'obviousness'. Further, it was determined the Plaintiff's patents and disclosure document filed Nov. 26, 2004; **(Exhibit G: Disclosure Document No. 565732)** recorded at the USPTO, all antedate the three (3) references of Astrin, Breed, and Mostov.

| **Reference** | **Filing Date** | **Publication Date** | **Basis for anticipation** |
|---|---|---|---|
| U.S. Patent Application Publication No. 2006/0250235 ("Astrin") | | 11/09/2006 | 102(b) |
| U.S. Patent Application Publication No. 2006/0181413 ("Mostov") | | 08/17/2006 | 102(b) |
| U.S. Patent provisional filing date is 01/28/2005. Application No. 11/343,560; Patent No. 7,990,270 ("Mostov") | 01/28/2005 | | 102(e) |
| U.S. Patent No. 7,961,094 ("Breed") | 11/29/2007 | | 102(e) |
| ***Plaintiff's Disclosure Document filed with USPTO. Disclosure Doc. No. 565732*** | ***11/26/2004*** | | |

45. Plaintiff was issued the '287 patent on 12-25-2018. The patent has two (2) independent claims similar to independent claim 11 of the '990 patent; two (2) independent claims similar to independent claim 74 of the '990 patent; and, two (2) independent claims similar to independent claim 81 of the '990 patent. The Information Disclosure Statement (IDS) included the three references, eighteen publications, and one Expert Declaration submitted in the DHS and DOJ's IPR petition for review PTAB.

46. Plaintiff was issued the '439 patent on 03-07-2017. The patent has four (4) independent claims similar to independent claim 11 of the '990 patent. The Information Disclosure Statement (IDS) included the three references, eighteen publications, and one Expert Declaration submitted in the DHS and DOJ's IPR petition for review at the PTAB.

47. Plaintiff was issued the '189 patent on 08-04-2015. The patent has three (3) independent claims similar to independent claim 11 of the '990 patent; three (3) independent claims similar to independent claim 74 of the '990 patent; and, three (3) independent claims similar to independent claim 81 of the '990 patent. The Information Disclosure Statement (IDS) included the three references, eighteen publications, and one Expert Declaration submitted in the DHS and DOJ's IPR petition for review at the PTAB.

48. Plaintiff was issued the '189 patent on 08-04-2015. The patent has three (3) independent claims similar to independent claim 11 of the '990 patent; three (3) independent claims similar to independent claim 74 of the '990 patent; and, three (3) independent claims similar to independent claim 81 of the '990 patent. The Information Disclosure Statement (IDS) included the three references, eighteen publications, and one Expert Declaration submitted in the DHS and DOJ's IPR petition for review at the PTAB.

49. Plaintiff submitted a continuation application [16/350,638] that was filed on 12-19-2018. The application has two (2) independent claims similar to independent claim 11 of the '990 patent. (In the non-final rejection issued on 07-09-2019, the Examiner only requested terminal disclaimers, there was no objections based on prior art references that the Plaintiff needed to respond too). The Information Disclosure Statement (IDS) included the three references, eighteen publications, and one Expert Declaration submitted in the DHS and DOJ's IPR petition for review at the PTAB.

50. Plaintiff submitted a patent application for re-issue of patent '439 [16/350,874] that was filed on 01-25-2019. The re-issue patent application has forty (40) dependent claims similar to the dependent claims of independent claims 11, 74, and 81 of the '990 patent. The re-issue patent application has a total of 110 claims. Of the total 110 claims there are nineteen (19) independent claims similar

to the independent claims 11, 74, & 81 of the '990 patent. The Information Disclosure Statement (IDS) included the three references, eighteen publications, and one Expert Declaration submitted in the DHS and DOJ's IPR petition.

51. Challenges made by the Defendants' to Plaintiff's patents asserted in this complaint be made on the heightened standard of "clear and convincing evidence". The challenge cannot be made by the lesser standard of "preponderance of evidence", and cannot be based on an IPR "Final Written Decision" when it is Supreme Court law now that the entire action against Plaintiff's patent claims (11, 74, & 81 of the '990 patent) was outside of the agencies statutory authority.

## CLAIM CONSTRUCTION

"*Inter Partes Review* (IPR): *Department of Homeland Security vs. Larry Golden;* Case No.: IPR2014-00454 (Patent RE43,990; Claims 11, 74, & 81); Final Written Decision entered on October 1, 2015. "In the 'Decision to Institute', we construed certain claim terms. Those constructions are reproduced in the chart below:

| Claim Term | Construction |
|---|---|
| "built in, embedded" (claim 74) | "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device" |
| "communication device" (claim 81) | "monitoring equipment" |

Dec. to Inst. 11-16

"No party challenges these constructions. Both of these terms were modified or removed in the amendment. To the extent that any of these constructions remain relevant after the amendment, we see no reason to modify them… [w]e further determined that no explicit construction was necessary for any other claim terms. Dec. to Inst. 10-11. Based on the record adduces during trial, we see no need to construe any other terms…"

52. "Beginning with the claim preamble amendment, the preamble of claim 11 originally read: "A communication device of at least one of *a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal at a monitoring site* for monitoring products for communication therebetween, comprising…." In claim 154, the language in italics has been eliminated and replaced with "the products grouped together by common features in the product grouping category of design similarity (e.g., computer terminal, personal computer (PC))…." Patent Owner contends that this new language is consistent with words found in the disclosure of the '118 application. Mot. To Amend 4. Patent Owner further contends that this new language is broad enough to include the removed items, such as cell phones and smart phones, because those items are "species terms" that are "included in the genus 'monitoring equipment' and 'communication device' when the clause 'products grouped together by common features in the product groupings category of design similarity' is included." *Id.* Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type

of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "*Inter Partes Review* (IPR): *Department of Homeland Security vs. Larry Golden;* Case No.: IPR2014-00454 (Patent RE43,990; Claims 11, 74, & 81); Final Written Decision entered on October 1, 2015.

**FRCP RULE 11(b): REPRESENTATIONS TO THE COURT**

53. The Plaintiff hereby certifies that to the best of Plaintiff's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, that the correspondence from the Plaintiff, cited by the United States Court of Federal Claims; (1) was not presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and, (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

(b) Representations to the Court. By presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or

later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances…

**INTENT TO FORCE DEFENDANTS TO INCUR LEGAL FEES**

54. On information and belief, each defendant has unjustly benefited or profited (i.e. unjust enrichment) at the Plaintiff's expense without making restitution for the reasonable value of any property, services, or other benefits that have been unfairly received and retained. On information and belief, each defendant has infringed Plaintiff's inventions covered in a patent(s), and each defendant has purposely violated the antitrust federal and state laws from business transacted in this judicial district and has committed acts of joint, direct and/or indirect infringement and antitrust law violations in this judicial district.

55. It is the belief of the Plaintiff that the non-movants (i.e. defendants) in most cases of alleged patent infringement, put forth strategies to incur legal cost and fees to the movant (i.e. plaintiff). An example of this type of behavior can be viewed in *Larry Golden v. The United States*, CFC Case No. 13-307C. During the first 12 months of filing the DOJ and Trial Court delayed the case by repeatedly asking for and being granted motions for a more definitive statement; the following 18 months the Plaintiff spent defending certain patent claims of his '990 patent at the PTAB in response to a frivolous IPR petition; after that the Plaintiff spent 19

Case: 22-1229 Document: 8 Page: 155 Filed: 01/04/2022

months proving jurisdiction. After six years the CFC Trial Court have not ordered the DOJ to present any prior art references to challenge the validity of Plaintiff's patent claims, or ordered the DOJ to respond to the Plaintiff's claim charts to show non-infringement. The DOJ and Trial Court has cost the Plaintiff hundreds of thousands of dollars litigating this case. Therefore, in this action Plaintiff don't quite understand how the Plaintiff, whose personal net worth is less than $100K, can incur legal fees upon the multi-million and multi-billion dollar corporations named in this action. It is the prayer of the Plaintiff that this Court won't allow the defendants named in this action to repeat the same behavior of delaying this case to incur upon the Plaintiff unnecessary cost.

56. If the International Trade Commission (ITC) can conduct an investigation and determine whether there's patent infringement in nine to twelve months then so too can the District Courts. The major difference between the ITC and the District Courts is, the ITC doesn't allow for negative procedural posture that is generated outside the need to show valid patents and infringement or lack thereof.

57. The actions and behavior of the Defendants has cost the State of South Carolina billions in taxable revenue.

58. According to Statista.com, the total United States Smartphone Sales for years 2007 thru 2019 is $536.32 billion US dollars: "[t]his statistic shows the

value of smartphone sales in the United States from 2007 to 2018 and also includes a forecast for 2019. In 2019, the revenue from smartphone sales is projected to amount to 77.5 billion U.S. dollars". Statista.com, August 30, 2019, Smartphone sales in the United States from 2005 to 2019 (in billion U.S. dollars). Retrieved from: https://www.statista.com/statistics/191985/sales-of-smartphones-in-the-us-since-2005/

59. The report, titled "The Smartphone Royalty Stack: Surveying Royalty Demands for the Components within Modern Smartphones", has finally tagged a dollar amount to what consumers pay toward royalty fees. The figure comes to about $120 for a hypothetical smartphone that costs $400. This means that 30 percent of a device's cost goes to royalty payments, which is almost equal to the price of the phone's physical components. Retrieved from: https://www.digitaltrends.com/mobile/400-smartphone-pay-120-patent-royalties-research-claims/

60. Considering the data from above ¶¶ 53-54, if the companies had entered into a licensing agreement for 2/3 the 30% (20%) for royalty payments to the Plaintiff on the sale of the smartphones for years 2007 thru 2019 ($536.32B); the estimated royalty payments to the Plaintiff equals $107.26B. What does that means to the State of South Carolina? $107.26B subject to a South Carolina state tax rate of 7.5% equals $8.04B in state tax revenues.

61. What does that mean for the State of South Carolina? THE FINANCIAL STATE OF SOUTH CAROLINA; September, 2019:

"A new analysis of the latest available audited financial reports found South Carolina has a Taxpayer BurdenTM of $14,500, earning it a "D" grade from Truth in Accounting. South Carolina's overall financial condition improved by 17 percent from the previous fiscal year. South Carolina's elected officials have made repeated financial decisions that have left the state with a debt burden of $21.8 billion. That burden equates to $14,500 for every state taxpayer. South Carolina's financial problems stem mostly from unfunded retirement obligations that have accumulated over the years. Of the $43 billion in retirement benefits promised, the state has not funded $14 billion in pension and $11.1 billion in retiree health care benefits."

62. If the smartphones manufactures at least satisfies the $107.26B royalty liability for the sale of the smartphones alone, the estimated $8.04B in state tax revenue could be used to pay off 37% of the State of South Carolina's debt burden. The above estimates does not include future royalties from the smartphone manufacturers; the settlement amount and future royalties from the service providers; and the settlement amount and future royalties from the automobile manufacturers and automobile dealers.

Case: 22-1229 Document: 8 Page: 158 Filed: 01/04/2022

63. If the named Defendants want to limit cost, the Defendants needs to submit and enter their defense to invalidate Plaintiff's patents on a "clear and convincing evidence" standard; submit and enter their non-infringement defense; and/or submit and enter any indemnification agreements made between the defendants, indemnifying a defendant from liability for the making, offering to sell, or selling an infringing product or device. The submissions should be made immediately.

64. The Plaintiff's conception date is September 11, 2001 for Plaintiff's Communicating, Monitoring, Detecting, and Controlling (CMDC) Device needed to administer Plaintiff's three "economic stimulus packages". A documentary video CD is included as **Exhibit H: CMDC Conception CD.**

## SIGNIFICANT HISTORICAL EVENTS

65. After the events of 9/11 the Plaintiff introduced to the United States ("government") three economic stimulus and terrorism prevention packages: The packages were titled: the "ATPG" project; the "SafeRack" project; and the "V-Tection" project. The Plaintiff submitted the packages to President Bush and his administration, the U.S. Senators and U.S. Congressmen that was in office during the Bush administration beginning in the year 2003. Beginning in year 2004, the Government began enforcing and administering the Plaintiff's intellectual property subject matter strategies. The packages outlined how the Government could

stimulate the economy following the 9/11 attacks and provide protection against future terrorist activities.

**The "ATPG" Project:**

66. Significant advancements in mobile technology have occurred since September 11, 2001, both in the advancement of the Plaintiff's claimed Communicating, Monitoring, Detecting, and Controlling (CMDC) devices and the infrastructures that support them.

67. The Plaintiff's planned strategy for the CMDC device was to: have a device capable of communicating, monitoring, detecting, and controlling; have a device capable of interconnecting with other computing devices, products, methods, and systems from various governmental agencies, industries, and private companies; have a device capable of detecting for chemical, biological, radiological, nuclear, explosives, and humans; have a device capable of monitoring and reporting over cellular networks, government mobile networks, satellite networks, Wi-Fi networks, and capable of viewing the environment in real time; and, for example, CMDC mobile devices that can operate equally and seamlessly via traditional cellular networks, as well as with infrastructure/ad hoc wireless networks.

68. More specifically the Plaintiff's CMDC device was, and is, designed for integration with any of the products grouped under this "ATPG" project, the

"SafeRack" project, and the "V-Tection" project. The CMDC device was designed to be mass developed, mass manufactured, mass marketed, and mass commercialized across all industries, agencies, groups, demographics, race, ages, and gender to form a ubiquitous communicating, monitoring, detecting, and controlling environment to prevent terrorist activity.

69. Upon information and belief of the Plaintiff the Department of Homeland Security (DHS) entered into cooperative agreements with Apple, Samsung, LG, and Qualcomm under the DHS Cell-All solicitation for the development of Plaintiff's CMDC device described in the Plaintiff's intellectual property subject matter. **Exhibit I: DHS Cell-All video CD**

70. "Verto Analytics looked at the numbers of Apple, Samsung, and LG (CMDC devices) smartphones currently owned by U.S. consumers, and the equivalent market share. January 2018, Apple leads the pack, with 45% market share (representing nearly 84 million smartphones), while Samsung claims 33% of the market (61.5 million smartphones). These two manufacturers dominate the U.S. smartphone market; LG, the third-place contender, has 10% market share, while all other brands combined account for 12% of the devices on the U.S. smartphone market. The Government later entered into contracts with Panasonic and Motorola for the use of their versions of CMDC devices (i.e. smartphones, laptops, tablets, etc.)

71. The Plaintiff's claimed intellectual property subject matter antiterrorist technology products, devices, etc. can be placed in, on, upon, or adjacent any of the Plaintiff's claimed Communicating, Monitoring, Detecting, and Controlling (CMDC) devices that is equivalent to a new and improved personal digital assistance (PDA), a new and improved personal computer (PC), a new and improved laptop, a new and improved cell phone, a new and improved tablet, a new and improved smartphone, and other new and improved wearables (i.e. pagers, watches, etc.), as they all are grouped together by common features of design similarities. The Plaintiff's CMDC devices can be placed in, on, upon, or adjacent; vehicles, locks, medical equipment, detection devices, stall/stop systems.

72. One of the strategies outlined in the ATPG package was the development of a Communicating, Monitoring, Detecting, and Controlling (CMDC) device that is capable of connecting and grouping various products, devices, methods, systems, networks, etc. for communicating, monitoring, detecting, and controlling. Beginning in the year 2008, the Government entered into R&D contracts and cooperative agreements for the development and commercialization of the CMDC device(s). The contracts and cooperative agreements for the development of the CMDC device(s) offered protection from being directly sued for infringement to Apple, Samsung, LG, Qualcomm, Panasonic, and Motorola.

73. The Government's request for a communicating, monitoring, detecting, and controlling (CMDC) device in the form of an improved cell phone, smartphone, laptop, or tablet to be used for the benefit of the public is significantly the same or equivalent to the Plaintiff's intellectual property subject matter and claimed CMDC device(s). The specifications and capabilities of the CMDC device(s) developed and/or manufactured by Apple, Samsung, LG, Qualcomm, Panasonic, and Motorola for the Government, are significantly the same as the Plaintiff's CMDC device(s) as illustrated below:

- <u>C</u>ommunication: at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, cellular connection, long and/or short range radio frequency (RF) connection, or GPS connection was "taken" for the benefit of the Government and for Government "use".
- <u>M</u>onitoring: at least one of a viewing screen for monitoring in real time, viewing screen monitoring for CBRNE-H signal alerts, viewing screen monitoring for CBRNE-H color coded indicator lights, or viewing screen monitoring for tracking, alerts, and heart rate. Turn on chem/bio heart rate notifications, so you know if your heart rate remains above or below a chosen beats per minute (BPM), or check for an irregular heart rhythm.
- <u>D</u>etecting: at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; that is wired or wireless, capable of being disposed within, on, upon or adjacent the CMDC device. *Apple Watch*: "Apr 8, 2019 - The two sensors could also be used to detect pollution or carbon monoxide, patents from Apple that suggest the company might be working on chemical smell

... devices, which could mean phones, tablets or smartwatches." Article: *New patents suggest Apple wants to teach your Watch to smell, which...* Retrieved from: https://www.mobihealthnews. com/.../new-patents-suggest-apple-wants-teach-your-wat... You can also check your chem/bio heart rate any time using the Heart Rate app.

- Controlling: at least a fixed, portable or mobile communication device interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween, for sending signals to at least lock or unlock doors, stall, stop, or slowdown vehicles, activate or deactivate security systems, activate or deactivate multi-sensor detection systems, or to activate or deactivate cell phone detection systems.

74. The security features of the Government's CMDC device are significantly the same as the Plaintiff's CMDC device as illustrated below:

- Biometrics: that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and or signature or a face recognition to at least gain access to the CMDC device or to prevent unauthorized use of the CMDC device.
- Lock, Unlock, Disabling Lock: the CMDC device being equipped to receive signals from or send signals to engage (lock), disengage (unlock), or disable (make unavailable) locks after a certain number of failed attempts to unlock.
- Near-Field Communication: Near Field Communication or NFC is a short-range communication channel. The purposes for this technology is to simplify first-time connections to other wireless technologies, like Wi-Fi and Bluetooth. Near Field Communication in a CMDC device can be used as part of a two-factor access control system for unlocking a door. Biometric Fingerprint recognition is used for authentication and NFC is used to

transmit authentication information to a computer controlling the door. NFC is preferred over RFID because RFID has a frequency vulnerable for detonating bombs.

- Location and Tracking: The CMDC tracking is a process for identifying the location of the device, whether stationary or moving. Localization may be effected by a number of technologies, such as using multi literation of radio signals between (several) cell towers of the network and the device, or simply using GPS. Some GPS CMDC devices use wireless-assisted GPS to determine the user's location. In wireless-assisted systems, the device uses the orbiting GPS satellites in conjunction with information about the device's signal. Sometimes called enhanced GPS, wireless-assisted GPS can often get a fix on the user's location faster than a GPS-only receiver. Some wireless-assisted systems can work inside buildings, under dense foliage and in city areas where traditional receivers cannot receive signals. GPS-enabled CMDC devices with view screens can often display turn-by-turn directions as well as announce them through the device's speaker. A database of maps is used to provide the directions. The CMDC device locator provides GPS coordinates and can dial emergency CMDC device numbers. The Government, parents and caregivers can track the device's location by device or online and can receive notification if it leaves a designated "safe area."

75. The Government's CMDC device comprising a stop, stall, or vehicle slowdown mean; and, the CMDC device being interconnected to the vehicle to control certain operating systems, are significantly the same as the Plaintiff's device as illustrated below:

- Stall, Stop, Slowdown: the CMDC device being equipped to send signals to vehicles (i.e. driver, driverless, autonomous, unmanned aerial, unmanned land, unmanned sea, boats, trucks, etc.) that engages the computer, electrical, fuel, and/or air systems of the vehicle or a combination of the computer, electrical, fuel and air systems that include but are not limited to vehicle brakes, foot peddle, lights, speed controls, ignition, steering, transmission, and the horsepower of the motor.
- Vehicle Operating Systems: ignition start/stop, door lock/unlock, temperature settings and temperature on/off, vehicle brakes, foot peddle, lights, speed controls, and steering.

76. As a result of the Government sharing Plaintiff's intellectual property subject matter with at least that of Samsung, Apple, LG, Qualcomm, Panasonic and Motorola for the development, manufacture, and commercialization of mobile devices which are substantially the same as Plaintiff's communicating, monitoring, detecting, and controlling (CMDC) devices: the economic impact is a reduction in value of the Plaintiff's property and by virtue of the access, disclosure, use with the public, and in some instances manufacture and development by or for the Government and its third party awardees; has destroyed the Plaintiff's competitive edge; has resulted in the development and manufacture products, devices, methods, and systems for public use without paying any compensation to Plaintiff; has had a substantial adverse impact (means unfavorable or harmful) on Plaintiff; has prevented the successful development of Plaintiff's CMDC device in accordance with the "reasonable investment-backed expectations" of the Plaintiff; and, the

Case: 22-1229 Document: 5 Page: 166 Filed: 01/04/2022

character of the Defendants' actions was triggered when the Defendants caused a permanent invasion of the Plaintiff's property and eliminated all economically beneficial uses of such property. Some examples are:

77. It is the belief of the Plaintiff that the U.S. Government Accountability Office, in accordance with the most recent OMB estimate, the federal government spends about $1.2 billion annually on about 1.5 million mobile (CMDC) devices and associated services. View GAO-15-431. For more information, contact Carol R. Cha at (202) 512-4456 or chac@gao.gov.

78. It is the belief of the Plaintiff that in 2008, the DHS S&T entered into what's known as cooperative research and development agreements with four cell phone (CMDC) manufacturers: Qualcomm, LG, Apple, and Samsung. These written agreements, which bring together a private company and a government agency for a specific project, often accelerate the commercialization of technology developed for government purposes. Information taken directly from the Department of Homeland Security's website.

79. It is the belief of the Plaintiff that in 2012, "the U.S. Department of Defense granted two separate security approvals for Samsung's Galaxy (CMDC) smartphones, along with (CMDC) iPhones and iPads running Apple's latest operating system—moves that would boost the number of U.S. government

agencies allowed to use those (CMDC) devices. An approval by the Pentagon is considered as the highest standards in security."

80. It is the belief of the Plaintiff that in 2013, the U.S. Department of Defense dropped its exclusive BlackBerry contract and opening all of its (CMDC) mobile communications networks to Apple, Google, and other (CMDC) device makers. 'The Department of Defense is taking a leadership role in leveraging (CMDC) mobile device technology by ensuring its workforce is empowered with (CMDC) mobile devices, Defense Department Chief Information Officer Teri Takai said in a statement..."

81. It is the belief of the Plaintiff that in 2014; by the Defense Information Systems Agency (DISA) opening its networks to Samsung and Apple (CMDC) devices, Defense DISA will broaden the variety of mobile (CMDC) computers that troops and civilian Defense Department employees can use in the field, on bases, in offices and elsewhere to receive and send information and work almost anywhere at any time.

82. It is the belief of the Plaintiff that in 2014, Samsung has announced that five of its Galaxy (CMDC) devices have been approved for the U.S government's Defense Information System Agency (DISA) products list. All of them are using Android 4.4 (KitKat) along with Samsung's KNOX secure

workspace platform, which includes system-level encryption for enterprise-based apps.

83. It is the belief of the Plaintiff that in 2014, the United States Air Force replaced 5000 legacy BlackBerry smartphones with Apple's (CMDC) iPhones. The announcement, reported by Defense News, comes as the future of BlackBerry within the Department of Defense is debated, with the chips seeming to fall on the side of transitioning away from a network supporting a mish-mash of BlackBerry devices to a mix of modern (CMDC) devices — though apparently without BlackBerry 10 in that mix.

84. It is the belief of the Plaintiff that in 2015, the Navy Enterprise Networks (NEN) Program Office made a transition to Android and iOS (CMDC) devices. Early users will be able to choose between the (CMDC) iPhone devices, but the Navy wants to be as flexible as possible and allow users to pick the (CMDC) devices that will work best for them. Approval of the (CMDC) iPhone 6 and iPad Air was made in Feb. 2015, and approval to use the Samsung Android (CMDC) phones and tablets was made in March.

85. It is the belief of the Plaintiff that in 2016, is the fiscal year Marines received Samsung (CMDC) smartphones that make calling for fire support easier, quicker and more accurate.

86. As a result of the manufacture, development, offer to sell, sell, or use, of Plaintiff's CMDC devices, Apple Inc. ("Apple"), Samsung Electronics, USA ("Samsung"), LG Electronics, USA, Inc. ("LG"), Qualcomm Inc. ("Qualcomm"), Motorola Solutions Inc. ("Motorola"), Panasonic Corporation ("Panasonic"), AT&T Inc. ("AT&T"), Verizon Corporation Services Group ("Verizon"), Sprint Corporation ("Sprint"), T-Mobile USA, Inc. ("T-Mobile"), Ford Global Technologies, LLC ("Ford"), Fairway Ford Lincoln of Greenville ("Fairway Ford"), General Motors Company ("GM"), Kevin Whitaker Chevrolet ("Whitaker Chevrolet"), FCA US LLC ("FCA"), and Big O Dodge Chrysler Jeep Ram ("Big O") has destroyed any competitive edge the Plaintiff may have had for owning the patent rights to the CMDC (i.e. smartphones, laptops, tablets, etc.) devices, and is therefore being "unjustly enriched".

87. The doctrine of unjust enrichment allows a plaintiff to recover from a defendant, without the benefit of an enforceable contractual obligation, where the defendant has unfairly benefited from the plaintiff's efforts without compensation. In New York, the elements of an unjust enrichment claim are "that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered." *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 182 (2011).

Case: 22-1229 Document: 6 Page: 170 Filed: 01/04/2022

88. Unjust enrichment is defined as a method of recovery when a "person has been unjustly enriched at the expense of another[,]" and thus the enriched party is required to make restitution to the other party. Put another way, it is an equitable principle to ensure "the return of, or payment for, benefits received under circumstances where it would be unfair for the recipient to retain them without the contributor being repaid or compensated." Unjust enrichment is only available in the absence of an express contract. Stated differently, a plaintiff cannot recover damages for unjust enrichment if he can recover damages for breach of a contract regarding the same act(s). For this reason, unjust enrichment is often referred to as a "contract implied in law."

89. Upon information and belief the network service providers for ubiquitous (universal, global, etc.) coverage that is being unjustly enriched as a result of Plaintiff's CMDC devices are AT&T, Verizon, Sprint, and T-Mobile.

90. It is the belief of the Plaintiff that at least that of Apple, Samsung, LG, Qualcomm, Motorola, and Panasonic began in at least year 2007, the manufacture, development, and use of Plaintiff's CMDC devices (also included are Plaintiff's new and improved smartphones, laptops, tablets, etc.) while under contract with the Federal Government. Section 28 U.S.C. § 1498(a) states:

> "Whenever an invention described in and covered by a patent of the United States is used or manufactured by or for the United States without license of the owner thereof or lawful right to use or manufacture the same, the owner's

remedy shall be by action against the United States in the United States Court of Federal Claims for the recovery of his reasonable and entire compensation for such use and manufacture."

91. This statute does two things: first, it acts as a waiver of the government's immunity, and second, it operates an assumption of liability by the government, thus insulating the government contractor itself from liability. However, during an earlier stage of *Zoltek Corporation v. United States* (Fed. Cir. 2012), the government argued that because the process was partially performed abroad, it did not fall under Section 1498(a). In a 2006 opinion (*Zoltek III*), a panel of the Federal Circuit agreed, and held that the scope of 1498(a) was limited to direct infringement under 35 U.S.C. § 271(a). Because 271(a) does not include manufacturing processes that are begun abroad and completed in the United States, the court concluded that the United States had not assumed liability under 1498(a).

92. It is the belief of the Plaintiff that Apple, Samsung, LG, Qualcomm, Motorola, and Panasonic began in at least year 2007, to manufacture at least one process of Plaintiff's CMDC device abroad to avoid liability under Section 1498(a). It wasn't until *Zoltek Corporation v. United States* (Fed. Cir. 2012) that the "loop hole" was closed, "we hold that for the purposes of section 1498, the use or importation 'within the United States [of] a product which is made by a process patented in the United States' constitutes use of the invention without lawful right because the products embody the invention itself." 672 F.3d 1326. It is further the

belief of the Plaintiff that each Defendant saturated the market with the manufacture, use, offer to sell, or sell of Plaintiff's CMDC devices between the years of 2007 and 2012 because the "loop hole" existed. As long as the "loop hole" existed the Defendants could not be held liable for patent infringement and was not obligated to enter into a licensing agreement with the Plaintiff.

**The "SafeRack" Project:**

93. Every dollar spent fighting the war on terrorism is a stunning blow to world productivity and could well be echoed in a slow-down in the economy, which means higher inflation rates and higher unemployment, followed by a lowered standard of living. The events of September 11 were, indeed, attacks on the Nation's economy and on a way of life. The events of 9/11 effectiveness must be judged in terms of not only lost lives, but also lost livelihoods. Moreover, new enemies, aware as never before of our society's vulnerabilities, may well attempt to exploit them in the years ahead. That's why the Plaintiff's coordinated campaign, introduced as his intellectual property subject matter, to combine terrorism prevention with economic growth became so crucial. The Plaintiff have ample precedent for such a campaign. In previous years, the U.S. government has come to recognize that many military technologies are too expensive to build independently and are best developed in tandem with civilian applications. Often called "dual-use" technologies, they have included the integrated circuit.

94. The Plaintiff's "dual-use technologies" strategies described in his intellectual property subject matter, offer dual economies in the war on terrorism. The strategies are designed to reduce costs by increasing production volume. But just as important, they expand the base of researchers, developers, designers, testers and users, thus greatly expanding the number of smart people evaluating and improving them. Cheaper products and more brainpower—a powerful one-two punch. Saving lives, saving money and saving the environment in one program is the purpose of the Plaintiff's strategies outlined in the "SafeRack" project.

95. The roll of Congress and the various government agencies (i.e. DHS, DoD, ARL, NRL, DARPA, FEMA, etc.) in the Plaintiff's coordinated campaign, introduced as his intellectual property subject matter, was to create a national and world demand for the research, development, and commercialization of the various antiterrorist technologies introduced as the Plaintiff's intellectual property subject matter. Congress and the various government agencies was tasked with giving full attention to promoting antiterrorist technologies that follow two fundamental guidelines. First, the Plaintiff's technologies should be designed to deny terrorists tools and targets. Second, the Plaintiff's technologies should not be an economic burden on society; they must have a broad and substantial impact on commerce and productivity.

96. The Plaintiff's coordinated campaign, introduced as his intellectual property subject matter, include "Product Grouping" strategies. The strategies are to group anti-terrorism wearables (i.e. new and improved smartphones, smartwatches, etc.), networked systems, devices, detection devices, and scanners with communication methods like GPS, radio-frequency (RF), near-field communication (NFC), cellular towers, navigation, internet, wireless, telematics, satellite, alarms, and wired communication to deter and/or prevent terrorist acts, activities or threats while making it economically feasible for commercialization.

97. The strategy is to group by design similarities of common features, the Plaintiff's intellectual property subject matter antiterrorist technologies into categories based on similarities of security problems, similarities of solutions, similarities of design, similarities of materials, similarities of cost, similarities of technical advancement capabilities, and similarities of availability. *The strategy is centered on creating demands which encourages competition and by mass-producing, can significantly reduce cost.* The advantages of the Plaintiff's intellectual property subject matter "Product Grouping" strategies are: products uniform, greater specialization, optimum utilization of workers and machinery, low production cost per unit, low stock-piling cost, production control is simplified, high sales turnover, and equipment standardized. The strategies are designed to stimulate the economy.

98. The Government's implementation of the Plaintiff's intellectual property subject matter antiterrorist technology strategies, as part of the "SafeRack" project, gave society interchangeable, integrable sensors and detectors that offer improved dynamic response, greatly reduced size, high precision, increased reliability, specific design, high sensitivity, simplicity, low cost, quick response, low power requirement, that can be micro-machined and mass-produced. The sensors and detectors can be mass-produced in the millions at low prices, which is the main appeal.

99. The Plaintiff's claimed intellectual property subject matter antiterrorist technology products, devices, etc. can be placed in, on, upon, or adjacent any of the products listed in any of the product grouping categories of: Product grouping 1 (storage & transportation); Product grouping 2 (sensors); Product grouping 3 (detector case; modified and adapted); Product grouping 4 (monitoring & communication devices); Product grouping 5 (communication methods); Product grouping 6 (biometrics); Product grouping 7 (authorized person); Product grouping 8 (chemical / biological / biometric / human heart rate); Product grouping 9 (processors) Product grouping 10 (locking mechanisms); and, Product grouping 11 (stall-to-stop / slowdown means).

100. The Plaintiff's claimed intellectual property subject matter antiterrorist technology products, devices, etc. can be placed in, on, upon, or

adjacent any of the Plaintiff's claimed Communicating, Monitoring, Detecting, and Controlling (CMDC) devices, to include a new and improved personal digital assistance (PDA), a new and improved personal computer (PC), a new and improved laptop, a new and improved cell phone, a new and improved tablet, a new and improved smartphone, and other new and improved wearables (i.e. pagers, watches, etc.) as they all are grouped together by common features of design similarities.

101. The "SafeRack" project allows us to group and integrate past government initiatives, current government initiatives and future government initiatives. When an announcement or solicitation is made by the various government agencies (i.e. DHS, DoD, ARL, NRL, DARPA, FEMA, etc.) that a large number of vulnerable places will be equipped with security devices that has an open platform for integrating chemical, biological, explosive, human, radiation, and nuclear sensors and detectors, the industry for developing the needed sensors and detectors will began producing high quality, low cost detectors and sensors to meet that demand. Satisfying and meeting the demand has stimulated the economy.

102. Unique within the Plaintiff's intellectual property subject matter antiterrorist technologies for meeting the government's standards and requirements for antiterrorist devices to be used with the public, is the Plaintiff's intellectual property subject matter "disabling locking mechanisms". The Plaintiff's

intellectual property subject matter includes grouping the "disabling locking mechanisms" by common features of design similarities for: products that do not have locks (e.g. mail drop boxes, newspaper vending boxes, trash cans, etc.); products that have locks (e.g. cargo containers, mini-storage houses, warehouses, lockers, cluster mail boxes, keyed mail boxes, trailers, etc.); products that have biometric locks (e.g. airport lockers, vehicles, smartphones etc.); and, products that have locks and are mobile (e.g. cars, trains, ships, mail carriers, planes, trucks, vans, buses, campers, etc.).

103. It is the belief of the Plaintiff that certain members of Congress who entered into an implied-in-fact contract with the Plaintiff and who forwarded the Plaintiff's intellectual property subject matter over to the Department of Homeland Security for procurement has violated state and federal antitrust laws. The members are: the Honorable Senator Fritz Hollings (05/21/2003); the Honorable Senator Fritz Hollings (10/01/2003); the Honorable Senator Lindsey Graham (10/21/2003); the Honorable Senator Jim DeMint (08/01/2004). The Executive Branch: the Office of the Vice President, Dick Cheney (06/03/2003); the Office of the President, George Bush (06/20/2005).

104. Upon information and belief the result of the Government has entered into contracts with third-party contractors (i.e. Samsung, Apple, LG, Qualcomm, Panasonic and Motorola) for the development, manufacture, and

commercialization of mobile devices which are substantially the same as Plaintiff's communicating, monitoring, detecting, and controlling (CMDC) devices is a violation of certain antitrust laws. Examples of the Government contracting with third party contractors for the development and commercialization of Plaintiff's CMDC (smartphone) device; capable of detecting for WMDs and hazardous agents and compounds, are illustrated below:

105. Upon information and belief, the US Department of Homeland Security (DHS), NASA's Ames Research Center, (the United States), entered into cooperative agreements (contracts) with Qualcomm Inc., LG Electronics, Apple Inc., and the Samsung Group after receiving several notices of Plaintiff's intellectual property for the development and commercialization of the "Cell-All: Synkera MikroKera Ultra". The "Cell-All: Synkera MikroKera Ultra" is a low-cost, low-power, high-speed nanosensor-based chemical sensing chip which consists of 64 nanosensors to detect deadly gases and plugs into an Apple iTouch 30-pin dock connector. The new device is able to detect and identify chemicals in the air using a "sample jet" and sends detection data to another phone (e.g. Apple iPhone) or a computer via telephone communication network or Wi-Fi. Additional monitoring equipment for this "Cell-All" project is at least a Samsung Galaxy s6 smartphone that has an Android operating system (O/S).

Case: 22-1229 Document: 8 Page: 179 Filed: 01/04/2022

106. Upon information and belief, the U.S. Army Edgewood Chemical Biological Center (ECBC), the U.S. Army Communications-Electronics Research, Development and Engineering Center (CERDEC), and the Defense Threat Reduction Agency (DTRA), (the United States), entered into a contract(s) with Samsung after receiving several notices of Plaintiff's intellectual property for the development and commercialization of the "Biotouch System / Nett Warrior Smartphone System". The U.S. Army developed a biological and chemical detection system. They developed volatile organic compound (VOC) strips that work with a device called a Biotouch. Biotouch relays information from VOC strips and sends results to a Nett Warrior Samsung Galaxy Note II smartphone, Defense Systems reports.

107. Upon information and belief, the US Department of Homeland Security (DHS), (the United States), entered into a contract(s) with Samsung after receiving several notices of Plaintiff's intellectual property for the development and commercialization of the "PositiveID / Firefly DX Samsung Galaxy s6 Smartphone". The PositiveID's (PSID) M-BAND was developed by MicroFluidic Systems ("MFS") subsidiary; received funding in excess of $30 million from the Department of Homeland Security (DHS). Firefly DX, builds upon technology advances achieved in development of M-BAND system. Firefly Dx overview: Miniaturized version of M-BAND using same technologies, real-time PCR

detection; Hand-held detection provides sample purification and biological analysis; A two-part device consisting of a portable handheld instrument with wireless communication and disposable single-use cartridges all analytical elements; Data processed in real time and communicated to PC or smartphone (e.g., Galaxy s6) using mobile applications and cloud storage; Has the ability to detect and identify common pathogens and diseases as various strains of influenza, E.coli, MRSA and human papilloma virus ("HPV").

108. It is the belief of the Plaintiff that the Plaintiff's proposed plan for government spending on the "war on terrorism" has stimulated our Nation's economy in the way of increased jobs, and increased revenue for the private sector which results in increased tax revenue received by the government:

109. "In the summer of 2017, the Stimson Center convened a nonpartisan study group to assess the adequacy and transparency of federal efforts to gather and report data on government wide spending on counterterrorism (CT). Stimson's research shows that total federal spending – including spending for government wide homeland security efforts, international programs, and the wars in Afghanistan, Iraq, and Syria – totaled $2.8 trillion for fiscal years 2002 through 2017. CT spending peaked at $260 billion in 2008 at the height of the wars in Afghanistan and Iraq. This represents a 16-fold increase over the pre-9/11 total. In 2017, as war funding declined, total CT spending equaled $175 billion, nearly an

11-fold increase from the 2001 level. With this growth, CT spending has become a substantial component of total discretionary spending for programs across a wide range of areas, including defense, education, and medical research. With total U.S. discretionary spending of more than $18 trillion over fiscal years 2002-2017, CT spending made up 15 percent of the total during that period. At its peak in 2008, CT spending amounted to almost 22 percent of total discretionary spending. By 2017, CT spending had fallen to 14 percent of the total."

110. The Plaintiff must have given the Government notice and have established an implied-in-fact contract(s) with the Government for Plaintiff's intellectual property subject matter: Six months after the DHS was established on November 25, 2002; and, after the Plaintiff had given the Government notice, the Plaintiff received response letters as **Exhibit J: Response Letters**

111. On May 21, 2003 from the Honorable Senator Fritz Hollings stating, "I have contacted the Department of Justice and the Department of Homeland Security to try to be of assistance";

112. On June 3, 2003 from the Office of the Vice President, Dick Cheney stating, "[y]our correspondence has been forwarded to the Department of Homeland Security for review. You will hear back directly from the Department";

113. On October 1, 2003 from the Honorable Senator Fritz Hollings stating, "[t]hank you for contacting me regarding your difficulty with receiving a response from the Department of Homeland Security";

114. On October 21, 2003 from the Honorable Senator Lindsey Graham stating, "I have contacted the Department of Homeland Security on your behalf. I have asked that they review your request and respond directly to you";

115. On January 24, 2005 the Honorable Senator Jim DeMint introduced Plaintiff's intellectual property subject matter in a Bill. "S. 3 (109th Congress); January 24, 2005. 1st Session 1. Short Title 'Protecting Americans in the War on Terror Act of 2005' was a bill in the United States Congress".

116. On June 20, 2005 from the Office of the President, George Bush stating, "[t]hank you for your letter regarding homeland security technology procurement. Please know I have forwarded it to the Department of Homeland Security for review and response".

117. *Implied-in-Fact Contracts:*

"Williston (1920) moved away from contracts implied by law, saying: "Contracts are express when their terms are stated by the parties. Contracts are implied when their terms are not so stated." This implied-in-fact idea was recognized in *Baltimore & Ohio R. Co. v. United States*, 261 U.S. 592 (1923), where, in interpreting a Federal statute, the court defined an "implied contract" under the

statute to mean "an agreement 'implied in fact' founded upon a meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." Justice Steakley, of the Texas Supreme Court, wrote that "[o]ur courts have recognized that the real difference between expressed contracts and those implied in fact is in the character and manner of proof required to establish them." *Haws & Garrett General Contractors, Inc. v. Gorbett Bros. Welding Co.*, 480 S.W.2d 607, 609 (Tex. 1972).

http://www.orsinger.com/PDFFiles/the-Rise-of-American-Contract-Law.pdf

118. *Breach of Implied-in-Fact Contracts*:

"To sue the United States for congressional interference with a contract right (public or private), the United States must have waived its sovereign immunity: the United States is immune from suit except as it consents to be sued; *Library of Congress v. Shaw*, 478 U.S. 310, 315 (1986); *United States v. Mitchell*, 463 U.S. 206, 211 (1983). This waiver/consent precondition applies to both breach of contract claims and takings claims; *See, e.g., Perry v. United States*, 294 U.S. 330, 352 (1935) (breach of contract claims). The consent to suit has been given, in both cases, in the form of the Tucker Act; 28 U.S.C. § 1491(a)(1). The Tucker Act gives the U.S. Court of Federal Claims jurisdiction over "claims" against the United States "founded either upon the Constitution… or upon any express or implied

contract with the United States …." The phrase "upon the Constitution" plainly includes takings claims against the United States—important not only for jurisdictional reasons, but because the Takings Clause of the Fifth Amendment is not construed to contain its own waiver of sovereign immunity. The waiver comes only from the Tucker Act. As for breach of contract actions, the phrase "upon any express or implied contract" states the Tucker Act's coverage of such actions explicitly. However, the phrase "implied contract" has been limited by case law to contracts implied in fact, excluding contracts implied in law. As mentioned, plaintiffs filing breach of contract complaints against the United States often add a takings claim under the Fifth Amendment Takings Clause. The Takings Clause is relevant because contract rights generally are deemed to constitute "property" as that term is used in the Takings Clause. *See, e.g., United States Trust Co. v. New Jersey*, 431 U.S. 1, 19 n.16 (1977) ("Contract rights are a form of property and as such may be taken … provided that just compensation is paid."), and *Lynch v. United States*, 292 U.S. 571, 579 (1934) ("Valid contracts are property, whether the obligor be a private individual, a municipality, a State, or the United States.") A breach by the United States, therefore, can be argued to constitute a taking of one's property in a contract right. http://nationalaglawcenter.org/wp-content /uploads/assets/crs/R42635.pdf

Case: 22-1229 Document: 6 Page: 185 Filed: 01/04/2022

119. As a result of the Government sharing Plaintiff's intellectual property subject matter with at least that of the Defendants for the development, manufacture, and commercialization of antiterrorism devices and mobile devices which are substantially the same as Plaintiff's antiterrorism devices for communicating, monitoring, detecting, and controlling: the economic impact is a reduction in value of the Plaintiff's property and by virtue of the access, disclosure, use with the public, and in some instances manufacture and development by or for the Government and its third party awardees; has destroyed the Plaintiff's competitive edge; has resulted in the development and manufacture products, devices, methods, and systems for public use, without paying any compensation to Plaintiff; has had a substantial adverse impact (means unfavorable or harmful) on Plaintiff; has prevented the successful development of Plaintiff's antiterrorism devices and CMDC devices in accordance with the "reasonable investment-backed expectations" of the Plaintiff; and, the character of the Defendants' actions was triggered when the Defendants caused a permanent invasion of the Plaintiff's property and eliminated all economically beneficial uses of such property.

**The "V-Tection" Project:**

120. Under the vehicle protection ('V-Tection') project it was the Government's responsibility to institute mandates for the Plaintiff's intellectual

subject matter "stall, stop, and vehicle slow-down systems (SSVSS)" for Government, private, and consumer vehicles.




121. Taken from 9/11, the Plaintiff's intellectual subject matter pre-programmed stall, stop, and vehicle slow-down systems, if applied, possibly could have prevented the terrorist from taking over the planes because the aircraft would have been on an autonomous or pilotless flight pattern. If the plane deviated away from the perimeters established within the flight pattern, the control tower would

receive an alert. If the pre-programmed stall, stop, and vehicle slow-down systems does not control the plane away from a crash and toward a safe landing, the personnel in the control tower has the ability to take control of the plane and steer it to a safe landing (i.e. remote air satellite or cellular).

122. Some of the Plaintiff's intellectual subject matter pre-programmed stall, stop, and vehicle slow-down systems include: lane departure stall, stop, and vehicle slow-down systems; unintended acceleration stall, stop, and vehicle slow-down systems; adapted cruise control stall, stop, and vehicle slow-down systems; reverse acceleration stall, stop, and vehicle slow-down systems; pre-crash stall, stop, and vehicle slow-down systems; and/or, a crowd sourcing stall, stop, and vehicle slow-down systems.

123. The operators (i.e. drivers, pilots, conductors, consumers, etc.) are equipped with the Plaintiff's intellectual subject matter CMDC devices (new and improved desktop computers, new and improved PDAs, PCs, laptops, cell phones, tablets, smartphones, and/or other wearables such as smartwatches, etc.) that are interconnected to vehicles' operating systems for initiating a stall, stop, and vehicle slow-down.

124. The Plaintiff's intellectual property subject matter includes technology to ensure the Government and law enforcement has a way to stop, stall, or slow a vehicle down. The Government and law enforcement <u>MUST</u> have a way

Case: 22-1229 Document: 6 Page: 188 Filed: 01/04/2022

to control the stopping, stalling, and slowing down the autonomous or driverless vehicles (e.g. unmanned land, air, and sea vehicles). This capability is for vehicles equipped with the Plaintiff's programmed systems but have been hacked or overridden. It also include vehicles that have been stolen, vehicles used for kidnapping, or vehicles used as a weapon of mass destruction (WMD).

125. Some of the Plaintiff's intellectual property subject matter stall, stop, and vehicle slow-down systems intended for Government and law enforcement includes sending signals over cellular or by satellite. The Government can also send signals by way of electromagnetic pulse, electrostatic discharge, microwave beam, or radio frequency using a handheld or some other CMDC device such as a new and improved smartphone, laptop, or tablet.

126. The result of the Government sharing Plaintiff's intellectual property subject matter with various Government Agencies (i.e. TSA, DoD, DHS), and private industry for the development, manufacture, and commercialization of stall, stop, and vehicle slow-down systems for Government and consumer vehicles. The Government and private industry's SSVSSs are substantially the same as the Plaintiff's intellectual property subject matter stall, stop, and vehicle slow-down systems for Government and consumer vehicles. Examples are illustrated below:

127. *Connected Vehicles: Connecting through such service providers as defendants AT&T, Verizon, T-Mobile and Sprint.*

"There are already millions of connected cars on the road and most of them connect over the same cellular network your phone does. In 2016, for the first time, cellular connections for cars grew at a faster rate than new phone connections. The Kymeta Corporation is delivering the next generation of the connected car. The company has developed a service called KĀLO, making it possible to gain access to satellite connectivity to deliver seamless, global internet access. It works just like a cellular plan for your car but, because it can use satellite networks, it works even where there are no cell towers."
https://spacenews.com/ satellites-and-the-connected-car/

128. *American Vision for Safer Transportation through Advancement of Revolutionary Technologies Act or the AV START Act.*

"This bill: (1) establishes a framework for a federal role in ensuring the safety of highly automated vehicles (HAVs); (2) preempts states from adopting, maintaining, or enforcing any law, rule, or standard regulating an HAV or automated driving system (ADS) regarding certain safety evaluation report subject areas; (3) sets forth conditions under which HAVs may be introduced into interstate commerce for testing, evaluation, or demonstration; and (4) applies certain safety exemptions to HAVs. The Department of Transportation shall: (1) establish a technical committee on HAV and ADS safety, (2) establish a working group on ADS education efforts, and (3) research the traffic safety implications of

HAVs. Each HAV or ADS manufacturer shall execute a written plan for identifying and reducing cybersecurity risks."
https://www.congress.gov/bill/115th-congress/senate-bill/1885

129. *USDOT Automated Vehicles Activities:*
"The U.S. Department of Transportation (USDOT) is committed to facilitating a new era of transportation innovation and safety and ensuring that our country remains a leader in automation. The Department of Transportation is acting as a convener and facilitator, partnering with a broad coalition of industry, academic, states and local, safety advocacy, and transportation stakeholders to support the safe development, testing, and deployment of automated vehicle technology. U.S. Department of Transportation invites public comment on the document, Preparing for the Future of Transportation: Automated Vehicles 3.0 (AV 3.0) [ISBN 978-0-16-094944-9]. This document builds upon Automated Driving Systems: A Vision for Safety 2.0 (ADS 2.0) and expands the scope to provide a framework and multimodal approach to the safe integration of AVs into the Nation's broader surface transportation system."

130. *Government's stall, stop, or vehicle slowdown systems:*
"1- Eureka Aerospace High Powered Electromagnetic System, or HPEMS; 2- Laser Weapons System (LaWS); 3- ATHENA (Advanced Test High Energy Asset); 4- Counter-Electronics High-Powered Microwave Advanced Missile

Project (CHAMP); 5- Northrop Grumman X-47B UCAS & X-47B Control Display Unit (CDU); 6- Boeing MH-6 Little Bird Helicopter; 7- K-Max Self-flying Helicopter; 8- Oshkosh Defense Autonomous Unmanned Ground Vehicle (UGV) "TerraMax; and, 9- Dream Hammer's "Ballista" Software for Computer, Tablet or Smartphone."

131. Upon information and belief, the Government (the United States) has entered into contracts and agreements for the development of stall, stop, and vehicle slowdown systems (SSVSS) that's interconnected to at least one CMDC device of a new and improved smartphone, tablet, or laptop, supplied by at least that of Apple, Samsung, LG, Qualcomm, Motorola, or Panasonic (e.g. defendants), and, is serviced by at least the of AT&T, Verizon, Sprint, or T-Mobile. After several notices from the Plaintiff the Government and several third parties (e.g. defendants) continues to violate antitrust laws by taking the Plaintiff's intellectual property subject matter and using it for the benefit of the public without paying the Plaintiff compensation. The SSVSSs are at least those of the Eureka Aerospace High Powered Electromagnetic System, or HPEMS; the Laser Weapons System (LaWS); the ATHENA (Advanced Test High Energy Asset); the Counter-Electronics High-Powered Microwave Advanced Missile Project (CHAMP); the Northrop Grumman X-47B UCAS & X-47B Control Display Unit (CDU); the Boeing MH-6 Little Bird Helicopter; the K-Max Self-flying Helicopter; the

Oshkosh Defense Autonomous Unmanned Ground Vehicle (UGV) "TerraMax; and, the Dream Hammer's "Ballista" Software for Computer, Tablet or Smartphone.

132. It is the belief of the Plaintiff that the Plaintiff's proposed plan for government spending on "vehicles' occupied, autonomous vehicles, and driverless vehicles" has stimulated our Nation's economy in the way of increased jobs, and increased revenue for the private sector which results in increased tax revenue received by the government:

> "With automakers and technology companies rushing to develop self-driving cars, the Obama administration on Thursday pledged to expedite regulatory guidelines for autonomous vehicles and invest in research to help bring them to market. Until now, the federal government has taken a hands-off approach to regulating new technology that allows vehicles to operate independently and without an actual driver. But in an announcement here at the North American International Auto Show, Transportation Secretary Anthony Foxx said the government would remove hurdles to developing autonomous vehicles and set further guidelines for them within six months. "We are bullish on autonomous vehicles," Mr. Foxx said. The actions we are taking today brings us up to speed." The government's new support includes a request in President Obama's proposed budget for the next fiscal year for $4 billion, to be spent over 10 years, to finance research projects and infrastructure improvements tied to driverless cars. Mr. Foxx said that autonomous vehicles had the potential to reduce traffic accidents and significantly improve safety on America's roads. He estimated that as many

as 25,000 deaths could have been avoided last year if driverless technology had been in widespread use."

133. It is the belief of the Plaintiff that significant advancements in SSVSS technology and CMDC mobile technology that has occurred since September 11, 2001. Plaintiff also believes that significant advancement in antitrust law violations has occurred since September 11, 2001 by the defendants named in this complaint.

134. As a result of the manufacture, development, offer to sell, sell, or use, of Plaintiff's SSVSSs and CMDC devices, at least that of Apple Inc. ("Apple"), Samsung Electronics, USA ("Samsung"), LG Electronics, USA, Inc. ("LG"), Qualcomm Inc. ("Qualcomm"), Motorola Solutions Inc. ("Motorola"), Panasonic Corporation ("Panasonic"), AT&T Inc. ("AT&T"), Verizon Corporation Services Group ("Verizon"), Sprint Corporation ("Sprint"), T-Mobile USA, Inc. ("T-Mobile"), Ford Global Technologies, LLC ("Ford"), Fairway Ford Lincoln of Greenville ("Fairway Ford"), General Motors Company ("GM"), Kevin Whitaker Chevrolet ("Whitaker Chevrolet"), FCA US LLC ("FCA"), and Big O Dodge Chrysler Jeep Ram ("Big O") has destroyed any competitive edge the Plaintiff may have had for owning the patent rights to the SSVSSs (i.e. remote air SSVSS, remote ground SSVSS, and pre-programmed automatic SSVSS) and CMDC devices (i.e. smartphones, laptops, tablets, etc.), and therefore being "unjustly enriched" by violating certain antitrust laws. The Plaintiff owns at least six patents that covers extensively Plaintiff's SSVSSs and CMDC devices:

135. On December 25, 2018, the United States Patent and Trademark Office (the "PTO") issued Patent No. 10,163,287 ("the '287 Patent"), entitled "Multi Sensor Detection, Stall to Stop and Lock Disabling System", to Larry Golden (Plaintiff).

136. On March 07, 2017, the United States Patent and Trademark Office (the "PTO") issued Patent No. 9,589,439 ("the '439 Patent"), entitled "Multi Sensor Detection, Stall to Stop and Lock Disabling System", to Larry Golden (Plaintiff).

137. On August 04, 2015, the United States Patent and Trademark Office (the "PTO") issued Patent No. 9,096,189 ("the '189 Patent"), entitled "Multi Sensor Detection, Stall to Stop and Lock Disabling System", to Larry Golden (Plaintiff).

138. On February 12, 2013, the United States Patent and Trademark Office (the "PTO") re-issued Patent No. RE43,990 ("the '990 Patent"), entitled "Multi Sensor Detection, Stall to Stop and Lock Disabling System", to Larry Golden (Plaintiff).

139. On January 01, 2013, the United States Patent and Trademark Office (the "PTO") issued Patent No. RE43,891 ("the '891 Patent"), entitled "Multi Sensor Detection, Stall to Stop and Lock Disabling System", to Larry Golden (Plaintiff).

140. On June 10, 2008, the United States Patent and Trademark Office (the "PTO") issued Patent No. 7,385,497 ("the '497 Patent"), entitled "Multi Sensor Detection, and Lock Disabling System", to Larry Golden (Plaintiff).

141. The Plaintiff is the owner by assignment of all rights, title and interest to and in the '287 Patent, the '439 Patent, the 189 Patent, the '990 Patent, the '891 Patent and the '497 Patent.

142. Plaintiff first contacted GM/OnStar during the summer months of 2007 to ask if they would like to participate with Plaintiff in responding to a Department of Homeland Security (DHS) solicitation: (Broad Agency Announcement; BAA 07-02A). The Plaintiff's primary contact person at GM/OnStar was Mr. Jim Culbertson. The Plaintiff asked Mr. Culbertson if GM/OnStar has the capability of bringing a moving vehicle to a stall, stop, or slowdown. Mr. Culbertson's response to me was, "I need time to find out if we have those capabilities and if there is interest from upper management".

143. After several conversations and several failed attempts to reach Mr. Culbertson, Plaintiff never heard back from GM/OnStar. Plaintiff noticed while watching TV, an announcement made by GM/OnStar on October 9, 2007 of a new, "Stolen vehicle slow down system" that was being offered by GM/OnStar beginning in the following year on their 2009 models. GM/OnStar's "Stolen vehicle slow down system" is substantially the same as the Plaintiff's "stall, stop,

and vehicle slowdown systems (SSVSS)" that Plaintiff had discussed earlier with GM/OnStar's Mr. Culbertson during the summer months of 2007.

144. Plaintiff called Mr. Jim Culbertson on March 27, 2008 at 11:20 a.m. at 313-665-2791. Mr. Culbertson referred Plaintiff to Angie Miller at 313-665-1485. When Plaintiff dialed Ms. Miller's number, the answering machine for a Michelle came on; therefore, Plaintiff did not leave a message. On April 14, 2008, Plaintiff faxed a letter to the General Motors Corporation, to the attention of Mr. G. Richard Wagoner, Jr., Chairman & CEO and to several members of the General Motors leadership team, to include, Mr. Frederick A. Henderson, President and Chief Operating Officer, Mr. Ray G. Young, Executive Vice President and Chief Financial Officer, and Mr. Robert S. Osborn, Group Vice President and General Counsel. The contents of the letter are stated below:

> I've made several attempts to contact Representatives of GM. I talked with and forwarded information to a few Representatives of both OnStar and GM last year during the months of March and April of 2007.
>
> "I shared with them technology I had at that time "patent pending" that is designed to stop moving vehicles. I wanted OnStar and GM to collaborate with me in responding to a Government solicitation.
>
> I tried again to contact OnStar and GM when you made the announcement on October 8, 2007 of having technology that will stop moving vehicles which caused your share price to move upward $4 dollars over the next 4 days (value, $2.2 billion).

I need to know if you have a patent for the technology. If you do, please send that information to me. My Patent Attorney and the PTO didn't find one. My patent application and all the claims have been allowed by the PTO.

If I don't hear back from you in a couple of days, my plans are to do a cease-and-desist for the 2 million, 2009 vehicles you have scheduled to roll out with that technology."

145. Plaintiff filed a complaint against GM/OnStar on February 11, 2010 with the U.S. SECURITIES AND EXCHANGE COMMISSION; Atlanta Regional Office. Plaintiff's compliant was, "GM/OnStar made an announcement to the general public of technology they knew that was patent pending in an effort to prime the market, thus causing GM shares to experience a four dollar per share increase over a four day period". The SEC file number is ARO-00022399.

146. Plaintiff filed a complaint against GM/OnStar on February 16, 2010 with the Federal Trade Commission; Bureau of Competition; Office of Policy and Coordination. Plaintiff compliant was, "GM/OnStar stole the technology Plaintiff presented to them". The FTC file number is 25448002.

147. Plaintiff filed a complaint against GM/OnStar on February 16, 2010 with the South Carolina Department of Consumer Affairs.

148. *GM Bailout:*

"The federal government took over GM and Chrysler in March 2009. The Government fired GM CEO Rick Wagoner. GM entered bankruptcy on June 1,

2009. By the end of July, GM emerged from bankruptcy reorganization, became two separate companies and spun off GMAC into Allied Financial. The Treasury Department began selling off its ownership of GM in 2010. The Obama administration used the take-over to set new auto efficiency standards design to improved air quality and forced U.S. automakers to be more competitive against Japanese and German firms. On December 18, 2014, the Treasury Department ended the bailout. That's when it sold its last remaining shares of Ally Financial, formerly known as General Motors Acceptance Corporation. It had bought them for $17.2 billion to infuse cash into the failing GM subsidiary. The Treasury Department sold the shares for $19.6 billion, making a $2.4 billion profit for taxpayers. On June 1, 2009, GM entered bankruptcy. It had $82 billion in assets and $172.8 billion in liabilities. That month, sales hit their low point of 9.545 million cars and trucks. The government lent GM $30.1 billion to fund operations through June and July while it went through bankruptcy reorganization. It also guaranteed GM's extended warranties. In return, it bought 60 percent of the company in warrants for common stock and preferred stock. The Canadian government bought 12 percent. A union health trust received 17.5 percent stock ownership. That was in lieu of the $20 billion needed to cover benefits for 650,000 retirees. Bondholders received 10 percent stock ownership in lieu of $27 billion in bonds. Stockholders lost all their investment. GM promised to repay the $30

billion loan by 2012 when it planned to break even. The company pledged to cut its debt by $30 billion by converting debt ownership for equity. It agreed to pay union health care benefits to retirees by 2010. It promised to sell its Saab, Saturn, and Hummer divisions, reducing the number of models for sale to 40. It shut down 11 factories, closed 40 percent of its 6,000 dealerships, and cut more than 20,000 jobs. Government funding also provided the following incentives for new car buyers: The government backed all new car warranties; the economic stimulus bill allowed new car buyers to deduct all car sales and excise taxes; Congress approved TARP-funded subsidies of zero percent financing for some Chrysler vehicles. The government intended to make GM more efficient. That would allow it to become profitable when sales returned to 10 million vehicles a year. That happened in July 2009, when sales hit 10.758 million. GM emerged from bankruptcy on July 10, 2009, as two separate companies. Old GM held most of the debt. New GM held the assets, $17 billion in debt, the contract with unions, and its underfunded pension funds. This allowed it to move forward as a profitable company. The new company only has four brands: Chevrolet, Cadillac, GMC, and Buick. The company sold Saab and discontinued Saturn and Hummer. In April 2010, New GM repaid its $6.7 billion TARP loan. In November 2010, Treasury revealed it would sell half its ownership of GM. That sale allowed an initial public offering on the stock market of $33 a share. It had already gotten back $37.2

billion by selling its ownership in GM. In November 2013, the Treasury Department announced it would sell its remaining 31.1 million shares in GM. In December 2014, Treasury sold its remaining shares in Ally Financial." file:///C:/Users/Owner/Documents/Auto%20Industry%20Bailout%20(GM,%20Chrysler,%20Ford).html

149. *Chrysler Bailout*

"The federal government took over Chrysler in March 2009. The Government required Chrysler to merge with Italy's Fiat S.p.A. Chrysler entered bankruptcy on April 3, 2009. By the end of July, Chrysler emerged from bankruptcy reorganization and became a brand owned mostly by Fiat. Chrysler paid off the last of its loans by 2011. On January 16, 2009, the Treasury Department approved a $1.5 billion loan for Chrysler Financial. The interest rate for the loans was one point above Libor. In return, Chrysler Financial promised to pay the government $75 million in notes and reduce executive bonuses by 40 percent. As a result, car buyers got zero percent financing for five years on some models. Chrysler received $4 billion of the $7 billion bridge loan it originally requested. In return, its owner Cerberus vowed to convert its debt to equity. Chrysler had also asked for $6 billion from the Energy Department to retool for more energy efficient vehicles. Chrysler wanted the Big Three to partner with the federal government in a joint venture to develop alternative energy vehicles. That didn't

happen, and Chrysler didn't get the loan from the Energy Department. Instead, it pledged to debut an electric vehicle in 2010 and ramp up its production to 500,000 by 2013. On April 30, 2009, Chrysler filed for bankruptcy. Treasury Secretary Tim Geithner agreed to lend it $6 billion to fund operations while in bankruptcy. It emerged as a new company, 58.5 percent of which automaker Fiat S.p.A. of Italy now partly owned. This Fiat-Chrysler merger created the world's sixth largest automaker. The rest was owned by the United Auto Workers Retiree Medical Benefits Trust. Chrysler closed underperforming dealerships as part of its bankruptcy proceedings. In May 2011, Chrysler repaid $11.2 billion of its outstanding $12.5 billion in TARP loans six years ahead of schedule. Total cost to taxpayers was $1.3 billion. In 2013, Fiat CEO Sergio Marchionne announced plans to take Chrysler public on the New York Stock Exchange. This allowed Fiat to purchase the rest of the company and merge the two into a more competitive global automaker. In October 2014, it was listed under the ticker symbol "FCAU." The new company was called Fiat Chrysler Auto Company N.V. Its 2017 market capitalization was $17 billion."

file:///C:/Users/Owner/Documents/Auto%20Industry%20Bailout%20(GM,%20Chrysler,%20Ford).html

150. *Ford Bailout*

"Ford Credit received its bailout from the Term Asset-Backed Securities Loan Facility, not TARP. That was a government program for auto, student, and other consumer loans. Although Ford did not receive TARP funds, it did receive government loans. These were critical because banks were not lending during the financial crisis. It requested a $9 billion line-of-credit from the government. In return, it pledged to spend $14 billion on new technologies. On June 23, 2009, Ford received a $5.9 billion loan from the Energy Department's Advanced Technology Vehicles Manufacturing program. In return, it pledged to accelerate development of both hybrid and battery-powered vehicles, close dealerships, and sell Volvo. It upgraded factories in Illinois, Kentucky, Michigan, Missouri, and Ohio to produce hybrid vehicles. Ford used the funds to switch its focus to commercial electric vehicles. In 2016, CEO Mark Fields said, "We want to become a top player in electrified solutions. The company wants to lead…we can win such as with our commercial vehicles." Eighty-one percent of the funds went to create new efficiency technologies for gas-powered vehicles. For example, they helped fund Ford's aluminum bodies in the F-series pickups. The Congressional Research Service estimated the loans saved 33,000 jobs. Ford will repay this loan by 2022. Many argue that Ford needed the funds to sustain its cash flow during the recession. Ford says it was in better shape than the other two (e.g. GM and FCA) because it had mortgaged its assets in 2006 to raise $23.6 billion. It used

the loans to retool its product lineup to focus on smaller, energy efficient vehicles. It got the United Automobile Workers to agree it could finance half of a new retiree health care trust with company stock. By April 2009, it retired $9.9 billion of the debt it had taken out in 2006."

file:///C:/Users/Owner/Documents/Auto%20Industry%20Bailout%20(GM,%20Chrysler,%20Ford).html

151. The U.S. government's $80.7 billion bailout of the auto industry lasted from December 2008 to December 2014. The U.S. Department of the Treasury used funds from the Troubled Asset Relief Program. In the end, taxpayers lost $10.2 billion.

152. The "Big Three" (defendants: GM, FCA USA, and Ford) automakers asked Congress for help similar to the bank bailout. They warned that General Motors Company and Chrysler LLC faced bankruptcy and the loss of 1 million jobs. The Ford Motor Company didn't need the funds since it had already cut costs. But it asked to be included so it wouldn't suffer by competing with companies who already had government subsidies. The Treasury Department lent money and bought stock ownership in GM and Chrysler. It provided incentives to spur new car purchases. In effect, the government nationalized GM and Chrysler just as it did Fannie Mae, Freddie Mac, and the American International Group. The main purpose of the bailout was to save jobs at GM. But GM had to slash its

employment and production anyway. Toyota and Honda continued to increase their U.S. factories, providing jobs for American auto workers. If there had been no bailout, Ford, Toyota, and Honda would have picked up even more market share. Since they had U.S. plants, they would have increased jobs for Americans once the recession was over. The loss of GM would be like the loss of Pan Am, TWA, and other companies that had a strong American heritage but lost their competitiveness. It would have perhaps tugged at the heartstrings of America but not really hurt the economy. As a result, the auto industry bailout was not critical to the U.S. economy, like the rescue of AIG or the banking system. file:///C:/Users/Owner/Documents/Auto%20Industry%20Bailout%20(GM,%20Chrysler,%20Ford).html

153. *Promoting Innovation through Patent and Antitrust Law and Policy: CHRISTINE A. VARNEY, Assistant Attorney General, Antitrust Division U.S. Department of Justice; Remarks as Prepared for the Joint Workshop of the U.S. Patent and Trademark Office, the Federal Trade Commission, and the Department of Justice on the Intersection of Patent Policy and Competition Policy; Implications for Promoting Innovation. Alexandria, Virginia / May 26, 2010 / "The United States Department of Justice (DOJ)"*

"Invention and innovation are critical in promoting economic growth, creating jobs, and maintaining our competitiveness in the global economy. In fact, a recent

PTO report estimates that innovation accounts for fully three quarters of our nation's post-World War II growth. Progress in technology and production processes drives prices down and quality up, while expanding the range of consumer choices. Many of the greatest benefits of invention and innovation are hard to measure—the value of technologies that alleviate illness and extend our lives that deliver food and water to vulnerable populations, that allow us to respond to natural disasters, and that allow families separated by oceans to connect face-to-face cannot be quantified in dollars and cents alone. In short, innovation is the essential element not only of economic growth, but of human progress as well. We thus have a vital interest in seeing it flourish. Today, it is widely recognized that patent and antitrust drive innovation in different but complementary ways. Both disciplines promote dynamic efficiency: that is, a system of property rights and market rules that create appropriate incentives for invention, innovation, and risk taking—delivering the greatest returns for society not just for today, but tomorrow as well. The patent grant does this by providing incentives for inventors to take risks and make investments in research and development. Patents transform a claimed piece of intellectual progress into a property right, allowing the inventor to exclude others from using that invention during the term of the patent. Our intellectual property framework further advances follow-on innovation through public disclosure of the invention. Antitrust law core mission is to appropriately

foster and protect the competitive environment by preventing certain conduct that threatens free markets. This environment is what pushes companies to constantly innovate and allows them to profit when they do. Antitrust recognizes the critical role that intellectual property rights play in driving innovation and so values these rights. Yet antitrust applies the same analytical framework to intellectual property as it does to other forms of property, and imposes some rules about how the patent monopoly can—and cannot—be used. Thus, antitrust and patent law work together to create and preserve the appropriate incentives for technological progress by creating property rights and preserving competition around those rights. The stakes are high for competition and innovation if the patent system is not working properly or antitrust enforcement policy is improperly calibrated. Our ability to use one regime to correct for shortcomings in the other is limited. This is what makes sessions like today's so important. The competitive implications of flaws in either system are tremendous, and although many of the issues on the table today are properly issues of only patent or antitrust in the first instance, their ramifications for the other system will certainly be worth consideration in the final analysis. That is why I believe it is important for the Department of Justice to participate regularly in intellectual property cases-such as in *Bilski, Quanta, eBay v. MercExchange*, the Google Books settlement dispute, and, recently, *Arkansas Carpenters Health (the "Cipro" case).* It is also why both the Antitrust Division of

the Department of Justice and the Federal Trade Commission devote substantial thought to these issues, including the agencies' joint antitrust guidelines for the licensing of intellectual property in 1995, the FTC's substantial 2003 report on patent law and policy, and the agencies' joint workshops and 2007 report on the intersection of antitrust and intellectual property law and policy. Though the issues we will be considering are difficult ones, I am confident that by promoting an ongoing dialogue and even closer working relationship among all of our agencies, we will find ways to make sure our tools work together to further our common goal of promoting innovation and competition. American patent law's devotion to "the progress of science and the useful arts" is as old as the Constitution itself. I am committed to making sure that antitrust equally promotes such progress." https://www.justice.gov/atr/speech/promoting-innovation-through-patent-and-antitrust-law-and-policy

154. It is the belief of the Plaintiff that the Defendants named in this complaint: Apple, Samsung, LG, Qualcomm, Motorola, Panasonic, AT&T, Verizon, Sprint, T-Mobile, GM, Whitaker Chevrolet, Ford, Fairway Ford, FCA, and Big O, has violated certain antitrust laws that protects the Plaintiff from anticompetitive behavior, and the Plaintiff's "right to exclude others" in a patent grant owned by the Plaintiff (see the related case filed in the United States District Court of South Carolina; Greenville Division; Case No. 6:19-cv-2557).

Case: 22-1229 Document: 6 Page: 208 Filed: 01/04/2022

## COUNT I
## (Infringement of the '287 Patent)

155. Golden realleges and incorporates herein the allegations set forth in Paragraphs 1-154.

156. Plaintiff alleges that at least one of the Defendants named in this complaint has infringed at least independent claim 4 & 5 of the '287 patent that covers Plaintiff's communication, monitoring, detecting and controlling (CMDC) device. **Exhibit K: Claim Chart for the '287 Patent**

157. On information and belief, Apple is jointly, directly and/or indirectly infringing at least claim 5 of the '287 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling and/or importing computerized communications devices (i.e. iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, and Apple Watch series 3, 4, & 5) included without limitation Plaintiff's CMDC devices. As set forth in Golden's preliminary infringement contentions that Apple is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '287 patent and Apple is thereby liable for infringement of the '287 patent pursuant to 35 U.S.C. § 271. Apple have caused damage to Golden, which infringement and damage will continue unless and until Apple is enjoined. **Exhibit L: Claim Chart for Apple Inc.**

158. On information and belief, Apple is jointly, directly and/or indirectly infringing at least claim 5 of the '287 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling and/or importing computerized communications devices (i.e. iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, and Apple Watch series 3, 4, & 5) included without limitation the Plaintiff's CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking; the CMDC's internet used with CMDC devices for mobile internet to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's chemical / biological monitoring used with CMDC devices for monitoring human heartrate; the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that Apple is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '287 patent and Apple is thereby liable for

infringement of the '287 patent pursuant to 35 U.S.C. § 271. Apple have caused damage to Golden, which infringement and damage will continue unless and until Apple is enjoined.

159. The alleged infringement of Apple identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

160. On information and belief, Samsung is jointly, directly and/or indirectly infringing at least claim 5 of the '287 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling and/or importing computerized communications devices (i.e. Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch Active2 series) included without limitation Plaintiff's CMDC devices. As set forth in Golden's preliminary infringement contentions that Samsung is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '287 patent and Samsung is thereby liable for infringement of the '287 patent pursuant to 35 U.S.C. § 271. Samsung have caused damage to

Golden, which infringement and damage will continue unless and until Samsung is enjoined. **Exhibit M: Claim Chart for Samsung Electronics, USA.**

161. On information and belief, Samsung is jointly, directly and/or indirectly infringing at least claim 5 of the '287 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling and/or importing computerized communications devices (i.e. Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch Active2 series) included without limitation Plaintiff's CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking; the CMDC's internet used with CMDC devices for mobile internet to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's chemical / biological monitoring used with CMDC devices for monitoring human heartrate; the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary

infringement contentions that Samsung is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '287 patent and Samsung is thereby liable for infringement of the '287 patent pursuant to 35 U.S.C. § 271. Samsung have caused damage to Golden, which infringement and damage will continue unless and until Samsung is enjoined.

162. The alleged infringement of Samsung identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

163. On information and belief, LG is jointly, directly and/or indirectly infringing at least claim 5 of the '287 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling and/or importing computerized communications devices (i.e. LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, & LG Watch Sport, LG Watch 7) included without limitation Plaintiff's CMDC devices. As set forth in Golden's preliminary infringement contentions that LG is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '287 patent and LG is thereby liable for infringement of the '287 patent pursuant to 35 U.S.C. § 271. LG have caused damage to Golden, which

infringement and damage will continue unless and until LG is enjoined. **Exhibit N: Claim Chart for LG Electronics, USA, Inc.**

164. On information and belief, LG is jointly, directly and/or indirectly infringing at least claim 5 of the '287 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling and/or importing computerized communications devices (i.e. LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7) included without limitation Plaintiff's CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking; the CMDC's internet used with CMDC devices for mobile internet to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's chemical / biological monitoring used with CMDC devices for monitoring human heartrate; the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that LG is making, using, offering for sale, selling and/or

importing of the CMDC device have at a minimum directly infringed the '287 patent and LG is thereby liable for infringement of the '287 patent pursuant to 35 U.S.C. § 271. LG have caused damage to Golden, which infringement and damage will continue unless and until LG is enjoined.

165. The alleged infringement of LG identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

166. On information and belief, Qualcomm is jointly, directly and/or indirectly infringing at least claim 4 & 5 of the '287 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling certain processing devices as Central Processing Units (i.e. Qualcomm's Snapdragon 5 Series, 6 Series, 7 Series, & 8 Series) for system-on-a-chip application processing for at least Apple, Samsung, LG, Motorola, and Panasonic; included without limitation Plaintiff's CMDC devices. As set forth in Golden's preliminary infringement contentions that Qualcomm is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '287 patent and Qualcomm is thereby liable for infringement of the '287 patent pursuant to 35

U.S.C. § 271. Qualcomm have caused damage to Golden, which infringement and damage will continue unless and until Qualcomm is enjoined. **Exhibit O: Claim Chart for Qualcomm Inc.**

167. On information and belief, Qualcomm is jointly, directly and/or indirectly infringing at least claim 4 & 5 of the '287 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling certain processing devices as Central Processing Units (i.e. Qualcomm's Snapdragon 5 Series, 6 Series, 7 Series, & 8 Series) for system-on-a-chip application processing for at least Apple, Samsung, LG, Motorola, and Panasonic; included without limitation Plaintiff's CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking; the CMDC's internet used with CMDC devices for mobile internet to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices (i.e. Apple, Samsung, LG, Motorola, and Panasonic) for mobile application processing i.e. system-on-a-chip (SoC);

> Qualcomm announced it was developing the Scorpion central processing unit (CPU) in November 2007. The following month, Qualcomm acquired Airgo Networks for an undisclosed amount; it said Airgo's 802.11a/b/g and 802.11n Wi-Fi technology would be integrated with the Snapdragon product suite. The Snapdragon system on chip (SoC) was announced in November 2006 and included the Scorpion processor, as well as other semiconductors. The first Snapdragon shipments were of the QSD8250 in November 2007.

The CMDC's chemical / biological monitoring used with CMDC devices for monitoring human heartrate; the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that Qualcomm is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '287 patent and Qualcomm is thereby liable for infringement of the '287 patent pursuant to 35 U.S.C. § 271. Qualcomm have caused damage to Golden, which infringement and damage will continue unless and until Qualcomm is enjoined.

168. The alleged infringement of Qualcomm identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

169. On information and belief, Motorola is jointly, directly and/or indirectly infringing at least claim 5 of the '287 patent in this judicial district and

elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling and/or importing computerized communications devices (i.e. Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series) included without limitation Plaintiff's CMDC devices. As set forth in Golden's preliminary infringement contentions that Motorola is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '287 patent and Motorola is thereby liable for infringement of the '287 patent pursuant to 35 U.S.C. § 271. Motorola have caused damage to Golden, which infringement and damage will continue unless and until Motorola is enjoined. **Exhibit P: Claim Chart for Motorola Solutions Inc. (Motorola Inc.)**

170. On information and belief, Motorola is jointly, directly and/or indirectly infringing at least claim 5 of the '287 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling and/or importing computerized communications devices (i.e. Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series) included without limitation Plaintiff's CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking; the CMDC's internet used with CMDC devices for mobile internet to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's chemical /

biological monitoring used with CMDC devices for monitoring human heartrate; the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that Motorola is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '287 patent and Motorola is thereby liable for infringement of the '287 patent pursuant to 35 U.S.C. § 271. Motorola have caused damage to Golden, which infringement and damage will continue unless and until Motorola is enjoined.

171. The alleged infringement of Motorola identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

172. On information and belief, Panasonic is jointly, directly and/or indirectly infringing at least claim 5 of the '287 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making,

using, offering for sale, selling and/or importing computerized communications devices (i.e. TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphone) included without limitation Plaintiff's CMDC devices. As set forth in Golden's preliminary infringement contentions that Panasonic is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '287 patent and Panasonic is thereby liable for infringement of the '287 patent pursuant to 35 U.S.C. § 271. Panasonic have caused damage to Golden, which infringement and damage will continue unless and until Panasonic is enjoined. **Exhibit Q: Claim Chart for Panasonic Corporation**

173. On information and belief, Panasonic is jointly, directly and/or indirectly infringing at least claim 5 of the '287 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling and/or importing computerized communications devices (i.e. TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphone) included without limitation Plaintiff's CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking; the CMDC's internet used with CMDC devices for mobile internet to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the

6:19-cv-02557-DCC Date Filed 10/15/19 Entry Number 16-1 Page 98 of 253

CMDC's chemical / biological monitoring used with CMDC devices for monitoring human heartrate; the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that Panasonic is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '287 patent and Panasonic is thereby liable for infringement of the '287 patent pursuant to 35 U.S.C. § 271. Panasonic have caused damage to Golden, which infringement and damage will continue unless and until Panasonic is enjoined.

174. The alleged infringement of Panasonic identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

175. On information and belief, AT&T is jointly, directly and/or indirectly infringing at least claims 4 & 5 of the '287 patent in this judicial district and

elsewhere in South Carolina and the United States by, among other things, *using, offering for sale, selling* and/or importing computerized communications devices (i.e. Apple, Samsung, LG, Motorola, and Panasonic unlocked smartphones, laptops, tablets, smartwatches) including without limitation the CMDC device. As set forth in Golden's preliminary infringement contentions that AT&T is using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly and/or indirectly infringed the '287 patent and AT&T is thereby liable for infringement of the '287 patent pursuant to 35 U.S.C. § 271. AT&T have caused damage to Golden, which infringement and damage will continue unless and until AT&T is enjoined.

176. On information and belief, AT&T is jointly, directly and/or indirectly infringing at least claims 4 & 5 of the '287 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, *using, offering for sale, or selling* at least one of Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C

series, Panasonic Power & ToughPad FZ-F1 smartphones that includes, without limitation the CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking; the CMDC's internet used with CMDC devices for mobile internet to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's chemical / biological monitoring used with CMDC devices for monitoring human heartrate; the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that AT&T is using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly and/or indirectly infringed the '287 patent and AT&T is thereby liable for infringement of the '287 patent pursuant to 35 U.S.C. § 271. AT&T have caused damage to Golden, which infringement and damage will continue unless and until AT&T is enjoined.

177. The alleged infringement of AT&T identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering

the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

178. On information and belief, Verizon is jointly, directly and/or indirectly infringing at least claims 4 & 5 of the '287 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, *using, offering for sale, selling* and/or importing computerized communications devices (i.e. Apple, Samsung, LG, Motorola, and Panasonic unlocked smartphones, laptops, tablets, smartwatches) including without limitation the CMDC device. As set forth in Golden's preliminary infringement contentions that Verizon is using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly and/or indirectly infringed the '287 patent and Verizon is thereby liable for infringement of the '287 patent pursuant to 35 U.S.C. § 271. Verizon have caused damage to Golden, which infringement and damage will continue unless and until Verizon is enjoined.

179. On information and belief, Verizon is jointly, directly and/or indirectly infringing at least one claim of the '287 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, *using, offering for sale, or selling* at least one of Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple

Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphones that includes, without limitation the CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking; the CMDC's internet used with CMDC devices for mobile internet to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's chemical / biological monitoring used with CMDC devices for monitoring human heartrate; the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that Verizon is using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly and/or indirectly infringed the '287 patent and Verizon is thereby liable for

infringement of the '287 patent pursuant to 35 U.S.C. § 271. Verizon have caused damage to Golden, which infringement and damage will continue unless and until Verizon is enjoined.

180. The alleged infringement of Verizon identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

181. On information and belief, Sprint is jointly, directly and/or indirectly infringing at least claims 4 & 5 of the '287 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, *using, offering for sale, selling* and/or importing computerized communications devices (i.e. Apple, Samsung, LG, Motorola unlocked, and Panasonic unlocked smartphones, laptops, tablets, smartwatches) including without limitation the CMDC device. As set forth in Golden's preliminary infringement contentions that Sprint is using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly and/or indirectly infringed the '287 patent and Sprint is thereby liable for infringement of the '287 patent pursuant to 35 U.S.C. § 271. Sprint have caused damage to Golden, which infringement and damage will continue unless and until Sprint is enjoined.

182. On information and belief, Sprint jointly, is directly and/or indirectly infringing at least one claim of the '287 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, *using, offering for sale, or selling* least one of Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphones that includes, without limitation the CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking; the CMDC's internet used with CMDC devices for mobile internet to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's chemical / biological monitoring used with CMDC devices for monitoring human heartrate; the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device;

and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that Sprint is using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly and/or indirectly infringed the '287 patent and Sprint is thereby liable for infringement of the '287 patent pursuant to 35 U.S.C. § 271. Sprint have caused damage to Golden, which infringement and damage will continue unless and until Sprint is enjoined.

183. The alleged infringement of Sprint identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

184. On information and belief, T-Mobile is jointly, directly and/or indirectly infringing at least claims 4 & 5 of the '287 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, *using, offering for sale, selling* and/or importing computerized communications devices (i.e. Apple, Samsung, LG, Motorola, and Panasonic unlocked smartphones, laptops, tablets, smartwatches) including without limitation the CMDC device. As set forth in Golden's preliminary infringement contentions that

T-Mobile is using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly and/or indirectly infringed the '287 patent and T-Mobile is thereby liable for infringement of the '287 patent pursuant to 35 U.S.C. § 271. T-Mobile have caused damage to Golden, which infringement and damage will continue unless and until T-Mobile is enjoined.

185. On information and belief, T-Mobile is jointly, directly and/or indirectly infringing at least one claim of the '287 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, _using, offering for sale, or selling_ at least one of Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphones that includes, without limitation the CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking; the CMDC's internet used with CMDC devices for mobile internet to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e.

system-on-a-chip (SoC); the CMDC's chemical / biological monitoring used with CMDC devices for monitoring human heartrate; the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that T-Mobile is using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly and/or indirectly infringed the '287 patent and T-Mobile is thereby liable for infringement of the '287 patent pursuant to 35 U.S.C. § 271. T-Mobile have caused damage to Golden, which infringement and damage will continue unless and until T-Mobile is enjoined.

186. The alleged infringement of T-Mobile identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

187. On information and belief, Ford is jointly, directly and/or indirectly infringing at least claims 1 & 5 of the '287 patent in this judicial district and

elsewhere in South Carolina and the United States by, among other things, using communications devices (i.e. smartphones, laptops, tablets, smartwatches) including without limitation the CMDC device. As set forth in Golden's preliminary infringement contentions that Ford is using the CMDC device have at a minimum directly and/or indirectly infringed the '287 patent and Ford is thereby liable for infringement of the '287 patent pursuant to 35 U.S.C. § 271. Ford have caused damage to Golden, which infringement and damage will continue unless and until Ford is enjoined. **Exhibit R: Claim Chart for Ford Global Technologies, LLC**

188. On information and belief, Ford is jointly, directly and/or indirectly infringing at least claims 1 & 5 of the '287 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, *using, with its vehicles at least one of the alleged infringing devices* i.e. Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-

F1 smartphone communication devices that includes, without limitation the CMDC's remote lock/unlock used with CMDC devices for locking and unlocking vehicle doors; the CMDC's remote ignition start/stop used with CMDC devices for starting and stopping the vehicle's engine; the CMDC's remote operating systems controls used with CMDC devices for operating the heating and cooling controls; the CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking the vehicle; the CMDC's internet used with CMDC devices for mobile internet (i.e. the connected vehicle) to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's chemical / biological monitoring used with CMDC devices for monitoring human heartrate; the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that Ford is using the CMDC device have at a minimum directly and/or indirectly infringed the '287 patent and Ford is thereby liable for infringement of the '287 patent pursuant to 35 U.S.C. § 271. Ford have caused

damage to Golden, which infringement and damage will continue unless and until Ford is enjoined.

189. The alleged infringement of Ford identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

190. On information and belief, Fairway Ford is jointly, directly and/or indirectly infringing at least claims 1 & 5 of the '287 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, using communications devices (i.e. smartphones, laptops, tablets, smartwatches) including without limitation the CMDC device. As set forth in Golden's preliminary infringement contentions that Fairway Ford is using the CMDC device have at a minimum directly and/or indirectly infringed the '287 patent and Fairway Ford is thereby liable for infringement of the '287 patent pursuant to 35 U.S.C. § 271. Fairway Ford have caused damage to Golden, which infringement and damage will continue unless and until Fairway Ford is enjoined. **Exhibit R: Claim Chart for Fairway Ford Lincoln of Greenville**

191. On information and belief, Fairway Ford is jointly, directly and/or indirectly infringing at least claims 1 & 5 of the '287 patent in this judicial district

and elsewhere in South Carolina and the United States by, among other things, *using, with its vehicles at least one of the alleged infringing devices* i.e. Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphone communication devices that includes, without limitation the CMDC's remote lock/unlock used with CMDC devices for locking and unlocking vehicle doors; the CMDC's remote ignition start/stop used with CMDC devices for starting and stopping the vehicle's engine; the CMDC's remote operating systems controls used with CMDC devices for operating the heating and cooling controls; the CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking the vehicle; the CMDC's internet used with CMDC devices for mobile internet (i.e. the connected vehicle) to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's chemical / biological monitoring used with CMDC devices for monitoring human heartrate;

the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that Fairway Ford is using the CMDC device have at a minimum directly and/or indirectly infringed the '287 patent and Fairway Ford is thereby liable for infringement of the '287 patent pursuant to 35 U.S.C. § 271. Fairway Ford have caused damage to Golden, which infringement and damage will continue unless and until Fairway Ford is enjoined.

192. The alleged infringement of Fairway Ford identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

193. On information and belief, GM is jointly, directly and/or indirectly infringing at least claims 1 & 5 of the '287 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, using communications devices (i.e. smartphones, laptops, tablets, smartwatches)

including without limitation the CMDC device. As set forth in Golden's preliminary infringement contentions that GM is using the CMDC device have at a minimum directly and/or indirectly infringed the '287 patent and GM is thereby liable for infringement of the '287 patent pursuant to 35 U.S.C. § 271. GM have caused damage to Golden, which infringement and damage will continue unless and until GM is enjoined. **Exhibit S: Claim Chart for General Motors Company**

194. On information and belief, GM is jointly, directly and/or indirectly infringing at least claims 1 & 5 of the '287 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, *using, with its vehicles at least one of the alleged infringing devices* i.e. Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphone communication devices that includes, without limitation the CMDC's remote lock/unlock used with CMDC devices for locking and unlocking

vehicle doors; the CMDC's remote ignition start/stop used with CMDC devices for starting and stopping the vehicle's engine; the CMDC's remote operating systems controls used with CMDC devices for operating the heating and cooling controls; the CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking the vehicle; the CMDC's internet used with CMDC devices for mobile internet (i.e. the connected vehicle) to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's chemical / biological monitoring used with CMDC devices for monitoring human heartrate; the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that GM is using the CMDC device have at a minimum directly and/or indirectly infringed the '287 patent and GM is thereby liable for infringement of the '287 patent pursuant to 35 U.S.C. § 271. GM have caused damage to Golden, which infringement and damage will continue unless and until GM is enjoined.

195. The alleged infringement of GM identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

196. On information and belief, Whitaker Chevrolet is jointly, directly and/or indirectly infringing at least claims 1 & 5 of the '287 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, using communications devices (i.e. smartphones, laptops, tablets, smartwatches) including without limitation the CMDC device. As set forth in Golden's preliminary infringement contentions that Whitaker Chevrolet is using the CMDC device have at a minimum directly and/or indirectly infringed the '287 patent and Whitaker Chevrolet is thereby liable for infringement of the '287 patent pursuant to 35 U.S.C. § 271. Whitaker Chevrolet have caused damage to Golden, which infringement and damage will continue unless and until Whitaker Chevrolet is enjoined. **Exhibit S: Claim Chart for Kevin Whitaker Chevrolet**

197. On information and belief, Whitaker Chevrolet is jointly, directly and/or indirectly infringing at least claims 1 & 5 of the '287 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, *using, with its vehicles at least one of the alleged infringing devices* i.e.

Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphone communication devices that includes, without limitation the CMDC's remote lock/unlock used with CMDC devices for locking and unlocking vehicle doors; the CMDC's remote ignition start/stop used with CMDC devices for starting and stopping the vehicle's engine; the CMDC's remote operating systems controls used with CMDC devices for operating the heating and cooling controls; the CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking the vehicle; the CMDC's internet used with CMDC devices for mobile internet (i.e. the connected vehicle) to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's chemical / biological monitoring used with CMDC devices for monitoring human heartrate; the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling

mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that Whitaker Chevrolet is using the CMDC device have at a minimum directly and/or indirectly infringed the '287 patent and Whitaker Chevrolet is thereby liable for infringement of the '287 patent pursuant to 35 U.S.C. § 271. Whitaker Chevrolet have caused damage to Golden, which infringement and damage will continue unless and until Whitaker Chevrolet is enjoined.

198. The alleged infringement of Whitaker Chevrolet identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

199. On information and belief, FCA is jointly, directly and/or indirectly infringing at least claims 1 & 5 of the '287 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, using communications devices (i.e. smartphones, laptops, tablets, smartwatches) including without limitation the CMDC device. As set forth in Golden's

preliminary infringement contentions that FCA is using the CMDC device have at a minimum directly and/or indirectly infringed the '287 patent and FCA is thereby liable for infringement of the '287 patent pursuant to 35 U.S.C. § 271. FCA have caused damage to Golden, which infringement and damage will continue unless and until FCA is enjoined. **Exhibit T: Claim Chart for FCA US LLC**

200. On information and belief, FCA is jointly, directly and/or indirectly infringing at least claims 1 & 5 of the '287 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, *using, with its vehicles at least one of the alleged infringing devices* i.e. Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphone communication devices that includes, without limitation the CMDC's remote lock/unlock used with CMDC devices for locking and unlocking vehicle doors; the CMDC's remote ignition start/stop used with CMDC devices for starting and stopping the vehicle's engine; the CMDC's remote operating systems

controls used with CMDC devices for operating the heating and cooling controls; the CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking the vehicle; the CMDC's internet used with CMDC devices for mobile internet (i.e. the connected vehicle) to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's chemical / biological monitoring used with CMDC devices for monitoring human heartrate; the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that FCA is using the CMDC device have at a minimum directly and/or indirectly infringed the '287 patent and FCA is thereby liable for infringement of the '287 patent pursuant to 35 U.S.C. § 271. FCA have caused damage to Golden, which infringement and damage will continue unless and until FCA is enjoined.

201. The alleged infringement of FCA identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering

the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

202. On information and belief, Big O is jointly, directly and/or indirectly infringing at least claims 1 & 5 of the '287 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, using communications devices (i.e. smartphones, laptops, tablets, smartwatches) including without limitation the CMDC device. As set forth in Golden's preliminary infringement contentions that Big O is using the CMDC device have at a minimum directly and/or indirectly infringed the '287 patent and Big O is thereby liable for infringement of the '287 patent pursuant to 35 U.S.C. § 271. Big O have caused damage to Golden, which infringement and damage will continue unless and until Big O is enjoined. **Exhibit T: Claim Chart for Big O Dodge Jeep RAM**

203. On information and belief, Big O is jointly, directly and/or indirectly infringing at least claims 1 & 5 of the '287 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, *using, with its vehicles at least one of the alleged infringing devices* i.e. Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series,

Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphone communication devices that includes, without limitation the CMDC's remote lock/unlock used with CMDC devices for locking and unlocking vehicle doors; the CMDC's remote ignition start/stop used with CMDC devices for starting and stopping the vehicle's engine; the CMDC's remote operating systems controls used with CMDC devices for operating the heating and cooling controls; the CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking the vehicle; the CMDC's internet used with CMDC devices for mobile internet (i.e. the connected vehicle) to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's chemical / biological monitoring used with CMDC devices for monitoring human heartrate; the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric

identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that Big O is using the CMDC device have at a minimum directly and/or indirectly infringed the '287 patent and Big O is thereby liable for infringement of the '287 patent pursuant to 35 U.S.C. § 271. Big O have caused damage to Golden, which infringement and damage will continue unless and until Big O is enjoined.

204. The alleged infringement of Big O identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

## COUNT II
## (Infringement of the '439 Patent)

205. Golden realleges and incorporates herein the allegations set forth in Paragraphs 1-204.

206. Plaintiff alleges that at least one of the Defendants named in this complaint has infringed at least independent claims 13, 14, 16, 19, 20, 22 & 23 of the '439 patent that covers Plaintiff's communication, monitoring, detecting and controlling (CMDC) device. **Exhibit U: Claim Chart for the '439 Patent**

207. On information and belief, Apple is jointly, directly and/or indirectly infringing at least claims 13, 14, 16, 17, 19, 20, 22, & 23 of the '439 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling and/or importing computerized communications devices (i.e. iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5) included without limitation Plaintiff's CMDC devices. As set forth in Golden's preliminary infringement contentions that Apple is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '439 patent and Apple is thereby liable for infringement of the '439 patent pursuant to 35 U.S.C. § 271. Apple have caused damage to Golden, which infringement and damage will continue unless and until Apple is enjoined. **Exhibit L: Claim Chart for Apple Inc.**

208. On information and belief, Apple is jointly, directly and/or indirectly infringing at least claims 13, 14, 16, 17, 19, 20, 22, & 23 of the '439 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling and/or importing computerized communications devices (i.e. iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5) included without limitation Plaintiff's CMDC's global

positioning system (GPS) used with CMDC devices for locating and tracking; the CMDC's internet used with CMDC devices for mobile internet to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's chemical / biological monitoring used with CMDC devices for monitoring human heartrate; the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that Apple is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '439 patent and Apple is thereby liable for infringement of the '439 patent pursuant to 35 U.S.C. § 271. Apple have caused damage to Golden, which infringement and damage will continue unless and until Apple is enjoined.

209. The alleged infringement of Apple identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a

permanent injunction is warranted and such a remedy would be in the public interest.

210. On information and belief, Samsung is jointly, directly and/or indirectly infringing at least claims 13, 14, 19, 20, 22 of the '439 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling and/or importing computerized communications devices (i.e. Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch Active2 series) included without limitation Plaintiff's CMDC devices. As set forth in Golden's preliminary infringement contentions that Samsung is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '439 patent and Samsung is thereby liable for infringement of the '439 patent pursuant to 35 U.S.C. § 271. Samsung have caused damage to Golden, which infringement and damage will continue unless and until Samsung is enjoined. **Exhibit M: Claim Chart for Samsung Electronics, USA.**

211. On information and belief, Samsung is jointly, directly and/or indirectly infringing at least claims 13, 14, 19, 20, 22 of the '439 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling and/or importing

computerized communications devices (i.e. Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch Active2 series) included without limitation Plaintiff's CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking; the CMDC's internet used with CMDC devices for mobile internet to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's chemical / biological monitoring used with CMDC devices for monitoring human heartrate; the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that Samsung is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '439 patent and Samsung is thereby liable for infringement of the '439 patent pursuant to 35 U.S.C. § 271. Samsung have caused damage to Golden, which infringement and damage will continue unless and until Samsung is enjoined.

212. The alleged infringement of Samsung identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

213. On information and belief, LG is jointly, directly and/or indirectly infringing at least claims 13, 14, 19, 20, 22 of the '439 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling and/or importing computerized communications devices (i.e. LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7) included without limitation Plaintiff's CMDC devices. As set forth in Golden's preliminary infringement contentions that LG is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '439 patent and LG is thereby liable for infringement of the '439 patent pursuant to 35 U.S.C. § 271. LG have caused damage to Golden, which infringement and damage will continue unless and until LG is enjoined. **Exhibit N: Claim Chart for LG Electronics, USA, Inc.**

214. On information and belief, LG is jointly, directly and/or indirectly infringing at least claims 13, 14, 19, 20, 22 of the '439 patent in this judicial district and elsewhere in South Carolina and the United States by, among other

things, making, using, offering for sale, selling and/or importing computerized communications devices (i.e. LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7) included without limitation Plaintiff's CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking; the CMDC's internet used with CMDC devices for mobile internet to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's chemical / biological monitoring used with CMDC devices for monitoring human heartrate; the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that LG is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '439 patent and LG is thereby liable for infringement of the '439 patent pursuant to 35 U.S.C. § 271. LG have caused damage to Golden, which infringement and damage will continue unless and until LG is enjoined.

215. The alleged infringement of LG identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

216. On information and belief, Qualcomm is jointly, directly and/or indirectly infringing at least claim 22 of the ‘439 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling certain processing devices as Central Processing Units (i.e. Qualcomm’s Snapdragon 5 Series, 6 Series, 7 Series, & 8 Series) for system-on-a-chip application processing for at least Apple, Samsung, LG, Motorola, and Panasonic; included without limitation Plaintiff’s CMDC devices. As set forth in Golden’s preliminary infringement contentions that Qualcomm is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the ‘439 patent and Qualcomm is thereby liable for infringement of the ‘439 patent pursuant to 35 U.S.C. § 271. Qualcomm have caused damage to Golden, which infringement and damage will continue unless and until Qualcomm is enjoined. **Exhibit O: Claim Chart for Qualcomm Inc.**

217. On information and belief, Qualcomm is jointly, directly and/or indirectly infringing at least claim 22 of the '439 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling certain processing devices as Central Processing Units (i.e. Qualcomm's Snapdragon 5 Series, 6 Series, 7 Series, & 8 Series) for system-on-a-chip application processing for at least Apple, Samsung, LG, Motorola, and Panasonic; included without limitation Plaintiff's CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking; the CMDC's internet used with CMDC devices for mobile internet to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's chemical / biological monitoring used with CMDC devices for monitoring human heartrate; the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that Qualcomm is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly

infringed the '439 patent and Qualcomm is thereby liable for infringement of the '439 patent pursuant to 35 U.S.C. § 271. Qualcomm have caused damage to Golden, which infringement and damage will continue unless and until Qualcomm is enjoined.

218. The alleged infringement of Qualcomm identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

219. On information and belief, Motorola is jointly, directly and/or indirectly infringing at least claims 22 & 23 of the '439 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling and/or importing computerized communications devices (i.e. Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series) included without limitation Plaintiff's CMDC devices. As set forth in Golden's preliminary infringement contentions that Motorola is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '439 patent and Motorola is thereby liable for nfringement of the '439 patent pursuant to 35 U.S.C. § 271. Motorola have caused mage to Golden, which infringement and damage will continue unless and until

Motorola is enjoined. **Exhibit P: Claim Chart for Motorola Solutions Inc. (Motorola Inc.)**

220. On information and belief, Motorola is jointly, directly and/or indirectly infringing at least claims 22 & 23 of the '439 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling and/or importing computerized communications devices (i.e. Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series) included without limitation Plaintiff's CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking; the CMDC's internet used with CMDC devices for mobile internet to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's chemical / biological monitoring used with CMDC devices for monitoring human heartrate; the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that Motorola is making, using, offering for sale, selling

and/or importing of the CMDC device have at a minimum directly infringed the '439 patent and Motorola is thereby liable for infringement of the '439 patent pursuant to 35 U.S.C. § 271. Motorola have caused damage to Golden, which infringement and damage will continue unless and until Motorola is enjoined.

221. The alleged infringement of Motorola identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

222. On information and belief, Panasonic is jointly, directly and/or indirectly infringing at least claims 13, 22, & 23 of the '439 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling and/or importing computerized communications devices (i.e. TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphone) included without limitation Plaintiff's CMDC devices. As set forth in Golden's preliminary infringement contentions that Panasonic is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '439 patent and Panasonic is thereby liable for infringement of the '439 patent pursuant to 35 U.S.C. § 271. Panasonic have caused damage to Golden, which infringement

and damage will continue unless and until Panasonic is enjoined. **Exhibit Q: Claim Chart for Panasonic Corporation**

223. On information and belief, Panasonic is jointly, directly and/or indirectly infringing at least claims 13, 22, & 23 of the '439 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling and/or importing computerized communications devices (i.e. TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphone) included without limitation Plaintiff's CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking; the CMDC's internet used with CMDC devices for mobile internet to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's chemical / biological monitoring used with CMDC devices for monitoring human heartrate; the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that Panasonic is making, using, offering for

sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '439 patent and Panasonic is thereby liable for infringement of the '439 patent pursuant to 35 U.S.C. § 271. Panasonic have caused damage to Golden, which infringement and damage will continue unless and until Panasonic is enjoined.

224. The alleged infringement of Panasonic identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

225. On information and belief, AT&T is jointly, directly and/or indirectly infringing at least claims 13, 14, 16, 19, 20, 22 & 23 of the '439 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, using, offering for sale, selling and/or importing computerized communications devices (i.e. smartphones, laptops, tablets, smartwatches) including without limitation the CMDC device. As set forth in Golden's preliminary infringement contentions that AT&T is using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly and/or indirectly infringed the '439 patent and AT&T is thereby liable for infringement of the '439 patent pursuant to 35 U.S.C. § 271. AT&T have caused damage to

Golden, which infringement and damage will continue unless and until AT&T is enjoined.

226. On information and belief, AT&T is jointly, directly and/or indirectly infringing at least claims 13, 14, 16, 19, 20, 22 & 23 of the '439 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, *using, offering for sale, or selling* at least one of Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphones that includes, without limitation the CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking; the CMDC's internet used with CMDC devices for mobile internet to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's chemical / biological monitoring used with CMDC devices for monitoring human heartrate; the CMDC's radio frequency near-field communication (NFC) used with CMDC

devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that AT&T is using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly and/or indirectly infringed the '439 patent and AT&T is thereby liable for infringement of the '439 patent pursuant to 35 U.S.C. § 271. AT&T have caused damage to Golden, which infringement and damage will continue unless and until AT&T is enjoined.

227. The alleged infringement of AT&T identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

228. On information and belief, Verizon is jointly, directly and/or indirectly infringing at least claims 13, 14, 16, 19, 20, 22 & 23 of the '439 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, using, offering for sale, selling and/or importing computerized communications devices (i.e. smartphones, laptops, tablets, smartwatches)

including without limitation the CMDC device. As set forth in Golden's preliminary infringement contentions that Verizon is using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly and/or indirectly infringed the '439 patent and Verizon is thereby liable for infringement of the '439 patent pursuant to 35 U.S.C. § 271. Verizon have caused damage to Golden, which infringement and damage will continue unless and until Verizon is enjoined.

229. On information and belief, Verizon is jointly, directly and/or indirectly infringing at least claims 13, 14, 16, 19, 20, 22 & 23 of the '439 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, <u>*using, offering for sale, or selling*</u> at least one of Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphones that includes without limitation the CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking; the CMDC's

internet used with CMDC devices for mobile internet to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's chemical / biological monitoring used with CMDC devices for monitoring human heartrate; the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that Verizon is using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly and/or indirectly infringed the '439 patent and Verizon is thereby liable for infringement of the '439 patent pursuant to 35 U.S.C. § 271. Verizon have caused damage to Golden, which infringement and damage will continue unless and until Verizon is enjoined.

230. The alleged infringement of Verizon identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

231. On information and belief, Sprint is jointly, directly and/or indirectly infringing at least claims 13, 14, 16, 19, 20, 22 & 23 of the '439 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, using, offering for sale, selling and/or importing computerized communications devices (i.e. smartphones, laptops, tablets, smartwatches) including without limitation the CMDC device. As set forth in Golden's preliminary infringement contentions that Sprint is using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly and/or indirectly infringed the '439 patent and Sprint is thereby liable for infringement of the '439 patent pursuant to 35 U.S.C. § 271. Sprint have caused damage to Golden, which infringement and damage will continue unless and until Sprint is enjoined.

232. On information and belief, Sprint is jointly, directly and/or indirectly infringing at least claims 13, 14, 16, 19, 20, 22 & 23 of the '439 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, <u>*using, offering for sale, or selling*</u> at least one of Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, &

Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphones that includes, without limitation the CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking; the CMDC's internet used with CMDC devices for mobile internet to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's chemical / biological monitoring used with CMDC devices for monitoring human heartrate; the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that Sprint is using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly and/or indirectly infringed the '439 patent and Sprint is thereby liable for infringement of the '439 patent pursuant to 35 U.S.C. § 271. Sprint have caused damage to Golden, which infringement and damage will continue unless and until Sprint is enjoined.

233. The alleged infringement of Sprint identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

234. On information and belief, T-Mobile is jointly, directly and/or indirectly infringing at least claims 13, 14, 16, 19, 20, 22 & 23 of the '439 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, using, offering for sale, selling and/or importing computerized communications devices (i.e. smartphones, laptops, tablets, smartwatches) including without limitation the CMDC device. As set forth in Golden's preliminary infringement contentions that T-Mobile is using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly and/or indirectly infringed the '439 patent and T-Mobile is thereby liable for infringement of the '439 patent pursuant to 35 U.S.C. § 271. T-Mobile have caused damage to Golden, which infringement and damage will continue unless and until T-Mobile is enjoined.

235. On information and belief, T-Mobile is jointly, directly and/or indirectly infringing at least claims 13, 14, 16, 19, 20, 22 & 23 of the '439 patent in this judicial district and elsewhere in South Carolina and the United States by,

among other things, *using, offering for sale, or selling* at least one of Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphones that includes, without limitation the CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking; the CMDC's internet used with CMDC devices for mobile internet to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's chemical / biological monitoring used with CMDC devices for monitoring human heartrate; the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary

infringement contentions that T-Mobile is using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly and/or indirectly infringed the '439 patent and T-Mobile is thereby liable for infringement of the '439 patent pursuant to 35 U.S.C. § 271. T-Mobile have caused damage to Golden, which infringement and damage will continue unless and until T-Mobile is enjoined.

236. The alleged infringement of T-Mobile identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

237. On information and belief, Ford is jointly, directly and/or indirectly infringing at least claims 22 & 23 of the '439 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, using communications devices (i.e. smartphones, laptops, tablets, smartwatches) including without limitation the CMDC device. As set forth in Golden's preliminary infringement contentions that Ford is using the CMDC device have at a minimum directly and/or indirectly infringed the '439 patent and Ford is thereby liable for infringement of the '439 patent pursuant to 35 U.S.C. § 271. Ford have caused damage to Golden, which infringement and damage will continue unless

and until Ford is enjoined. **Exhibit R: Claim Chart for Ford Global Technologies, LLC**

238. On information and belief, Ford is jointly, directly and/or indirectly infringing at least claims 22 & 23 of the '439 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, *using, with its vehicles at least one of the alleged infringing devices* i.e. Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphone communication devices that includes, without limitation the CMDC's remote lock/unlock used with CMDC devices for locking and unlocking vehicle doors; the CMDC's remote ignition start/stop used with CMDC devices for starting and stopping the vehicle's engine; the CMDC's remote operating systems controls used with CMDC devices for operating the heating and cooling controls; the CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking the vehicle; the CMDC's internet used with CMDC devices

for mobile internet (i.e. the connected vehicle) to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's chemical / biological monitoring used with CMDC devices for monitoring human heartrate; the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that Ford is using the CMDC device have at a minimum directly and/or indirectly infringed the '439 patent and Ford is thereby liable for infringement of the '439 patent pursuant to 35 U.S.C. § 271. Ford have caused damage to Golden, which infringement and damage will continue unless and until Ford is enjoined.

239. The alleged infringement of Ford identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

240. On information and belief, Fairway Ford is jointly, directly and/or indirectly infringing at least claims 22 & 23 of the '439 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, using communications devices (i.e. smartphones, laptops, tablets, smartwatches) including without limitation the CMDC device. As set forth in Golden's preliminary infringement contentions that Fairway Ford is using the CMDC device have at a minimum directly and/or indirectly infringed the '439 patent and Fairway Ford is thereby liable for infringement of the '439 patent pursuant to 35 U.S.C. § 271. Fairway Ford have caused damage to Golden, which infringement and damage will continue unless and until Fairway Ford is enjoined.

**Exhibit R: Claim Chart for Fairway Ford Lincoln of Greenville**

241. On information and belief, Fairway Ford is jointly, directly and/or indirectly infringing at least claims 22 & 23 of the '439 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, *using, with its vehicles at least one of the alleged infringing devices* i.e. Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto

Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphone communication devices that includes, without limitation the CMDC's remote lock/unlock used with CMDC devices for locking and unlocking vehicle doors; the CMDC's remote ignition start/stop used with CMDC devices for starting and stopping the vehicle's engine; the CMDC's remote operating systems controls used with CMDC devices for operating the heating and cooling controls; the CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking the vehicle; the CMDC's internet used with CMDC devices for mobile internet (i.e. the connected vehicle) to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's chemical / biological monitoring used with CMDC devices for monitoring human heartrate; the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that Fairway Ford is using the CMDC device have at a

minimum directly and/or indirectly infringed the '439 patent and Fairway Ford is thereby liable for infringement of the '439 patent pursuant to 35 U.S.C. § 271. Fairway Ford have caused damage to Golden, which infringement and damage will continue unless and until Fairway Ford is enjoined.

242. The alleged infringement of Fairway Ford identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

243. On information and belief, GM is jointly, directly and/or indirectly infringing at least claims 22 & 23 of the '439 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, using communications devices (i.e. smartphones, laptops, tablets, smartwatches) including without limitation the CMDC device. As set forth in Golden's preliminary infringement contentions that GM is using the CMDC device have at a minimum directly and/or indirectly infringed the '439 patent and GM is thereby liable for infringement of the '439 patent pursuant to 35 U.S.C. § 271. GM have caused damage to Golden, which infringement and damage will continue unless and until GM is enjoined. **Exhibit S: Claim Chart for General Motors Company**

244. On information and belief, GM is jointly, directly and/or indirectly infringing at least claims 22 & 23 of the '439 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, *using, with its vehicles at least one of the alleged infringing devices* i.e. Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphone communication devices that includes, without limitation the CMDC's remote lock/unlock used with CMDC devices for locking and unlocking vehicle doors; the CMDC's remote ignition start/stop used with CMDC devices for starting and stopping the vehicle's engine; the CMDC's remote operating systems controls used with CMDC devices for operating the heating and cooling controls; the CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking the vehicle; the CMDC's internet used with CMDC devices for mobile internet (i.e. the connected vehicle) to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile

application processing i.e. system-on-a-chip (SoC); the CMDC's chemical / biological monitoring used with CMDC devices for monitoring human heartrate; the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that GM is using the CMDC device have at a minimum directly and/or indirectly infringed the '439 patent and GM is thereby liable for infringement of the '439 patent pursuant to 35 U.S.C. § 271. GM have caused damage to Golden, which infringement and damage will continue unless and until GM is enjoined.

245. The alleged infringement of GM identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

246. On information and belief, Whitaker Chevrolet is jointly, directly and/or indirectly infringing at least claims 22 & 23 of the '439 patent in this

judicial district and elsewhere in South Carolina and the United States by, among other things, using communications devices (i.e. smartphones, laptops, tablets, smartwatches) including without limitation the CMDC device. As set forth in Golden's preliminary infringement contentions that Whitaker Chevrolet is using the CMDC device have at a minimum directly and/or indirectly infringed the '439 patent and Whitaker Chevrolet is thereby liable for infringement of the '439 patent pursuant to 35 U.S.C. § 271. Whitaker Chevrolet have caused damage to Golden, which infringement and damage will continue unless and until Whitaker Chevrolet is enjoined. **Exhibit S: Claim Chart for Kevin Whitaker Chevrolet**

247. On information and belief, Whitaker Chevrolet is jointly, directly and/or indirectly infringing at least claims 22 & 23 of the '439 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, *using, with its vehicles at least one of the alleged infringing devices* i.e. Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power &

ToughPad FZ-F1 smartphone communication devices that includes, without limitation the CMDC's remote lock/unlock used with CMDC devices for locking and unlocking vehicle doors; the CMDC's remote ignition start/stop used with CMDC devices for starting and stopping the vehicle's engine; the CMDC's remote operating systems controls used with CMDC devices for operating the heating and cooling controls; the CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking the vehicle; the CMDC's internet used with CMDC devices for mobile internet (i.e. the connected vehicle) to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's chemical / biological monitoring used with CMDC devices for monitoring human heartrate; the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that Whitaker Chevrolet is using the CMDC device have at a minimum directly and/or indirectly infringed the '439 patent and Whitaker Chevrolet is thereby liable for infringement of the '439 patent pursuant

Case: 22-1229 Document: 6 Page: 276 Filed: 01/04/2022

to 35 U.S.C. § 271. Whitaker Chevrolet have caused damage to Golden, which infringement and damage will continue unless and until Whitaker Chevrolet is enjoined.

248. The alleged infringement of Whitaker Chevrolet identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

249. On information and belief, FCA is jointly, directly and/or indirectly infringing at least claims 22 & 23 of the '439 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, using communications devices (i.e. smartphones, laptops, tablets, smartwatches) including without limitation the CMDC device. As set forth in Golden's preliminary infringement contentions that FCA is using the CMDC device have at a minimum directly and/or indirectly infringed the '439 patent and FCA is thereby liable for infringement of the '439 patent pursuant to 35 U.S.C. § 271. FCA have caused damage to Golden, which infringement and damage will continue unless and until FCA is enjoined. **Exhibit T: Claim Chart for FCA US LLC**

250. On information and belief, FCA is jointly, directly and/or indirectly infringing at least claims 22 & 23 of the '439 patent in this judicial district and

elsewhere in South Carolina and the United States by, among other things, *using, with its vehicles at least one of the alleged infringing devices* i.e. Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphone communication devices that includes, without limitation the CMDC's remote lock/unlock used with CMDC devices for locking and unlocking vehicle doors; the CMDC's remote ignition start/stop used with CMDC devices for starting and stopping the vehicle's engine; the CMDC's remote operating systems controls used with CMDC devices for operating the heating and cooling controls; the CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking the vehicle; the CMDC's internet used with CMDC devices for mobile internet (i.e. the connected vehicle) to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's chemical / biological monitoring used with CMDC devices for monitoring human heartrate;

the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that FCA is using the CMDC device have at a minimum directly and/or indirectly infringed the '439 patent and FCA is thereby liable for infringement of the '439 patent pursuant to 35 U.S.C. § 271. FCA have caused damage to Golden, which infringement and damage will continue unless and until FCA is enjoined.

251. The alleged infringement of FCA identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

252. On information and belief, Big O is jointly, directly and/or indirectly infringing at least claims 22 & 23 of the '439 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, using communications devices (i.e. smartphones, laptops, tablets, smartwatches)

including without limitation the CMDC device. As set forth in Golden's preliminary infringement contentions that Big O is using the CMDC device have at a minimum directly and/or indirectly infringed the '439 patent and Big O is thereby liable for infringement of the '439 patent pursuant to 35 U.S.C. § 271. Big O have caused damage to Golden, which infringement and damage will continue unless and until Big O is enjoined. **Exhibit T: Claim Chart for Big O Dodge Jeep RAM**

253. On information and belief, Big O is jointly, directly and/or indirectly infringing at least claims 22 & 23 of the '439 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, *using, with its vehicles at least one of the alleged infringing devices* i.e. Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphone communication devices that includes, without limitation the CMDC's remote lock/unlock used with CMDC devices for locking and unlocking

vehicle doors; the CMDC's remote ignition start/stop used with CMDC devices for starting and stopping the vehicle's engine; the CMDC's remote operating systems controls used with CMDC devices for operating the heating and cooling controls; the CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking the vehicle; the CMDC's internet used with CMDC devices for mobile internet (i.e. the connected vehicle) to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's chemical / biological monitoring used with CMDC devices for monitoring human heartrate; the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that Big O is using the CMDC device have at a minimum directly and/or indirectly infringed the '439 patent and Big O is thereby liable for infringement of the '439 patent pursuant to 35 U.S.C. § 271. Big O have caused damage to Golden, which infringement and damage will continue unless and until Big O is enjoined.

254. The alleged infringement of Big O identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

**COUNT III**
**(Infringement of the '189 Patent)**

255. Golden realleges and incorporates herein the allegations set forth in Paragraphs 1-254.

256. Plaintiff alleges that at least one of the Defendants named in this complaint has infringed at least independent claims 1-5, 7, & 8 of the '189 patent that covers Plaintiff's communication, monitoring, detecting and controlling (CMDC) device. **Exhibit V: Claim Chart for the '189 Patent**

257. On information and belief, Apple is jointly, directly and/or indirectly infringing at least claims 1-5, 7, & 8 of the '189 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling and/or importing computerized communications devices (i.e. iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5) included without limitation Plaintiff's CMDC devices. As set forth in Golden's preliminary infringement contentions that Apple is making, using, offering for sale, selling

and/or importing of the CMDC device have at a minimum directly infringed the '189 patent and Apple is thereby liable for infringement of the '189 patent pursuant to 35 U.S.C. § 271. Apple have caused damage to Golden, which infringement and damage will continue unless and until Apple is enjoined. **Exhibit L: Claim Chart for Apple Inc.**

258. On information and belief, Apple is jointly, directly and/or indirectly infringing at least claims 1-5, 7, & 8 of the '189 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling and/or importing computerized communications devices (i.e. iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5) included without limitation Plaintiff's CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking; the CMDC's internet used with CMDC devices for mobile internet to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's chemical / biological monitoring used with CMDC devices for monitoring human heartrate; the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device;

6:19-cv-02557-DCC Date Filed 10/15/19 Entry Number 16-1 Page 161 of 253

and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that Apple is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '189 patent and Apple is thereby liable for infringement of the '189 patent pursuant to 35 U.S.C. § 271. Apple have caused damage to Golden, which infringement and damage will continue unless and until Apple is enjoined.

259. The alleged infringement of Apple identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

260. On information and belief, Samsung is jointly, directly and/or indirectly infringing at least claims 1-5, 7, & 8 of the '189 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling and/or importing computerized communications devices (i.e. Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch Active2 series) included without limitation Plaintiff's CMDC

devices. As set forth in Golden's preliminary infringement contentions that Samsung is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '189 patent and Samsung is thereby liable for infringement of the '189 patent pursuant to 35 U.S.C. § 271. Samsung have caused damage to Golden, which infringement and damage will continue unless and until Samsung is enjoined. **Exhibit M: Claim Chart for Samsung Electronics, USA.**

261. On information and belief, Samsung is jointly, directly and/or indirectly infringing at least claims 1-5, 7, & 8 of the '189 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling and/or importing computerized communications devices (i.e. Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch Active2 series) included without limitation Plaintiff's CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking; the CMDC's internet used with CMDC devices for mobile internet to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's chemical / biological monitoring used with CMDC devices for monitoring human heartrate; the CMDC's radio frequency near-field

communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that Samsung is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '189 patent and Samsung is thereby liable for infringement of the '189 patent pursuant to 35 U.S.C. § 271. Samsung have caused damage to Golden, which infringement and damage will continue unless and until Samsung is enjoined.

262. The alleged infringement of Samsung identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

263. On information and belief, LG is jointly, directly and/or indirectly infringing at least claims 1-5, 7, & 8 of the '189 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling and/or importing computerized communications

devices (i.e. LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7)) included without limitation Plaintiff's CMDC devices. As set forth in Golden's preliminary infringement contentions that LG is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '189 patent and LG is thereby liable for infringement of the '189 patent pursuant to 35 U.S.C. § 271. LG have caused damage to Golden, which infringement and damage will continue unless and until LG is enjoined. **Exhibit N: Claim Chart for LG Electronics, USA, Inc.**

264. On information and belief, LG is jointly, directly and/or indirectly infringing at least claims 1-5, 7, & 8 of the '189 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling and/or importing computerized communications devices (i.e. LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7)) included without limitation Plaintiff's CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking; the CMDC's internet used with CMDC devices for mobile internet to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's chemical / biological monitoring used with CMDC devices for monitoring human heartrate; the CMDC's radio frequency near-field

communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that LG is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '189 patent and LG is thereby liable for infringement of the '189 patent pursuant to 35 U.S.C. § 271. LG have caused damage to Golden, which infringement and damage will continue unless and until LG is enjoined.

265. The alleged infringement of LG identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

266. On information and belief, Qualcomm is jointly, directly and/or indirectly infringing at least claims 1-5, 7, & 8 of the '189 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling certain processing devices as Central Processing Units (i.e. Qualcomm's Snapdragon 5 Series, 6 Series, 7 Series,

& 8 Series) for system-on-a-chip application processing for at least Apple, Samsung, LG, Motorola, and Panasonic; included without limitation Plaintiff's CMDC devices. As set forth in Golden's preliminary infringement contentions that Qualcomm is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '189 patent and Qualcomm is thereby liable for infringement of the '189 patent pursuant to 35 U.S.C. § 271. Qualcomm have caused damage to Golden, which infringement and damage will continue unless and until Qualcomm is enjoined. **Exhibit O: Claim Chart for Qualcomm Inc.**

267. On information and belief, Qualcomm is jointly, directly and/or indirectly infringing at least claims 1-5, 7, & 8 of the '189 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling certain processing devices as Central Processing Units (i.e. Qualcomm's Snapdragon 5 Series, 6 Series, 7 Series, & 8 Series) for system-on-a-chip application processing for at least Apple, Samsung, LG, Motorola, and Panasonic; included without limitation Plaintiff's CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking; the CMDC's internet used with CMDC devices for mobile internet to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip

(SoC); the CMDC's chemical / biological monitoring used with CMDC devices for monitoring human heartrate; the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that Qualcomm is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '189 patent and Qualcomm is thereby liable for infringement of the '189 patent pursuant to 35 U.S.C. § 271. Qualcomm have caused damage to Golden, which infringement and damage will continue unless and until Qualcomm is enjoined.

268. The alleged infringement of Qualcomm identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

269. On information and belief, Motorola is jointly, directly and/or indirectly infringing at least claims 1-5, 7, & 8 of the '189 patent in this judicial

district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling and/or importing computerized communications devices (i.e. Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series) included without limitation Plaintiff's CMDC devices. As set forth in Golden's preliminary infringement contentions that Motorola is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '189 patent and Motorola is thereby liable for infringement of the '189 patent pursuant to 35 U.S.C. § 271. Motorola have caused damage to Golden, which infringement and damage will continue unless and until Motorola is enjoined. **Exhibit P: Claim Chart for Motorola Solutions Inc. (Motorola Inc.)**

270. On information and belief, Motorola is jointly, directly and/or indirectly infringing at least claims 1-5, 7, & 8 of the '189 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling and/or importing computerized communications devices (i.e. Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series) included without limitation Plaintiff's CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking; the CMDC's internet used with CMDC devices for mobile internet to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for

mobile application processing i.e. system-on-a-chip (SoC); the CMDC's chemical / biological monitoring used with CMDC devices for monitoring human heartrate; the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that Motorola is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '189 patent and Motorola is thereby liable for infringement of the '189 patent pursuant to 35 U.S.C. § 271. Motorola have caused damage to Golden, which infringement and damage will continue unless and until Motorola is enjoined.

271. The alleged infringement of Motorola identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

272. On information and belief, Panasonic is jointly, directly and/or indirectly infringing at least claims 1-5, 7, & 8 of the '189 patent in this judicial

district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling and/or importing computerized communications devices (i.e. TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphone) included without limitation Plaintiff's CMDC devices. As set forth in Golden's preliminary infringement contentions that Panasonic is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '189 patent and Panasonic is thereby liable for infringement of the '189 patent pursuant to 35 U.S.C. § 271. Panasonic have caused damage to Golden, which infringement and damage will continue unless and until Panasonic is enjoined. **Exhibit Q: Claim Chart for Panasonic Corporation**

273. On information and belief, Panasonic is jointly, directly and/or indirectly infringing at least claims 1-5, 7, & 8 of the '189 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling and/or importing computerized communications devices (i.e. TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphone) included without limitation Plaintiff's CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking; the CMDC's internet used with CMDC devices for mobile internet to fit the dimensions of a CMDC device; the CMDC's central processing

unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's chemical / biological monitoring used with CMDC devices for monitoring human heartrate; the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that Panasonic is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '189 patent and Panasonic is thereby liable for infringement of the '189 patent pursuant to 35 U.S.C. § 271. Panasonic have caused damage to Golden, which infringement and damage will continue unless and until Panasonic is enjoined.

274. The alleged infringement of Panasonic identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

275. On information and belief, AT&T is jointly, directly and/or indirectly infringing at least claims 1-5, 7, & 8 of the '189 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, using, offering for sale, selling and/or importing computerized communications devices (i.e. smartphones, laptops, tablets, smartwatches) including without limitation the CMDC device. As set forth in Golden's preliminary infringement contentions that AT&T is using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly and/or indirectly infringed the '189 patent and AT&T is thereby liable for infringement of the '189 patent pursuant to 35 U.S.C. § 271. AT&T have caused damage to Golden, which infringement and damage will continue unless and until AT&T is enjoined.

276. On information and belief, AT&T is jointly, directly and/or indirectly infringing at least claims 1-5, 7, & 8 of the '189 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, <u>*using, offering for sale, or selling*</u> at least one of Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series, Motorola One

series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphones that includes, without limitation the CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking; the CMDC's internet used with CMDC devices for mobile internet to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's chemical / biological monitoring used with CMDC devices for monitoring human heartrate; the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that AT&T is using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly and/or indirectly infringed the '189 patent and AT&T is thereby liable for infringement of the '189 patent pursuant to 35 U.S.C. § 271. AT&T have caused damage to Golden, which infringement and damage will continue unless and until AT&T is enjoined.

277. The alleged infringement of AT&T identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

278. On information and belief, Verizon is jointly, directly and/or indirectly infringing at least one claim of the '189 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, using, offering for sale, selling and/or importing computerized communications devices (i.e. smartphones, laptops, tablets, smartwatches) including without limitation the CMDC device. As set forth in Golden's preliminary infringement contentions that Verizon is using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly and/or indirectly infringed the '189 patent and Verizon is thereby liable for infringement of the '189 patent pursuant to 35 U.S.C. § 271. Verizon have caused damage to Golden, which infringement and damage will continue unless and until Verizon is enjoined.

279. On information and belief, Verizon is jointly, directly and/or indirectly infringing at least 1-5, 7, & 8 claim of the '189 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, <u>*using, offering for sale, or selling*</u> at least one of Apple's iPhone 7 series,

iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphones that includes, without limitation the CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking; the CMDC's internet used with CMDC devices for mobile internet to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's chemical / biological monitoring used with CMDC devices for monitoring human heartrate; the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that Verizon is using, offering for sale, selling and/or

importing of the CMDC device have at a minimum directly and/or indirectly infringed the '189 patent and Verizon is thereby liable for infringement of the '189 patent pursuant to 35 U.S.C. § 271. Verizon have caused damage to Golden, which infringement and damage will continue unless and until Verizon is enjoined.

280. The alleged infringement of Verizon identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

281. On information and belief, Sprint is jointly, directly and/or indirectly infringing at least claims 1-5, 7, & 8 of the '189 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, using, offering for sale, selling and/or importing computerized communications devices (i.e. smartphones, laptops, tablets, smartwatches) including without limitation the CMDC device. As set forth in Golden's preliminary infringement contentions that Sprint is using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly and/or indirectly infringed the '189 patent and Sprint is thereby liable for infringement of the '189 patent pursuant to 35 U.S.C. § 271. Sprint have caused damage to Golden, which infringement and damage will continue unless and until Sprint is enjoined.

282. On information and belief, Sprint is jointly, directly and/or indirectly infringing at least claims 1-5, 7, & 8 of the '189 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, *using, offering for sale, or selling* at least one of Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphones that includes, without limitation the CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking; the CMDC's internet used with CMDC devices for mobile internet to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's chemical / biological monitoring used with CMDC devices for monitoring human heartrate; the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device;

and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that Sprint is using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly and/or indirectly infringed the '189 patent and Sprint is thereby liable for infringement of the '189 patent pursuant to 35 U.S.C. § 271. Sprint have caused damage to Golden, which infringement and damage will continue unless and until Sprint is enjoined.

283. The alleged infringement of Sprint identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

284. On information and belief, T-Mobile is jointly, directly and/or indirectly infringing at least claims 1-5, 7, & 8 of the '189 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, using, offering for sale, selling and/or importing computerized communications devices (i.e. smartphones, laptops, tablets, smartwatches) including without limitation the CMDC device. As set forth in Golden's preliminary infringement contentions that T-Mobile is using, offering for sale,

selling and/or importing of the CMDC device have at a minimum directly and/or indirectly infringed the '189 patent and T-Mobile is thereby liable for infringement of the '189 patent pursuant to 35 U.S.C. § 271. T-Mobile have caused damage to Golden, which infringement and damage will continue unless and until T-Mobile is enjoined.

285. On information and belief, T-Mobile is jointly, directly and/or indirectly infringing at least claims 1-5, 7, & 8 of the '189 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, *using, offering for sale, or selling* at least one of Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphones that includes, without limitation the CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking; the CMDC's internet used with CMDC devices for mobile internet to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application

processing i.e. system-on-a-chip (SoC); the CMDC's chemical / biological monitoring used with CMDC devices for monitoring human heartrate; the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that T-Mobile is using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly and/or indirectly infringed the '189 patent and T-Mobile is thereby liable for infringement of the '189 patent pursuant to 35 U.S.C. § 271. T-Mobile have caused damage to Golden, which infringement and damage will continue unless and until T-Mobile is enjoined.

286. The alleged infringement of T-Mobile identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

287. On information and belief, Ford is jointly, directly and/or indirectly infringing at least claim 1 of the '189 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, using communications devices (i.e. smartphones, laptops, tablets, smartwatches) including without limitation the CMDC device. As set forth in Golden's preliminary infringement contentions that Ford is using the CMDC device have at a minimum directly and/or indirectly infringed the '189 patent and Ford is thereby liable for infringement of the '189 patent pursuant to 35 U.S.C. § 271. Ford have caused damage to Golden, which infringement and damage will continue unless and until Ford is enjoined. **Exhibit R: Claim Chart for Ford Global Technologies, LLC**

288. On information and belief, Ford is jointly, directly and/or indirectly infringing at least claim 1 of the '189 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, *using, with its vehicles at least one of the alleged infringing devices* i.e. Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series,

Motorola One series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphone communication devices that includes, without limitation the CMDC's remote lock/unlock used with CMDC devices for locking and unlocking vehicle doors; the CMDC's remote ignition start/stop used with CMDC devices for starting and stopping the vehicle's engine; the CMDC's remote operating systems controls used with CMDC devices for operating the heating and cooling controls; the CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking the vehicle; the CMDC's internet used with CMDC devices for mobile internet (i.e. the connected vehicle) to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's chemical / biological monitoring used with CMDC devices for monitoring human heartrate; the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that Ford is using the CMDC device have at a minimum

directly and/or indirectly infringed the '189 patent and Ford is thereby liable for infringement of the '189 patent pursuant to 35 U.S.C. § 271. Ford have caused damage to Golden, which infringement and damage will continue unless and until Ford is enjoined.

289. The alleged infringement of Ford identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

290. On information and belief, Fairway Ford is jointly, directly and/or indirectly infringing at least claim 1 of the '189 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, using communications devices (i.e. smartphones, laptops, tablets, smartwatches) including without limitation the CMDC device. As set forth in Golden's preliminary infringement contentions that Fairway Ford is using the CMDC device have at a minimum directly and/or indirectly infringed the '189 patent and Fairway Ford is thereby liable for infringement of the '189 patent pursuant to 35 U.S.C. § 271. Fairway Ford have caused damage to Golden, which infringement and damage will continue unless and until Fairway Ford is enjoined. **Exhibit R: Claim Chart for Fairway Ford Lincoln of Greenville**

291. On information and belief, Fairway Ford is jointly, directly and/or indirectly infringing at least claim 1 of the '189 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, *using, with its vehicles at least one of the alleged infringing devices* i.e. Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphone communication devices that includes, without limitation the CMDC's remote lock/unlock used with CMDC devices for locking and unlocking vehicle doors; the CMDC's remote ignition start/stop used with CMDC devices for starting and stopping the vehicle's engine; the CMDC's remote operating systems controls used with CMDC devices for operating the heating and cooling controls; the CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking the vehicle; the CMDC's internet used with CMDC devices for mobile internet (i.e. the connected vehicle) to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile

application processing i.e. system-on-a-chip (SoC); the CMDC's chemical / biological monitoring used with CMDC devices for monitoring human heartrate; the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that Fairway Ford is using the CMDC device have at a minimum directly and/or indirectly infringed the '189 patent and Fairway Ford is thereby liable for infringement of the '189 patent pursuant to 35 U.S.C. § 271. Fairway Ford have caused damage to Golden, which infringement and damage will continue unless and until Fairway Ford is enjoined.

292. The alleged infringement of Fairway Ford identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

293. On information and belief, GM is jointly, directly and/or indirectly infringing at least claim 1 of the '189 patent in this judicial district and elsewhere

in South Carolina and the United States by, among other things, using communications devices (i.e. smartphones, laptops, tablets, smartwatches) including without limitation the CMDC device. As set forth in Golden's preliminary infringement contentions that GM is using the CMDC device have at a minimum directly and/or indirectly infringed the '189 patent and GM is thereby liable for infringement of the '189 patent pursuant to 35 U.S.C. § 271. GM have caused damage to Golden, which infringement and damage will continue unless and until GM is enjoined. **Exhibit S: Claim Chart for General Motors Company**

294. On information and belief, GM is jointly, directly and/or indirectly infringing at least claim 1 of the '189 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, *using, with its vehicles at least one of the alleged infringing devices* i.e. Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphone

communication devices that includes, without limitation the CMDC's remote lock/unlock used with CMDC devices for locking and unlocking vehicle doors; the CMDC's remote ignition start/stop used with CMDC devices for starting and stopping the vehicle's engine; the CMDC's remote operating systems controls used with CMDC devices for operating the heating and cooling controls; the CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking the vehicle; the CMDC's internet used with CMDC devices for mobile internet (i.e. the connected vehicle) to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's chemical / biological monitoring used with CMDC devices for monitoring human heartrate; the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that GM is using the CMDC device have at a minimum directly and/or indirectly infringed the '189 patent and GM is thereby liable for infringement of the '189 patent pursuant to 35 U.S.C. § 271. GM have caused

damage to Golden, which infringement and damage will continue unless and until GM is enjoined.

295. The alleged infringement of GM identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

296. On information and belief, Whitaker Chevrolet is jointly, directly and/or indirectly infringing at least claim 1 of the '189 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, using communications devices (i.e. smartphones, laptops, tablets, smartwatches) including without limitation the CMDC device. As set forth in Golden's preliminary infringement contentions that Whitaker Chevrolet is using the CMDC device have at a minimum directly and/or indirectly infringed the '189 patent and Whitaker Chevrolet is thereby liable for infringement of the '189 patent pursuant to 35 U.S.C. § 271. Whitaker Chevrolet have caused damage to Golden, which infringement and damage will continue unless and until Whitaker Chevrolet is enjoined. **Exhibit S: Claim Chart for Kevin Whitaker Chevrolet**

297. On information and belief, Whitaker Chevrolet is jointly, directly and/or indirectly infringing at least claim 1 of the '189 patent in this judicial

district and elsewhere in South Carolina and the United States by, among other things, *using, with its vehicles at least one of the alleged infringing devices* i.e. Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphone communication devices that includes, without limitation the CMDC's remote lock/unlock used with CMDC devices for locking and unlocking vehicle doors; the CMDC's remote ignition start/stop used with CMDC devices for starting and stopping the vehicle's engine; the CMDC's remote operating systems controls used with CMDC devices for operating the heating and cooling controls; the CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking the vehicle; the CMDC's internet used with CMDC devices for mobile internet (i.e. the connected vehicle) to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's chemical / biological monitoring used with CMDC devices for monitoring human heartrate;

the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that Whitaker Chevrolet is using the CMDC device have at a minimum directly and/or indirectly infringed the '189 patent and Whitaker Chevrolet is thereby liable for infringement of the '189 patent pursuant to 35 U.S.C. § 271. Whitaker Chevrolet have caused damage to Golden, which infringement and damage will continue unless and until Whitaker Chevrolet is enjoined.

298. The alleged infringement of Whitaker Chevrolet identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

299. On information and belief, FCA is jointly, directly and/or indirectly infringing at least claim 1 of the '189 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, using

communications devices (i.e. smartphones, laptops, tablets, smartwatches) including without limitation the CMDC device. As set forth in Golden's preliminary infringement contentions that FCA is using the CMDC device have at a minimum directly and/or indirectly infringed the '189 patent and FCA is thereby liable for infringement of the '189 patent pursuant to 35 U.S.C. § 271. FCA have caused damage to Golden, which infringement and damage will continue unless and until FCA is enjoined. **Exhibit T: Claim Chart for FCA US LLC**

300. On information and belief, FCA is jointly, directly and/or indirectly infringing at least claim 1 of the '189 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, *using, with its vehicles at least one of the alleged infringing devices* i.e. Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphone communication devices that includes, without limitation the CMDC's remote lock/unlock used with CMDC devices for locking and unlocking vehicle doors; the

CMDC's remote ignition start/stop used with CMDC devices for starting and stopping the vehicle's engine; the CMDC's remote operating systems controls used with CMDC devices for operating the heating and cooling controls; the CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking the vehicle; the CMDC's internet used with CMDC devices for mobile internet (i.e. the connected vehicle) to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's chemical / biological monitoring used with CMDC devices for monitoring human heartrate; the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that FCA is using the CMDC device have at a minimum directly and/or indirectly infringed the '189 patent and FCA is thereby liable for infringement of the '189 patent pursuant to 35 U.S.C. § 271. FCA have caused damage to Golden, which infringement and damage will continue unless and until FCA is enjoined.

301. The alleged infringement of FCA identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

302. On information and belief, Big O is jointly, directly and/or indirectly infringing at least claim 1 of the '189 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, using communications devices (i.e. smartphones, laptops, tablets, smartwatches) including without limitation the CMDC device. As set forth in Golden's preliminary infringement contentions that Big O is using the CMDC device have at a minimum directly and/or indirectly infringed the '189 patent and Big O is thereby liable for infringement of the '189 patent pursuant to 35 U.S.C. § 271. Big O have caused damage to Golden, which infringement and damage will continue unless and until Big O is enjoined. **Exhibit T: Claim Chart for Big O Dodge Jeep RAM**

303. On information and belief, Big O is jointly, directly and/or indirectly infringing at least claim 1 of the '189 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, *using, with its vehicles at least one of the alleged infringing devices* i.e. Apple's iPhone 7 series,

iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphone communication devices that includes, without limitation the CMDC's remote lock/unlock used with CMDC devices for locking and unlocking vehicle doors; the CMDC's remote ignition start/stop used with CMDC devices for starting and stopping the vehicle's engine; the CMDC's remote operating systems controls used with CMDC devices for operating the heating and cooling controls; the CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking the vehicle; the CMDC's internet used with CMDC devices for mobile internet (i.e. the connected vehicle) to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's chemical / biological monitoring used with CMDC devices for monitoring human heartrate; the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling

mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that Big O is using the CMDC device have at a minimum directly and/or indirectly infringed the '189 patent and Big O is thereby liable for infringement of the '189 patent pursuant to 35 U.S.C. § 271. Big O have caused damage to Golden, which infringement and damage will continue unless and until Big O is enjoined.

304. The alleged infringement of Big O identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

**COUNT IV**
**(Infringement of the '990 Patent)**

305. Golden realleges and incorporates herein the allegations set forth in Paragraphs 1-304.

306. Plaintiff alleges that at least one of the Defendants named in this complaint has infringed at least independent claim 125, and/or dependent claims 12, 16, 18, 20, 21, 22, 25, 28, 30, 39, 41, 55, 78, 79, 104, 108, 113, 118, 126, 132,

134 & 125 of the '990 patent that covers Plaintiff's communication, monitoring, detecting and controlling (CMDC) device and locking mechanism. **Exhibit W: Claim Chart for the '990 Patent**

307. On information and belief, Apple is jointly, directly and/or indirectly infringing at least independent claim 125, and/or dependent claims 12, 16, 18, 20, 21, 22, 25, 28, 30, 39, 41, 55, 78, 79, 104, 108, 113, 118, 126, 132, 134 & 125 of the '990 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling and/or importing computerized communications devices (i.e. iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5) included without limitation Plaintiff's CMDC devices. As set forth in Golden's preliminary infringement contentions that Apple is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '990 patent and Apple is thereby liable for infringement of the '990 patent pursuant to 35 U.S.C. § 271. Apple have caused damage to Golden, which infringement and damage will continue unless and until Apple is enjoined. **Exhibit L: Claim Chart for Apple Inc.**

308. On information and belief, Apple is jointly, directly and/or indirectly infringing at least independent claim 125, and/or dependent claims 12, 16, 18, 20, 21, 22, 25, 28, 30, 39, 41, 55, 78, 79, 104, 108, 113, 118, 126, 132, 134 & 125 of

the '990 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling and/or importing computerized communications devices (i.e. iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5) included without limitation Plaintiff's CMDC's multi-sensor detection system (i.e. home security system) used with CMDC devices for home monitoring; the CMDC's internal or external remote/electrical lock disabler used with CMDC devices for locking and unlocking home doors; the CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking; the CMDC's internet used with CMDC devices for mobile internet to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that Apple is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly

infringed the '990 patent and Apple is thereby liable for infringement of the '990 patent pursuant to 35 U.S.C. § 271. Apple have caused damage to Golden, which infringement and damage will continue unless and until Apple is enjoined.

309. The alleged infringement of Apple identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

310. On information and belief, Samsung is jointly, directly and/or indirectly infringing at least independent claim 125, and/or dependent claims 12, 16, 18, 20, 21, 22, 25, 28, 30, 39, 41, 55, 78, 79, 104, 108, 113, 118, 126, 132, 134 & 125 of the '990 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling and/or importing computerized communications devices (i.e. Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch Active2 series) included without limitation Plaintiff's CMDC devices. As set forth in Golden's preliminary infringement contentions that Samsung is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '990 patent and Samsung is thereby liable for infringement of the '990 patent

pursuant to 35 U.S.C. § 271. Samsung have caused damage to Golden, which infringement and damage will continue unless and until Samsung is enjoined.

**Exhibit M: Claim Chart for Samsung Electronics, USA.**

311. On information and belief, Samsung is jointly, directly and/or indirectly infringing at least independent claim 125, and/or dependent claims 12, 16, 18, 20, 21, 22, 25, 28, 30, 39, 41, 55, 78, 79, 104, 108, 113, 118, 126, 132, 134 & 125 of the '990 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling and/or importing computerized communications devices (i.e. Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch Active2 series) included without limitation Plaintiff's CMDC's multi-sensor detection system (i.e. home security system) used with CMDC devices for home monitoring; the CMDC's internal or external remote/electrical lock disabler used with CMDC devices for locking and unlocking home doors; the CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking; the CMDC's internet used with CMDC devices for mobile internet to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading

of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that Samsung is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '990 patent and Samsung is thereby liable for infringement of the '990 patent pursuant to 35 U.S.C. § 271. Samsung have caused damage to Golden, which infringement and damage will continue unless and until Samsung is enjoined.

312. The alleged infringement of Samsung identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

313. On information and belief, LG is jointly, directly and/or indirectly infringing at least independent claim 125, and/or dependent claims 12, 16, 18, 20, 21, 22, 25, 28, 30, 39, 41, 55, 78, 79, 104, 108, 113, 118, 126, 132, 134 & 125 of the '990 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling

and/or importing computerized communications devices (i.e. LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7)) included without limitation Plaintiff's CMDC devices. As set forth in Golden's preliminary infringement contentions that LG is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '990 patent and LG is thereby liable for infringement of the '990 patent pursuant to 35 U.S.C. § 271. LG have caused damage to Golden, which infringement and damage will continue unless and until LG is enjoined. **Exhibit N: Claim Chart for LG Electronics, USA, Inc.**

314. On information and belief, LG is jointly, directly and/or indirectly infringing at least independent claim 125, and/or dependent claims 12, 16, 18, 20, 21, 22, 25, 28, 30, 39, 41, 55, 78, 79, 104, 108, 113, 118, 126, 132, 134 & 125 of the '990 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling and/or importing computerized communications devices (i.e. LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7)) included without limitation Plaintiff's CMDC's multi-sensor detection system (i.e. home security system) used with CMDC devices for home monitoring; the CMDC's internal or external remote/electrical lock disabler used with CMDC devices for locking and unlocking home doors; the CMDC's global positioning system (GPS) used with

CMDC devices for locating and tracking; the CMDC's internet used with CMDC devices for mobile internet to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that LG is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '990 patent and LG is thereby liable for infringement of the '990 patent pursuant to 35 U.S.C. § 271. LG have caused damage to Golden, which infringement and damage will continue unless and until LG is enjoined.

315. The alleged infringement of LG identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

316. On information and belief, Qualcomm is jointly, directly and/or indirectly infringing at least independent claim 125, and/or dependent claims 12, 16, 18, 20, 21, 22, 25, 28, 30, 39, 41, 55, 78, 79, 104, 108, 113, 118, 126, 132, 134 & 125 of the '990 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling certain processing devices as Central Processing Units (i.e. Qualcomm's Snapdragon 5 Series, 6 Series, 7 Series, & 8 Series) for system-on-a-chip application processing for at least Apple, Samsung, LG, Motorola, and Panasonic; included without limitation Plaintiff's CMDC devices. As set forth in Golden's preliminary infringement contentions that Qualcomm is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '990 patent and Qualcomm is thereby liable for infringement of the '990 patent pursuant to 35 U.S.C. § 271. Qualcomm have caused damage to Golden, which infringement and damage will continue unless and until Qualcomm is enjoined. **Exhibit O: Claim Chart for Qualcomm Inc.**

317. On information and belief, Qualcomm is jointly, directly and/or indirectly infringing at least independent claim 125, and/or dependent claims 12, 16, 18, 20, 21, 22, 25, 28, 30, 39, 41, 55, 78, 79, 104, 108, 113, 118, 126, 132, 134 & 125 of the '990 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale,

selling certain processing devices as Central Processing Units (i.e. Qualcomm's Snapdragon 5 Series, 6 Series, 7 Series, & 8 Series) for system-on-a-chip application processing for at least Apple, Samsung, LG, Motorola, and Panasonic; included without limitation Plaintiff's CMDC's multi-sensor detection system (i.e. home security system) used with CMDC devices for home monitoring; the CMDC's internal or external remote/electrical lock disabler used with CMDC devices for locking and unlocking home doors; the CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking; the CMDC's internet used with CMDC devices for mobile internet to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that Qualcomm is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '990 patent and Qualcomm is thereby liable for infringement of the '990 patent pursuant to 35

Case: 22-1229 Document: 6 Page: 327 Filed: 01/04/2022

U.S.C. § 271. Qualcomm have caused damage to Golden, which infringement and damage will continue unless and until Qualcomm is enjoined.

318. The alleged infringement of Qualcomm identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

319. On information and belief, Motorola is jointly, directly and/or indirectly infringing at least independent claim 125, and/or dependent claims 12, 16, 18, 20, 21, 22, 25, 28, 30, 39, 41, 55, 78, 79, 104, 108, 113, 118, 126, 132, 134 & 125 of the '990 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling and/or importing computerized communications devices (i.e. Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series) included without limitation Plaintiff's CMDC devices. As set forth in Golden's preliminary infringement contentions that Motorola is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '990 patent and Motorola is thereby liable for infringement of the '990 patent pursuant to 35 U.S.C. § 271. Motorola have caused damage to Golden, which infringement

and damage will continue unless and until Motorola is enjoined. **Exhibit P: Claim Chart for Motorola Solutions Inc. (Motorola Inc.)**

320. On information and belief, Motorola is jointly, directly and/or indirectly infringing at least independent claim 125, and/or dependent claims 12, 16, 18, 20, 21, 22, 25, 28, 30, 39, 41, 55, 78, 79, 104, 108, 113, 118, 126, 132, 134 & 125 of the '990 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling and/or importing computerized communications devices (i.e. Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series) included without limitation Plaintiff's CMDC's multi-sensor detection system (i.e. home security system) used with CMDC devices for home monitoring; the CMDC's internal or external remote/electrical lock disabler used with CMDC devices for locking and unlocking home doors; the CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking; the CMDC's internet used with CMDC devices for mobile internet to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the

Case: 22-1229 Document: 6 Page: 329 Filed: 01/04/2022

CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that Motorola is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '990 patent and Motorola is thereby liable for infringement of the '990 patent pursuant to 35 U.S.C. § 271. Motorola have caused damage to Golden, which infringement and damage will continue unless and until Motorola is enjoined.

321. The alleged infringement of Motorola identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

322. On information and belief, Panasonic is jointly, directly and/or indirectly infringing at least independent claim 125, and dependent claims 12, 16, 18, 20, 21, 22, 25, 28, 30, 39, 41, 55, 78, 79, 104, 108, 113, 118, 126, 132, 134 & 125 of the '990 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling and/or importing computerized communications devices (i.e. TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphone)

Case: 22-1229 Document: 6 Page: 330 Filed: 01/04/2022

included without limitation Plaintiff's CMDC devices. As set forth in Golden's preliminary infringement contentions that Panasonic is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '990 patent and Panasonic is thereby liable for infringement of the '990 patent pursuant to 35 U.S.C. § 271. Panasonic have caused damage to Golden, which infringement and damage will continue unless and until Panasonic is enjoined. **Exhibit Q: Claim Chart for Panasonic Corporation**

323. On information and belief, Panasonic is jointly, directly and/or indirectly infringing at least independent claim 125, and/or dependent claims 12, 16, 18, 20, 21, 22, 25, 28, 30, 39, 41, 55, 78, 79, 104, 108, 113, 118, 126, 132, 134 & 125 of the '990 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling and/or importing computerized communications devices (i.e. TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphone) included without limitation Plaintiff's CMDC's multi-sensor detection system (i.e. home security system) used with CMDC devices for home monitoring; the CMDC's internal or external remote/electrical lock disabler used with CMDC devices for locking and unlocking home doors; the CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking; the CMDC's internet used with CMDC devices for mobile internet to fit the

dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that Panasonic is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '990 patent and Panasonic is thereby liable for infringement of the '990 patent pursuant to 35 U.S.C. § 271. Panasonic have caused damage to Golden, which infringement and damage will continue unless and until Panasonic is enjoined.

324. The alleged infringement of Panasonic identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

325. On information and belief, AT&T is jointly, directly and/or indirectly infringing at least independent claim 125, and/or dependent claims 12, 16, 18, 20,

21, 22, 25, 28, 30, 39, 41, 55, 78, 79, 104, 108, 113, 118, 126, 132, 134 & 125 of the ‘990 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, using, offering for sale, selling and/or importing computerized communications devices (i.e. smartphones, laptops, tablets, smartwatches) including without limitation the CMDC device. As set forth in Golden’s preliminary infringement contentions that AT&T is using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly and/or indirectly infringed the ‘990 patent and AT&T is thereby liable for infringement of the ‘990 patent pursuant to 35 U.S.C. § 271. AT&T have caused damage to Golden, which infringement and damage will continue unless and until AT&T is enjoined.

326. On information and belief, AT&T is jointly, directly and/or indirectly infringing at least independent claim 125, and/or dependent claims 12, 16, 18, 20, 21, 22, 25, 28, 30, 39, 41, 55, 78, 79, 104, 108, 113, 118, 126, 132, 134 & 125 of the ‘990 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, <u>*using, offering for sale, or selling*</u> at least one of Apple’s iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung’s Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch Active2 series; LG’s V20,

Case: 22-1229 Document: 6 Page: 333 Filed: 01/04/2022

V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphones that includes, without limitation the CMDC's multi-sensor detection system (i.e. home security system) used with CMDC devices for home monitoring; the CMDC's internal or external remote/electrical lock disabler used with CMDC devices for locking and unlocking home doors; the CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking; the CMDC's internet used with CMDC devices for mobile internet to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that AT&T is using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly and/or indirectly infringed the '990 patent and AT&T is thereby liable for infringement of the '990

patent pursuant to 35 U.S.C. § 271. AT&T have caused damage to Golden, which infringement and damage will continue unless and until AT&T is enjoined.

327. The alleged infringement of AT&T identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

328. On information and belief, Verizon is jointly, directly and/or indirectly infringing at least independent claim 125, and/or dependent claims 12, 16, 18, 20, 21, 22, 25, 28, 30, 39, 41, 55, 78, 79, 104, 108, 113, 118, 126, 132, 134 & 125 of the '990 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, using, offering for sale, selling and/or importing computerized communications devices (i.e. smartphones, laptops, tablets, smartwatches) including without limitation the CMDC device. As set forth in Golden's preliminary infringement contentions that Verizon is using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly and/or indirectly infringed the '990 patent and Verizon is thereby liable for infringement of the '990 patent pursuant to 35 U.S.C. § 271. Verizon have caused damage to Golden, which infringement and damage will continue unless and until Verizon is enjoined.

329. On information and belief, Verizon is jointly, directly and/or indirectly infringing at least independent claim 125, and/or dependent claims 12, 16, 18, 20, 21, 22, 25, 28, 30, 39, 41, 55, 78, 79, 104, 108, 113, 118, 126, 132, 134 & 125 of the '990 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, *using, offering for sale, or selling* at least one of Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphones that includes, without limitation the CMDC's multi-sensor detection system (i.e. home security system) used with CMDC devices for home monitoring; the CMDC's internal or external remote/electrical lock disabler used with CMDC devices for locking and unlocking home doors; the CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking; the CMDC's internet used with CMDC devices for mobile internet to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the

CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that Verizon is using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly and/or indirectly infringed the '990 patent and Verizon is thereby liable for infringement of the '990 patent pursuant to 35 U.S.C. § 271. Verizon have caused damage to Golden, which infringement and damage will continue unless and until Verizon is enjoined.

330. The alleged infringement of Verizon identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

331. On information and belief, Sprint is jointly, directly and/or indirectly infringing at least independent claim 125, and/or dependent claims 12, 16, 18, 20, 21, 22, 25, 28, 30, 39, 41, 55, 78, 79, 104, 108, 113, 118, 126, 132, 134 & 125 of the '990 patent in this judicial district and elsewhere in South Carolina and the

United States by, among other things, using, offering for sale, selling and/or importing computerized communications devices (i.e. smartphones, laptops, tablets, smartwatches) including without limitation the CMDC device. As set forth in Golden's preliminary infringement contentions that Sprint is using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly and/or indirectly infringed the '990 patent and Sprint is thereby liable for infringement of the '990 patent pursuant to 35 U.S.C. § 271. Sprint have caused damage to Golden, which infringement and damage will continue unless and until Sprint is enjoined.

332. On information and belief, Sprint is jointly, directly and/or indirectly infringing at least independent claim 125, and/or dependent claims 12, 16, 18, 20, 21, 22, 25, 28, 30, 39, 41, 55, 78, 79, 104, 108, 113, 118, 126, 132, 134 & 125 of the '990 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, <u>*using, offering for sale, or selling*</u> at least one of Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series;

and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphones that includes, without limitation the CMDC's multi-sensor detection system (i.e. home security system) used with CMDC devices for home monitoring; the CMDC's internal or external remote/electrical lock disabler used with CMDC devices for locking and unlocking home doors; the CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking; the CMDC's internet used with CMDC devices for mobile internet to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that Sprint is using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly and/or indirectly infringed the '990 patent and Sprint is thereby liable for infringement of the '990 patent pursuant to 35 U.S.C. § 271. Sprint have caused damage to Golden, which infringement and damage will continue unless and until Sprint is enjoined.

333. The alleged infringement of Sprint identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

334. On information and belief, T-Mobile is jointly, directly and/or indirectly infringing at least independent claim 125, and/or dependent claims 12, 16, 18, 20, 21, 22, 25, 28, 30, 39, 41, 55, 78, 79, 104, 108, 113, 118, 126, 132, 134 & 125 of the '990 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, using, offering for sale, selling and/or importing computerized communications devices (i.e. smartphones, laptops, tablets, smartwatches) including without limitation the CMDC device. As set forth in Golden's preliminary infringement contentions that T-Mobile is using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly and/or indirectly infringed the '990 patent and T-Mobile is thereby liable for infringement of the '990 patent pursuant to 35 U.S.C. § 271. T-Mobile have caused damage to Golden, which infringement and damage will continue unless and until T-Mobile is enjoined.

335. On information and belief, T-Mobile is jointly, directly and/or indirectly infringing at least independent claim 125, and/or dependent claims 12,

16, 18, 20, 21, 22, 25, 28, 30, 39, 41, 55, 78, 79, 104, 108, 113, 118, 126, 132, 134 & 125 of the '990 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, *using, offering for sale, or selling* at least one of Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphones that includes, without limitation the CMDC's multi-sensor detection system (i.e. home security system) used with CMDC devices for home monitoring; the CMDC's internal or external remote/electrical lock disabler used with CMDC devices for locking and unlocking home doors; the CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking; the CMDC's internet used with CMDC devices for mobile internet to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling

mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that T-Mobile is using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly and/or indirectly infringed the '990 patent and T-Mobile is thereby liable for infringement of the '990 patent pursuant to 35 U.S.C. § 271. T-Mobile have caused damage to Golden, which infringement and damage will continue unless and until T-Mobile is enjoined.

336. The alleged infringement of T-Mobile identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

337. On information and belief, Ford is jointly, directly and/or indirectly infringing at least claim 125 of the '990 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, using communications devices (i.e. smartphones, laptops, tablets, smartwatches) including without limitation the CMDC device. As set forth in Golden's

preliminary infringement contentions that Ford is using the CMDC device have at a minimum directly and/or indirectly infringed the '990 patent and Ford is thereby liable for infringement of the '990 patent pursuant to 35 U.S.C. § 271. Ford have caused damage to Golden, which infringement and damage will continue unless and until Ford is enjoined. **Exhibit R: Claim Chart for Ford Global Technologies, LLC**

338. On information and belief, Ford is jointly, directly and/or indirectly infringing at least claim 125 of the '990 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, *using, with its vehicles at least one of the alleged infringing devices* i.e. Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphone communication devices that includes, without limitation the CMDC's multi-sensor detection system (i.e. vehicle security system) used with CMDC devices for vehicle monitoring; the CMDC's internal or external

remote/electrical lock disabler used with CMDC devices for locking and unlocking vehicle doors; the CMDC's remote ignition start/stop used with CMDC devices for starting and stopping the vehicle's engine; the CMDC's remote operating systems controls used with CMDC devices for operating the heating and cooling controls; the CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking the vehicle; the CMDC's internet used with CMDC devices for mobile internet (i.e. the connected vehicle) to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that Ford is using the CMDC device have at a minimum directly and/or indirectly infringed the '990 patent and Ford is thereby liable for infringement of the '990 patent pursuant to 35 U.S.C. § 271. Ford have caused damage to Golden, which infringement and damage will continue unless and until Ford is enjoined.

339. The alleged infringement of Ford identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

340. On information and belief, Fairway Ford is jointly, directly and/or indirectly infringing at least claim 125 of the '990 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, using communications devices (i.e. smartphones, laptops, tablets, smartwatches) including without limitation the CMDC device. As set forth in Golden's preliminary infringement contentions that Fairway Ford is using the CMDC device have at a minimum directly and/or indirectly infringed the '990 patent and Fairway Ford is thereby liable for infringement of the '990 patent pursuant to 35 U.S.C. § 271. Fairway Ford have caused damage to Golden, which infringement and damage will continue unless and until Fairway Ford is enjoined. **Exhibit R: Claim Chart for Fairway Ford Lincoln of Greenville**

341. On information and belief, Fairway Ford is jointly, directly and/or indirectly infringing at least claim 125 of the '990 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, *using, with its vehicles at least one of the alleged infringing devices* i.e. Apple's iPhone 7

series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphone communication devices that includes, without limitation the CMDC's multi-sensor detection system (i.e. vehicle security system) used with CMDC devices for vehicle monitoring; the CMDC's internal or external remote/electrical lock disabler used with CMDC devices for locking and unlocking vehicle doors; the CMDC's remote ignition start/stop used with CMDC devices for starting and stopping the vehicle's engine; the CMDC's remote operating systems controls used with CMDC devices for operating the heating and cooling controls; the CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking the vehicle; the CMDC's internet used with CMDC devices for mobile internet (i.e. the connected vehicle) to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading

of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that Fairway Ford is using the CMDC device have at a minimum directly and/or indirectly infringed the '990 patent and Fairway Ford is thereby liable for infringement of the '990 patent pursuant to 35 U.S.C. § 271. Fairway Ford have caused damage to Golden, which infringement and damage will continue unless and until Fairway Ford is enjoined.

342. The alleged infringement of Fairway Ford identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

343. On information and belief, GM is jointly, directly and/or indirectly infringing at least claim 125 of the '990 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, using communications devices (i.e. smartphones, laptops, tablets, smartwatches) including without limitation the CMDC device. As set forth in Golden's preliminary infringement contentions that GM is using of the CMDC device have

at a minimum directly and/or indirectly infringed the '990 patent and GM is thereby liable for infringement of the '990 patent pursuant to 35 U.S.C. § 271. GM have caused damage to Golden, which infringement and damage will continue unless and until GM is enjoined. **Exhibit S: Claim Chart for General Motors Company**

344. On information and belief, GM is jointly, directly and/or indirectly infringing at least claim 125 of the '990 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, *using, with its vehicles at least one of the alleged infringing devices* i.e. Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphone communication devices that includes, without limitation the CMDC's multi-sensor detection system (i.e. vehicle security system) used with CMDC devices for vehicle monitoring; the CMDC's internal or external remote/electrical lock disabler used with CMDC devices for locking and unlocking

vehicle doors; the CMDC's remote ignition start/stop used with CMDC devices for starting and stopping the vehicle's engine; the CMDC's remote operating systems controls used with CMDC devices for operating the heating and cooling controls; the CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking the vehicle; the CMDC's internet used with CMDC devices for mobile internet (i.e. the connected vehicle) to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that GM is using the CMDC device have at a minimum directly and/or indirectly infringed the '990 patent and GM is thereby liable for infringement of the '990 patent pursuant to 35 U.S.C. § 271. GM have caused damage to Golden, which infringement and damage will continue unless and until GM is enjoined.

345. The alleged infringement of GM identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering

the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

346. On information and belief, Whitaker Chevrolet is jointly, directly and/or indirectly infringing at least claim 125 of the '990 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, using, offering for sale, selling and/or importing computerized communications devices (i.e. smartphones, laptops, tablets, smartwatches) including without limitation the CMDC device. As set forth in Golden's preliminary infringement contentions that Whitaker Chevrolet is using the CMDC device have at a minimum directly and/or indirectly infringed the '990 patent and Whitaker Chevrolet is thereby liable for infringement of the '990 patent pursuant to 35 U.S.C. § 271. Whitaker Chevrolet have caused damage to Golden, which infringement and damage will continue unless and until Whitaker Chevrolet is enjoined. **Exhibit S: Claim Chart for Kevin Whitaker Chevrolet**

347. On information and belief, Whitaker Chevrolet is jointly, directly and/or indirectly infringing at least claim 125 of the '990 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, *using, with its vehicles at least one of the alleged infringing devices* i.e. Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone

XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphone without limitation the CMDC's multi-sensor detection system (i.e. vehicle security system) used with CMDC devices for vehicle monitoring; the CMDC's internal or external remote/electrical lock disabler used with CMDC devices for locking and unlocking vehicle doors; the CMDC's remote ignition start/stop used with CMDC devices for starting and stopping the vehicle's engine; the CMDC's remote operating systems controls used with CMDC devices for operating the heating and cooling controls; the CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking the vehicle; the CMDC's internet used with CMDC devices for mobile internet (i.e. the connected vehicle) to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after

several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that Whitaker Chevrolet is using the CMDC device have at a minimum directly and/or indirectly infringed the '990 patent and Whitaker Chevrolet is thereby liable for infringement of the '990 patent pursuant to 35 U.S.C. § 271. Whitaker Chevrolet have caused damage to Golden, which infringement and damage will continue unless and until Whitaker Chevrolet is enjoined.

348. The alleged infringement of Whitaker Chevrolet identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

349. On information and belief, FCA is jointly, directly and/or indirectly infringing at least claim 125 of the '990 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, using, communications devices (i.e. smartphones, laptops, tablets, smartwatches) including without limitation the CMDC device. As set forth in Golden's preliminary infringement contentions that FCA is using the CMDC device have at

a minimum directly and/or indirectly infringed the '990 patent and FCA is thereby liable for infringement of the '990 patent pursuant to 35 U.S.C. § 271. FCA have caused damage to Golden, which infringement and damage will continue unless and until FCA is enjoined. **Exhibit T: Claim Chart for FCA US LLC**

350. On information and belief, FCA is jointly, directly and/or indirectly infringing at least claim 125 of the '990 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, *using, with its vehicles at least one of the alleged infringing devices* i.e. Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphone without limitation the CMDC's multi-sensor detection system (i.e. vehicle security system) used with CMDC devices for vehicle monitoring; the CMDC's internal or external remote/electrical lock disabler used with CMDC devices for locking and unlocking vehicle doors; the CMDC's remote ignition start/stop used with CMDC devices for starting and stopping the vehicle's engine;

the CMDC's remote operating systems controls used with CMDC devices for operating the heating and cooling controls; the CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking the vehicle; the CMDC's internet used with CMDC devices for mobile internet (i.e. the connected vehicle) to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that FCA is using, the CMDC device have at a minimum directly and/or indirectly infringed the '990 patent and FCA is thereby liable for infringement of the '990 patent pursuant to 35 U.S.C. § 271. FCA have caused damage to Golden, which infringement and damage will continue unless and until FCA is enjoined.

351. The alleged infringement of FCA identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a

permanent injunction is warranted and such a remedy would be in the public interest.

352. On information and belief, Big O is jointly, directly and/or indirectly infringing at least claim 125 of the '990 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, using, communications devices (i.e. smartphones, laptops, tablets, smartwatches) including without limitation the CMDC device. As set forth in Golden's preliminary infringement contentions that Big O is using the CMDC device have at a minimum directly and/or indirectly infringed the '990 patent and Big O is thereby liable for infringement of the '990 patent pursuant to 35 U.S.C. § 271. Big O have caused damage to Golden, which infringement and damage will continue unless and until Big O is enjoined. **Exhibit T: Claim Chart for Big O Dodge Jeep RAM**

353. On information and belief, Big O is jointly, directly and/or indirectly infringing at least claim 125 of the '990 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, *using, with its vehicles at least one of the alleged infringing devices* i.e. Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, & Samsung

Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphone, without limitation the CMDC's multi-sensor detection system (i.e. vehicle security system) used with CMDC devices for vehicle monitoring; the CMDC's internal or external remote/electrical lock disabler used with CMDC devices for locking and unlocking vehicle doors; the CMDC's remote ignition start/stop used with CMDC devices for starting and stopping the vehicle's engine; the CMDC's remote operating systems controls used with CMDC devices for operating the heating and cooling controls; the CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking the vehicle; the CMDC's internet used with CMDC devices for mobile internet (i.e. the connected vehicle) to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an

authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that Big O is using, the CMDC device have at a minimum directly and/or indirectly infringed the '990 patent and Big O is thereby liable for infringement of the '990 patent pursuant to 35 U.S.C. § 271. Big O have caused damage to Golden, which infringement and damage will continue unless and until Big O is enjoined.

354. The alleged infringement of Big O identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

**COUNT V**
**(Infringement of the '891 Patent)**

355. Golden realleges and incorporates herein the allegations set forth in Paragraphs 1-354.

356. Plaintiff alleges that at least one of the Defendants named in this complaint has infringed at least of independent claims 11, 23, & 44, and/or dependent claims 47, 48, 49, 50, 51 & 53 of the '891 patent that covers Plaintiff's communication, monitoring, detecting and controlling (CMDC) device and vehicles adapted for and/or equipped with at least one stall, stop, or vehicle slow-down system (SSVSS). **Exhibit X: Claim Chart for the '891 Patent**

357. On information and belief, Ford is jointly, directly and/or indirectly infringing at least one of independent claims 11, 23, & 44 and/or dependent claims 47, 48, 49, 50, 51 & 53 of the '891 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, using, offering for sale, selling and/or importing pre-programmed stall, stop, or vehicle slowdown systems (PSSVSS) that includes, without limitation a PSSVSS for an autonomous or driverless vehicle; a PSSVSS for vehicle pre-crash forward acceleration; a PSSVSS for vehicle pre-crash reverse acceleration; a PSSVSS for vehicle lane departure; a PSSVSS for vehicle stabilization; a PSSVSS for vehicle unintended acceleration; a PSSVSS for vehicle moved outside a designated perimeter; a PSSVSS for traffic sign recognition; a PSSVSS for intelligent speed limiter, or, a PSSVSS for vehicle adapted cruise control. As set forth in Golden's preliminary infringement contentions that Ford is using, offering for sale, selling and/or importing of the hardware and software for the CMDC device have at a minimum directly and/or indirectly infringed the '891 patent and Ford is thereby liable for infringement of the '891 patent pursuant to 35 U.S.C. § 271. Ford have caused damage to Golden, which infringement and damage will continue unless and until Ford is enjoined. **Exhibit R: Claim Chart for Ford Global Technologies, LLC**

358. The alleged infringement of Ford identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering

the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

359. On information and belief, Fairway Ford is jointly, directly and/or indirectly infringing at least one of independent claims 11, 23, & 44 and/or dependent claims 47, 48, 49, 50, 51 & 53 of the ‘891 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, using, offering for sale, selling and/or importing pre-programmed stall, stop, or vehicle slowdown systems (PSSVSS) that includes, without limitation a PSSVSS for an autonomous or driverless vehicle; a PSSVSS for vehicle pre-crash forward acceleration; a PSSVSS for vehicle pre-crash reverse acceleration; a PSSVSS for vehicle lane departure; a PSSVSS for vehicle stabilization; a PSSVSS for vehicle unintended acceleration; a PSSVSS for vehicle moved outside a designated perimeter; or, a PSSVSS for vehicle adapted cruise control. As set forth in Golden’s preliminary infringement contentions that Fairway Ford is using, offering for sale, selling and/or importing of the hardware and software for the CMDC device have at a minimum directly and/or indirectly infringed the ‘891 patent and Fairway Ford is thereby liable for infringement of the ‘891 patent pursuant to 35 U.S.C. § 271. Fairway Ford have caused damage to Golden, which infringement

and damage will continue unless and until Fairway Ford is enjoined. **Exhibit R: Claim Chart for Fairway Ford Lincoln of Greenville**

360. The alleged infringement of Fairway Ford identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

361. On information and belief, GM is jointly, directly and/or indirectly infringing at least independent claim 11 and/or dependent claims 12, 13, 14, 15, 16, 17, 18 &19 of the '891 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, using, offering for sale, selling and/or importing computerized communications devices (i.e. CMDC personal computers, desktops interconnected to GM/OnStar's STOLEN VEHICLE SYSTEM) including without limitation the CMDC device remote means of stalling, stopping, or slowing a vehicle by way of cellular, satellite, radio-frequency, internet, electromagnetic pulse, electrostatic discharge, or microwave beam. As set forth in Golden's preliminary infringement contentions that GM is using, offering for sale, selling and/or importing of the hardware and software for the CMDC device interconnected to a vehicle for stalling, stopping, and/or slowing the vehicle have at a minimum directly and/or indirectly infringed the '891 patent

and GM is thereby liable for infringement of the '891 patent pursuant to 35 U.S.C. § 271. GM have caused damage to Golden, which infringement and damage will continue unless and until GM is enjoined. **Exhibit S: Claim Chart for General Motors Company**

362. On information and belief, GM is jointly, directly and/or indirectly infringing at least one of independent claims 11, 23, & 44 and/or dependent claims 47, 48, 49, 50, 51 & 53 of the '891 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, using, offering for sale, selling and/or importing pre-programmed stall, stop, or vehicle slowdown systems (PSSVSS) that includes, without limitation a PSSVSS for an autonomous or driverless vehicle; a PSSVSS for vehicle pre-crash forward acceleration; a PSSVSS for vehicle pre-crash reverse acceleration; a PSSVSS for vehicle lane departure; a PSSVSS for vehicle stabilization; a PSSVSS for vehicle unintended acceleration; a PSSVSS for vehicle moved outside a designated perimeter; or, a PSSVSS for vehicle adapted cruise control. As set forth in Golden's preliminary infringement contentions that GM is using, offering for sale, selling and/or importing of the hardware and software for the CMDC device have at a minimum directly and/or indirectly infringed the '891 patent and GM is thereby liable for infringement of the '891 patent pursuant to 35 U.S.C. § 271. GM have caused

damage to Golden, which infringement and damage will continue unless and until GM is enjoined.

363. The alleged infringement of GM identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

364. On information and belief, Whitaker Chevrolet is jointly, directly and/or indirectly infringing at least independent claim 11 and/or dependent claims 12, 13, 14, 15, 16, 17, 18 &19 of the '891 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, using, offering for sale, selling and/or importing computerized communications devices (i.e. CMDC personal computers, desktops interconnected to GM/OnStar's STOLEN VEHICLE SYSTEM) including without limitation the CMDC device remote means of stalling, stopping, or slowing a vehicle by way of cellular, satellite, radio-frequency, internet, electromagnetic pulse, electrostatic discharge, or microwave beam. As set forth in Golden's preliminary infringement contentions that Whitaker Chevrolet is using, offering for sale, selling and/or importing of the hardware and software for the CMDC device interconnected to a vehicle for stalling, stopping, and/or slowing the vehicle have at a minimum directly and/or

indirectly infringed the '891 patent and Whitaker Chevrolet is thereby liable for infringement of the '891 patent pursuant to 35 U.S.C. § 271. Whitaker Chevrolet have caused damage to Golden, which infringement and damage will continue unless and until Whitaker Chevrolet is enjoined. **Exhibit S: Claim Chart for Kevin Whitaker Chevrolet**

365. On information and belief, Whitaker Chevrolet is jointly, directly and/or indirectly infringing at least one of independent claims 11, 23, & 44 and/or dependent claims 47, 48, 49, 50, 51 & 53 of the '891 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, using, offering for sale, selling and/or importing pre-programmed stall, stop, or vehicle slowdown systems (PSSVSS) that includes, without limitation a PSSVSS for an autonomous or driverless vehicle; a PSSVSS for vehicle pre-crash forward acceleration; a PSSVSS for vehicle pre-crash reverse acceleration; a PSSVSS for vehicle lane departure; a PSSVSS for vehicle stabilization; a PSSVSS for vehicle unintended acceleration; a PSSVSS for vehicle moved outside a designated perimeter; or, a PSSVSS for vehicle adapted cruise control. As set forth in Golden's preliminary infringement contentions that Whitaker Chevrolet is using, offering for sale, selling and/or importing of the hardware and software for the CMDC device have at a minimum directly and/or indirectly infringed the '891 patent and Whitaker Chevrolet is thereby liable for infringement of the '891 patent

pursuant to 35 U.S.C. § 271. Whitaker Chevrolet have caused damage to Golden, which infringement and damage will continue unless and until Whitaker Chevrolet is enjoined.

366. The alleged infringement of Whitaker Chevrolet identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

367. On information and belief, FCA is jointly, directly and/or indirectly infringing at least one claim of the '891 patent one of independent claims 11, 23, & 44 and/or dependent claims 47, 48, 49, 50, 51 & 53 of the '891 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, using, offering for sale, selling and/or importing pre-programmed stall, stop, or vehicle slowdown systems (PSSVSS) that includes, without limitation a PSSVSS for an autonomous or driverless vehicle; a PSSVSS for vehicle pre-crash forward acceleration; a PSSVSS for vehicle pre-crash reverse acceleration; a PSSVSS for vehicle lane departure; a PSSVSS for vehicle stabilization; a PSSVSS for vehicle unintended acceleration; a PSSVSS for vehicle moved outside a designated perimeter; or, a PSSVSS for vehicle adapted cruise control. As set forth in Golden's preliminary infringement contentions that FCA is

using, offering for sale, selling and/or importing of the hardware and software for the CMDC device have at a minimum directly and/or indirectly infringed the '891 patent and FCA is thereby liable for infringement of the '891 patent pursuant to 35 U.S.C. § 271. FCA have caused damage to Golden, which infringement and damage will continue unless and until FCA is enjoined. **Exhibit T: Claim Chart for FCA US LLC**

368. The alleged infringement of FCA identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

369. On information and belief, Big O is jointly, directly and/or indirectly infringing at least one of independent claims 11, 23, & 44 and/or dependent claims 47, 48, 49, 50, 51 & 53 of the '891 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, using, offering for sale, selling and/or importing pre-programmed stall, stop, or vehicle slowdown systems (PSSVSS) that includes, without limitation a PSSVSS for an autonomous or driverless vehicle; a PSSVSS for vehicle pre-crash forward acceleration; a PSSVSS for vehicle pre-crash reverse acceleration; a PSSVSS for vehicle lane departure; a PSSVSS for vehicle stabilization; a PSSVSS for vehicle unintended

acceleration; a PSSVSS for vehicle moved outside a designated perimeter; or, a PSSVSS for vehicle adapted cruise control. As set forth in Golden's preliminary infringement contentions that Big O is using, offering for sale, selling and/or importing of the hardware and software for the CMDC device have at a minimum directly and/or indirectly infringed the '891 patent and Big O is thereby liable for infringement of the '891 patent pursuant to 35 U.S.C. § 271. Big O have caused damage to Golden, which infringement and damage will continue unless and until Big O is enjoined. **Exhibit T: Claim Chart for Big O Dodge Jeep RAM**

370. The alleged infringement of Big O identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

**COUNT VI**
**(Infringement of the '497 Patent)**

371. Golden realleges and incorporates herein the allegations set forth in Paragraphs 1-370.

372. Plaintiff alleges that at least one of the Defendants named in this complaint has infringed at least independent claim 1, and/or dependent claims 2-6 of the '497 patent that covers Plaintiff's monitoring equipment, comprising at least one of disabling lock, detector case, CMDC device (i.e. new and improved cell

phone), biometric fingerprint, GPS connection, internet connection, or central processing unit (CPU). **Exhibit Y: Claim Chart for the '497 Patent**

373. On information and belief, Apple is jointly, directly and/or indirectly infringing at least independent claim 1, and/or dependent claims 2-6 of the '497 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling and/or importing computerized communications devices (i.e. iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5) included without limitation Plaintiff's CMDC devices. As set forth in Golden's preliminary infringement contentions that Apple is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '497 patent and Apple is thereby liable for infringement of the '497 patent pursuant to 35 U.S.C. § 271. Apple have caused damage to Golden, which infringement and damage will continue unless and until Apple is enjoined. **Exhibit L: Claim Chart for Apple Inc.**

374. On information and belief, Apple is jointly, directly and/or indirectly infringing at least independent claim 1, and/or dependent claims 2-6 of the '497 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling and/or importing computerized communications devices (i.e. iPhone 7 series, iPhone 8

series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5) included without limitation Plaintiff's CMDC as monitoring equipment that is interconnected to a lock disabler for locking and unlocking doors; the CMDC's global positioning system (GPS) is used for locating and tracking; the CMDC's internet is used for mobile internet to fit the dimensions of a CMDC device; the CMDC's central processing unit is used for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's fingerprint biometric lock disabler is used for identification and for disabling a lock after multiple failed attempts to unlock the CMDC device; and, the CMDC's interchangeable sensors are used for chemical, biological, and radiological detection. As set forth in Golden's preliminary infringement contentions that Apple is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '497 patent and Apple is thereby liable for infringement of the '497 patent pursuant to 35 U.S.C. § 271. Apple have caused damage to Golden, which infringement and damage will continue unless and until Apple is enjoined.

375. The alleged infringement of Apple identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a

permanent injunction is warranted and such a remedy would be in the public interest.

376. On information and belief, Samsung is jointly, directly and/or indirectly infringing at least independent claim 1, and/or dependent claims 2-6 of the ‘497 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling and/or importing computerized communications devices (i.e. Samsung’s Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch Active2 series) included without limitation Plaintiff’s CMDC devices. As set forth in Golden’s preliminary infringement contentions that Samsung is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the ‘497 patent and Samsung is thereby liable for infringement of the ‘497 patent pursuant to 35 U.S.C. § 271. Samsung have caused damage to Golden, which infringement and damage will continue unless and until Samsung is enjoined.

**Exhibit M: Claim Chart for Samsung Electronics, USA.**

377. On information and belief, Samsung is jointly, directly and/or indirectly infringing at least independent claim 1, and/or dependent claims 2-6 of the ‘497 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling

and/or importing computerized communications devices (i.e. Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch Active2 series) included without limitation Plaintiff's the CMDC as monitoring equipment that is interconnected to a lock disabler for locking and unlocking doors; the CMDC's global positioning system (GPS) is used for locating and tracking; the CMDC's internet is used for mobile internet to fit the dimensions of a CMDC device; the CMDC's central processing unit is used for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's fingerprint biometric lock disabler is used for identification and for disabling a lock after multiple failed attempts to unlock the CMDC device; and, the CMDC's interchangeable sensors are used for chemical, biological, and radiological detection. As set forth in Golden's preliminary infringement contentions that Samsung is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '497 patent and Samsung is thereby liable for infringement of the '497 patent pursuant to 35 U.S.C. § 271. Samsung have caused damage to Golden, which infringement and damage will continue unless and until Samsung is enjoined.

378. The alleged infringement of Samsung identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity,

such as a permanent injunction is warranted and such a remedy would be in the public interest.

379. On information and belief, LG is jointly, directly and/or indirectly infringing at least independent claim 1, and/or dependent claims 2-6 of the '497 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling and/or importing computerized communications devices (i.e. LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7)) included without limitation Plaintiff's CMDC devices. As set forth in Golden's preliminary infringement contentions that LG is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '497 patent and LG is thereby liable for infringement of the '497 patent pursuant to 35 U.S.C. § 271. LG have caused damage to Golden, which infringement and damage will continue unless and until LG is enjoined. **Exhibit N: Claim Chart for LG Electronics, USA, Inc.**

380. On information and belief, LG is jointly, directly and/or indirectly infringing at least independent claim 1, and/or dependent claims 2-6 of the '497 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling and/or importing computerized communications devices (i.e. LG's V20, V30, V35, V50,

LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7)) included without limitation Plaintiff's CMDC as monitoring equipment that is interconnected to a lock disabler for locking and unlocking doors; the CMDC's global positioning system (GPS) is used for locating and tracking; the CMDC's internet is used for mobile internet to fit the dimensions of a CMDC device; the CMDC's central processing unit is used for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's fingerprint biometric lock disabler is used for identification and for disabling a lock after multiple failed attempts to unlock the CMDC device; and, the CMDC's interchangeable sensors are used for chemical, biological, and radiological detection. As set forth in Golden's preliminary infringement contentions that LG is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '497 patent and LG is thereby liable for infringement of the '497 patent pursuant to 35 U.S.C. § 271. LG have caused damage to Golden, which infringement and damage will continue unless and until LG is enjoined.

381. The alleged infringement of LG identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

382. On information and belief, Qualcomm is jointly, directly and/or indirectly infringing at least independent claim 1, and/or dependent claims 2-6 of the '497 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling certain processing devices as Central Processing Units (i.e. Qualcomm's Snapdragon 5 Series, 6 Series, 7 Series, & 8 Series) for system-on-a-chip application processing for at least Apple, Samsung, LG, Motorola, and Panasonic; included without limitation Plaintiff's CMDC devices. As set forth in Golden's preliminary infringement contentions that Qualcomm is making, using, offering for sale, selling certain processing devices. The CMDC device have at a minimum directly infringed the '497 patent and Qualcomm is thereby liable for infringement of the '497 patent pursuant to 35 U.S.C. § 271. Qualcomm have caused damage to Golden, which infringement and damage will continue unless and until Qualcomm is enjoined. **Exhibit O: Claim Chart for Qualcomm Inc.**

383. On information and belief, Qualcomm is jointly, directly and/or indirectly infringing at least independent claim 1, and/or dependent claims 2-6 of the '497 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling certain processing devices as Central Processing Units (i.e. Qualcomm's Snapdragon 5 Series, 6 Series, 7 Series, & 8 Series) for system-on-a-chip

Case: 22-1229 Document: 6 Page: 373 Filed: 01/04/2022

application processing for at least Apple, Samsung, LG, Motorola, and Panasonic; included without limitation Plaintiff's CMDC as monitoring equipment that is interconnected to a lock disabler for locking and unlocking doors; the CMDC's global positioning system (GPS) is used for locating and tracking; the CMDC's internet is used for mobile internet to fit the dimensions of a CMDC device; the CMDC's central processing unit is used for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's fingerprint biometric lock disabler is used for identification and for disabling a lock after multiple failed attempts to unlock the CMDC device; and, the CMDC's interchangeable sensors are used for chemical, biological, and radiological detection. As set forth in Golden's preliminary infringement contentions that Qualcomm is making, using, offering for sale, selling certain processing devices. The CMDC device have at a minimum directly infringed the '497 patent and Qualcomm is thereby liable for infringement of the '497 patent pursuant to 35 U.S.C. § 271. Qualcomm have caused damage to Golden, which infringement and damage will continue unless and until Qualcomm is enjoined.

384. The alleged infringement of Qualcomm identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity,

such as a permanent injunction is warranted and such a remedy would be in the public interest.

## PRAYER FOR RELIEF

Wherefore, Golden respectfully requests that this Court enter:

A. A judgment in favor of Golden that each defendant has infringed at least one of the '287 Patent, the '439 Patent, the 189 Patent, the '990 Patent, the '891 Patent and the '497 Patent as aforesaid;

B. A permanent injunction enjoining each defendant, its officers, directors, agents, servants, affiliates, employees, divisions, branches, subsidiaries, parents and all others acting in active concert or privity therewith from direct, indirect and/or joint infringement of the '287, '439, '189, '990, '891, and '497 patents as aforesaid pursuant to 35 U.S.C. § 283;

C. A judgment and order requiring each defendant to pay Golden its damages with pre- and post-judgment interest thereon pursuant to 35 U.S.C. § 284;

D. Any and all further relief to which the Court may deem Golden entitled.

## DEMAND FOR JURY TRIAL

Golden requests a trial by jury on all issues so triable by right pursuant to Fed. R. Civ. P. 38.

Case: 22-1229 Document: 6 Page: 375 Filed: 01/04/2022

Respectfully submitted,

S/ Larry Golden 10/14/19

Larry Golden, Petitioner, Pro Se

740 Woodruff Rd., #1102

Greenville, South Carolina 29607

(H) 864-288-5605 / (M) 864-992-7104

atpg-tech@charter.net

Guaranteed delivery date *

UNITED STATES POSTAL SERVICE®

PRIORITY MAIL EXPRESS®

EJ 829 307 766 US

CUSTOMER USE ONLY

FROM: (PLEASE PRINT) PHONE (864) 288-5605

LARRY GOLDEN
740 WOODRUFF RD. #1102
GREENVILLE, SC 29607

DELIVERY OPTIONS (Customer Use Only)

X SIGNATURE REQUIRED *Note:* The mailer must check the "Signature Required" box if the mailer: 1) Requires the addressee's signature; OR 2) Purchases additional insurance; OR 3) Purchases COD service; OR 4) Purchases Return Receipt service. If the box is not checked, the Postal Service will leave the item in the addressee's mail receptacle or other secure location without attempting to obtain the addressee's signature on delivery.

Delivery Options
- ☐ No Saturday Delivery (delivered next business day)
- ☐ Sunday/Holiday Delivery Required (additional fee, where available*)

*Refer to USPS.com® or local Post Office™ for availability.

TO: (PLEASE PRINT) PHONE ( )

U.S. COURT OF APPEALS FOR THE FEDERAL CIRCUIT
HOWARD T. MARKEY NATIONAL COURTS BLDGS.
717 MADISON PLACE, N.W.
~~GREENVILLE, SC~~
WASHINGTON, DC

ZIP + 4® (U.S. ADDRESSES ONLY)

2 0 4 3 9 - _ _ _ _

- For pickup or USPS Tracking™, visit USPS.com or call 800-222-1811.
- $100.00 insurance included.

PEEL FROM THIS CORNER

PAYMENT BY ACCOUNT (if applicable)

USPS® Corporate Acct. No. | Federal Agency Acct. No. or Postal Service™ Acct. No.

ORIGIN (POSTAL SERVICE USE ONLY)

| | | | |
|---|---|---|---|
| X 1-Day | ☐ 2-Day | ☐ Military | ☐ DPO |
| PO ZIP Code: 29606 | Scheduled Delivery Date (MM/DD/YY): 123121 | Postage: $ 49.45 | |
| | Scheduled Delivery Time: ☑ 6:00 PM | Insurance Fee: $ | COD Fee: $ |
| Date Accepted (MM/DD/YY): 123021 | | Return Receipt Fee: $ | Live Animal Transportation Fee: $ |
| Time Accepted: 254 ☐ AM ☑ PM | Sunday/Holiday Premium Fee | Total Postage & Fees | |
| Special Handling/Fragile: $ | Acceptance Employee Initials: $ MG | $ 49.45 | |
| Weight: 4 lbs. 11 ozs. ☐ Flat Rate | | | |

DELIVERY (POSTAL SERVICE USE ONLY)

| Delivery Attempt (MM/DD/YY) | Time | | Employee Signature |
|---|---|---|---|
| | | ☐ AM ☐ PM | |
| | | ☐ AM ☐ PM | |

7690-02-000-9996

LABEL 11-B, MAY 2021 PSN

UNITED STATES POSTAL